IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 9, 2024 Session

**STATE OF TENNESSEE v. ANDY L. ALLMAN**

**Appeal from the Criminal Court for Sumner County
Nos. 548-2017, 875-2017, 133-2020  Dee David Gay, Judge**

---

**No. M2022-01542-CCA-R3-CD**

---

Defendant, Andy L. Allman, appeals his convictions for twelve counts of theft and six counts of falsely holding oneself out to be a lawyer in case Nos. 2017-CR-548, 2017-CR-548, and 2017-CR-875 for which he received an effective thirty-five year sentence to be served in confinement.  Multiple counts were either nolle prosequied by the State before trial or dismissed during trial.  On appeal, Defendant argues that (1) the evidence was insufficient to support his convictions; (2) the trial court erroneously charged the jury concerning his charges for falsely holding oneself out the be a lawyer; (3) his sentence is excessive; (4) a portion of the State's closing argument resulted in plain error; (5) the trial court deprived Defendant of his right to present a defense by excluding evidence; (6) the trial court improperly admitted evidence of the Board of Professional Responsibility's findings; (7) the trial court abused its discretion by denying Defendant's motion to exclude evidence; and (8) the cumulative effect of these errors entitle him to a new trial.  Following our review of the entire record, the briefs and oral arguments of the parties, and the applicable law, we affirm the judgments of the trial court but remand for entry of judgment forms for those counts that were either nolle prosequied by the State before trial or dismissed during trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Patrick T. McNally, Nashville, Tennessee (on appeal) and Andy L. Allman, Pro Se (at trial), for the appellant, Andy L. Allman.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Ray Whitley, District Attorney General; and Thomas Boone Dean and Tara Wyllie, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

The charges in this case arose when Defendant, a licensed attorney, deposited retainer fees paid by clients into his firm's operating account and personal checking account, which frequently had negative balances, and thereafter failed to perform the agreed-upon legal work and failed to refund the retainer fees. Additionally, Defendant transferred client funds from an insurance settlement, and several estate, divorce, and child support settlements from his firm's trust account into his firm's operating account and his personal account where such funds were depleted. After Defendant was suspended from practicing law, he continued representing clients, taking fees, and providing legal advice without advising clients that his license to practice law had been suspended.

Defendant was indicted for nineteen counts of theft of property, eight counts of falsely holding oneself out as a lawyer, and one count of the unlawful practice of law. The Grand Jury later returned two additional indictments charging Defendant with ten counts of theft and three counts of falsely holding himself out as a lawyer. The trial court consolidated the three indictments for one trial. We have compiled the following chart to outline Defendant's charges, convictions, and dispositions:[1]

| Case | Indicted Count | Jury Count | Indicted Offense | Victim | Disposition Effective 35 year sentence |
|------|---------------|------------|------------------|--------|----------------------------------------|
| 2017-CR-548 | 2 | 1 | theft of $4,500 | Roger Brown | 4 years 30%; **Concurrent:** 5,11,14,16,18,19,21,22,23, & 25 (2017-CR-548) and count 11 (2017-CR-875); **Consecutive:** 2020-CR-133 and counts 3, 9, 12, & 13 (2017-CR-548) |
| | 3 | 2 | theft of > $60,000 | Michael Kevin Dycus | 12 years 30%; **Consecutive:** all counts in all cases |
| | 5 | 3 | theft of $4,500 | Bethany Stollar | 4 years; alignment the same as count 2 |

---

[1] The counts in which the State entered a nolle prosequi before trial or that were dismissed during trial are not included in the chart.

| | | | | | |
|---|---|---|---|---|---|
| | 9 | 7 | theft of > $10,000 | Rosa Ponce | 6 years 30%; **Concurrent**: counts 9 & 12 (2017-CR-548) and count 2 (2020-CR-133) **Consecutive**: counts 2, 3, 5, 11, 13, 14, 16, 18, 19, 21, 22, 23, & 25 (2017-CR-548) and count 11 (2017-CR-875) and count 1 (2020-CR-133) |
| | 11 | 9 | theft of $4,500 | Robert Lussier | 4 years; alignment the same as count 2 |
| | 12 | 10 | theft > $10,000 | Floyd Kenneth Sutton | 6 years; alignment the same as count 9 |
| | 13 | 11 | theft > $60,000 | Estate of Jane Denney | 12 years 30%; **Consecutive**: all counts in all three cases |
| | 14 | 12 | theft of $4,500 | Yvonne Prather | 4 years; alignment the same as count 2 |
| | 16 | 14 | theft of $4,500 | Nancy Whitman | 4 years; alignment the same as count 2 |
| | 18 | 16 | falsely hold out as a lawyer T.C.A. § 23-3-108 | Sharon Sullivan | 2 years 30%; **Concurrent**: counts 2, 5, 11, 14, 16, 18, 19, 21, 22, 23 & 25 (2017-CR-548) and count 11 (2017-CR-875) **Consecutive**: counts 3, 9, 12, & 13 (2017-CR-548) and 2020-CR-133 |
| | 19 | 17 | falsely hold out as a lawyer | Danielle Dianne Means | 2 years; alignment the same as count 18 |
| | 21 | 18 | theft of $4,500 | Wanda Kelley | 4 years; alignment the same as count 2 |
| | 22 | 19 | falsely hold out as a lawyer | Lisa Smelser | 2 years; alignment the same as count 18 |
| | 23 | 20 | Theft of "$2,500 or more" | Lisa Smelser | 4 years; alignment the same as count 2 |
| | 25 | 21 | falsely hold out as a lawyer | Rachell Scott | 2 years; alignment the same as count 18 |
| 2017-CR-875 | 11 | 22 | falsely hold out as a lawyer | Ginny O'Kelley | 2 years; alignment the same as count 2 (2017-CR-548) |

| | | | | (Jinny Broughton)[2] | |
|---|---|---|---|---|---|
| 2020-CR-133 | 1 | 5 | falsely hold out as a lawyer | Mario Herrera | 1 year 30%; **Consecutive:** all counts in all cases |
| | 2 | 6 | Theft of $54,269.11 | Mario Herrera | 6 years 30%; **Concurrent**: counts 9 and 12 (2017-CR-548) |

Defendant ultimately proceeded to trial on twelve counts of theft and six counts of falsely holding oneself out as a lawyer as referenced in the above chart.[3]

*Pretrial Motions*

### A. Motion to Sever

On May 17, 2019, Defendant filed a motion to sever the "flat fee" retainer counts arguing that "joinder of these [c]ounts at trial are not necessary to the proof of the remaining issues and are unduly prejudicial to . . . Defendant's defense, denying . . . Defendant a fair determination." More specifically, Defendant averred that the retainer fee counts were "contract disputes" because of their nonrefundable nature and were thus civil disputes and not criminal offenses. The State countered that the retainer fee counts were based on the same conduct or arose from the same criminal episode, requiring mandatory joinder, and the retainer fee counts showed a common scheme or plan, thus allowing permissive joinder. The State also pointed out that previous defense counsel had agreed to joinder.

A report from forensic accountant Jennifer Stalvey was entered as an exhibit at the hearing. She did not testify, but the State noted that she had linked the check number or cash amount paid by each victim to a deposit into one of Defendant's bank accounts. The report also listed whether the account into which the money was deposited had a negative balance immediately before the deposit.

Tennessee Bureau of Investigation ("TBI") Special Agent Reilly Gray testified that she was the lead investigator on Defendant's case and began her investigation in the "latter part of 2016." She said that the Board of Professional Responsibility ("BPR"), Hendersonville Police Department, and the District Attorney General's office provided her with the names of "close" to seventy to seventy-five individuals as potential victims in this

---

[2] Jinny Broughton is the same person as Ginny O'Kelley, who was listed as the victim in count eleven of case No. 2017-CR-875 of the first indictment. We will refer to her as Jinny Broughton or Ms. Broughton.

[3] While the chart shows the counts as they are charged in the indictments as well as how they were charged to the jury, we will refer to the counts as they are charged in the indictment.

case. Special Agent Gray was also aware of a Davidson County theft case involving Defendant.

Special Agent Gray interviewed the potential victims and obtained "close to a dozen" search warrants for Defendant's residence, storage facility, and three different banks in which Defendant had firm and personal accounts. She interviewed a representative from each bank and obtained files and electronic devices. Concerning the retainer fee cases, Special Agent Gray testified:

> [I]ndividuals that had gone to seek out [Defendant] for various types of cases such as work place discrimination, employment issues, and they had retained [Defendant]. Most of those individuals talked about having a personal meeting with him at which time they gave him general information. He had them sign an agreement.

> In some of the cases, we received a copy of that agreement and in some of those they had signed their copy but did not have a copy that [Defendant] had signed. And they had been giving him roughly - - in most cases it was $4,500. In some cases it varied, but that was the typical retainer amount. And then to their knowledge no work was done on the case.

> And in some cases the statute of limitations had run out so that after [Defendant's] suspension, they were not able to seek other representation for their case.

> \*       \*       \*

> For the most part, most of them had not had any communication with [Defendant] after that initial meeting.

> They had made numerous attempts to call the office [in] which case they may actually speak with a staff member or a paralegal. They would mostly get the run-around that [Defendant] was in a meeting, he was on the phone, he was out of the office, and never [were] able to make contact with him.

> In some cases[,] they may have made contact, but he also told them I'm working on it, something will be done, and they never saw any actual hard evidence of that. There were no papers filed, nothing sent to them, nothing other than word of mouth that something was being accomplished.

As to other cases, Special Agent Gray testified that Kenneth Sutton retained Defendant to represent him in a child support case and gave "over $12,000 to [Defendant] for that case." She noted that on the same day that Defendant met with Mr. Sutton, $12,000 was deposited

into Defendant's personal account. Special Agent Gray testified that "nothing was completed" on Mr. Sutton's case, and "[w]e couldn't find anything through the court system that anything had been done on Mr. Sutton's case." She said that the money was never deposited into Defendant's firm's trust account. Special Agent Gray agreed that the money was supposed to "be held as a result of a court order ordering [Mr. Sutton] to pay that into [Defendant's] trust account as potential child [support] payment[.]"

Special Agent Gray testified that Kevin Dycus contacted Defendant about representing him and his minor son, G.D.,[4] in an estate case where Mr. Dycus's ex-wife, G.D.'s mother, had passed away. G.D. was the beneficiary of her life insurance policy, and the funds were to be held in a trust account for G.D. to access after he became an adult. Special Agent Gray testified:

> Mr. Dycus had a check. This was over a hundred thousand dollars that was signed over to [Defendant]. That check was deposited into [Defendant's] account. It was never actually given out or appropriated anywhere else in a separate trust account.
>
> Upon search of various records, either through Mr. Dycus [sic] and then also verified through other account records, at one point [Defendant] had actually texted a picture of an account to Mr. Dycus alleging that yes, the funds are here, these are the funds, basically to show this is where it is.
>
> Mr. Dycus had asked several times for an account number, for information to basically verify where this money was being held, and [Defendant] had texted him a picture, which we later found out through alternative records was actually a picture of another trust account for another victim in this case, and the funds for the Ingr[a]m[5] estate had already been spent in various ways by [Defendant].

Special Agent Gray confirmed that Mr. Dycus never received any distribution of funds from the estate for G.D.

As to the Jane Denney estate for which Defendant had been appointed executor, Special Agent Gray testified that the proceeds of the estate, which totaled "upwards of over a hundred thousand dollars[,]" were deposited by Defendant into a separate firm's trust account at Pinnacle Bank. She noted that "this was the only account that we were aware of that he placed in a separate trust[.]" Special Agent Gray further testified: "[t]hat money

---

[4] Because it is the policy of this court to protect the identity of minor victims, we will identify them by their initials.

[5] This was the estate of G.D.'s late mother.

was deposited, and within, I would say, approximately a 30-day period or a month's time, that account was completely drained to the pennies."

Concerning Defendant's other charges, Special Agent Gray testified that Rosa Ponce hired Defendant to represent her "in a claim against her previous employer to which that case had actually been settled" and Ms. Ponce was to receive a settlement of approximately $14,000. Defendant did not advise Ms. Ponce that the funds had been paid nor did he distribute the settlement funds to her. Special Agent Gray testified, "It wasn't until her taxes were filed, then, that following year, that then her tax statement came in the mail that she had actually received the settlement, but she never received any payment from [Defendant]."

Special Agent Gray also testified that she investigated several cases in which Defendant was practicing law while his license was suspended. She said that various individuals came forward who sought Defendant's representation "after what we knew to be the permanent suspension date, and then, obviously, I had obtained the recording from Cheryl Garrett where she had stated that she had asked [Defendant] outright if he was her lawyer and he had said yes." Special Agent Gray noted that on the day a search warrant was served at Defendant's house, she called him and "he had asked me if it could wait because he was meeting with a client at that time[.]"

The trial court denied Defendant's severance motion, concluding:

If you look at the mandatory joinder rule that the General pointed out, you've got that. If you look at permissive joinder, you look at whether they are part of a common scheme or plan and whether they are of the same or similar character. Same or similar character is a no-brainer. Yes. Offenses constitute parts of a common scheme or plan, we look and see what common scheme or plan evidence, and the one that would apply here is part of a larger continuing plan or conspiracy.

What I've heard today, just briefly - - I mean, we've got similar situations: Denn[e]ys, hundred thousand dollars; Dycus, hundred thousand dollars; Sutton, $12,000; Ponce, $14,000. These are non-retainers and these [people] don't know where the money is.

You take the retainers - - and I do not believe that the *Reguli*[6] case is authoritative here. What I think we need to look at is whether the [D]efendant was given money and whether he took that money or used it to do what he was supposed to do, and that's what we'll look in each of those other cases and we'll have to go through each one of them. In order to do

---

[6] *Bd. of Pro. Resp. v. Reguli*, 489 S.W.3d 408, 421-22 (Tenn. 2015).

that - - we'll have to do that - - and it'll take a week to go through that just pretrial.

So as of this stage, I will not grant a severance. All these motions [sic] will be tried together, and that's really what the parties agreed to do a long time ago.

### B. Motion to Dismiss Retainer Fee Cases

On May 17, 2019, Defendant filed a motion to dismiss the "flat fee" retainer counts in case Nos. 2017-CR-548 and 2017-CR-875, or in the alternative for a bill of particulars, arguing that the indictments were not particular enough for him to establish a defense. Defendant asserted, relying on *Reguli*, that the fees were "advanced retainer fees" which were earned upon receipt. He further asserted that "[t]here is no evidence of a security retainer agreement which makes the paid fees held by the Defendant identified in the disclosures and documents as being property of the client payees. There is therefore no probable cause for the crimes of embezzlement, fraudulent conversion and similar offenses." Defendant also attached the "Attorney-Client Litigation Agreement" for multiple listed victims and pages of forensic accountant Jennifer Stalvey's report showing deposits, expenses, and total financial loss for multiple listed victims.

At the hearing, Defendant reiterated his argument that the fees paid were nonrefundable fees, which under *Reguli*, were earned upon receipt. The State argued that under *Reguli*, retainer fees are refundable unless stated otherwise in an agreement signed by the client, and Defendant's Attorney-Client Litigation agreements did not include this language. The trial court denied the motion to dismiss.[7]

### C. Motion to Dismiss on Double Jeopardy Grounds

On October 15, 2021, the trial court denied Defendant's motion to dismiss four counts of falsely holding oneself out as a lawyer on double jeopardy grounds because the evidence presented was not "amenable to a *Blockburger*[8] [a]nalysis because this [c]ourt cannot determine what charges or what allegations . . . [D]efendant was convicted of in the Board of Professional Responsibility to compare with the charges or the indictments[.]" The trial court concluded that the convicting document that required review under *Blockburger* was the plea agreement, which was not before the court at that hearing.

---

[7] The hearing transcript mentioned a hearing from June/July 2019, but the record does not include a transcript of that hearing.

[8] When analyzing double jeopardy issues, the appropriate two-part test is set out in *Blockburger v. United States*, 284 U.S. 299 (1932).

Thereafter, on October 20, 2021, Defendant filed a motion to reconsider the trial court's denial of his motion to dismiss. Defendant attached to his motion a copy of his BPR plea agreement and argued that counts twenty (falsely holding himself out as a lawyer to Wanda Kelley), twenty-one (theft from Ms. Kelley), twenty-two (falsely holding himself out as a lawyer to Lisa Smelser), and twenty-three (theft from Ms. Smelser) in case No. 2017-CR-548 should be dismissed as violating double jeopardy protections. He asserted that these counts were identical to the criminal contempt charges to which Defendant pled guilty to in front of the BPR.

According to the plea agreement, Defendant pled nolo contendere in 2018 to two counts of criminal contempt before the BPR. The plea agreement stated that those criminal contempt convictions were predicated on Defendant's "undertaking the representation of Lisa Smelser in a wrongful termination action and accepting a $4,500 cashier's check on November 22, 2016," and "undertaking the representation of Wanda Kelley in a wrongful termination action, executing an Attorney-Client Litigation Agreement and accepting $4,500 in cash on November 7, 2016."

The trial court considered Defendant's motion immediately before trial on November 1, 2021, noting that the appropriate analysis was in accordance with the two-step *Blockburger* approach. The court stated that the "[f]irst step of the *Blockburger* test is the threshold question of whether the convictions arise from the same act or transaction[,]" and the second is whether "each offense includes an element that the other does not."

The trial court concluded that the elements of theft, as indicted in counts twenty-one and twenty-three, were "completely different" from the elements of criminal contempt in the plea agreement. Therefore, counts twenty-one and twenty-three did not violate double jeopardy. Regarding falsely holding himself out as a lawyer to Ms. Smelser in count twenty-two, the trial court found that the dates in the indictment were different from the dates in the plea agreement. Thus, count twenty-two did not violate double jeopardy. The trial court found that count twenty, holding himself out as a lawyer to Ms. Kelley, was "in violation of the double jeopardy provisions of our constitution. You've got the same date. You've got the same conduct. And my ruling is [c]ount [twenty] will be dismissed.

**D. Motion to Allow Evidence of Delayed Paychecks by Defendant's Employees**

Prior to trial, the State filed a motion to allow evidence that Defendant's employees had delayed paychecks. On September 17, 2021, the trial court entered an order stating in relevant part: "[f]or reasons stated on the record, the State's motion is taken under advisement and there will need to [be] a hearing outside the presence of the jury before these matters are addressed." Although it appears the trial court heard argument on this motion on September 8, 2021, neither the motion nor the transcript of the hearing on this motion are included in the record on appeal.

During trial on November 4, 2021, the trial court held a jury-out hearing to consider whether to allow testimony from Defendant's prior employees regarding "bounced and delayed paychecks." The State argued that the employees should be "allowed to say that there were issues with their checks clearing and for the bank people to say that there were lots of issues with that." Defendant responded that there were many witnesses and that "the bank statements speak for themselves." The trial court held:

> [Defendant], we've kind of covered that and I put that off until we got closer to trial so I could know a little bit about what's happened. Now, evidence has been pretty substantial here about negative balances and kind of walking the line there on the accounts. One of the arguments or a couple of the arguments would be motive and intent, and that would go to show not a propensity for violating the law, but as an element of proof for the underlying offenses.
>
> *     *     *
>
> . . . I've got to follow the Rules of Evidence, and my ruling stands. The State can call any witnesses they want to, and when it comes to [Defendant], if you want to call witnesses and the testimony is admissible under the Rule of Law, we'll do it, so I will allow the testimony for those reasons.

### E. Motion to Exclude Testimony of Bank Employees

On October 22, 2021, Defendant filed a motion in limine to exclude the testimony of Volunteer Bank employees Jimmy Overton and Alisha Matthews and testimony from the custodian of records for Pinnacle Bank. He argued that the parties had stipulated to the admission of his bank records, and the State was calling numerous witnesses to testify, thereby "making their testimony irrelevant, confusing, and a waste of time." Before trial on November 1, 2021, Defendant reiterated his position that the testimony would be irrelevant and a "waste of time" because of his stipulation to the admission of the bank records. The State countered that a stipulation did not limit the presentation of its case, and the testimony would not be redundant because the witnesses would also testify about personal interactions with Defendant. Defendant responded that they "might need to voir dire each of [the witnesses]." The trial court refused this request and denied Defendant's motion.

### G. Motion to Exclude Health Conditions of the Victims' Family Members

Defendant moved to exclude evidence at trial concerning the health conditions of Cathy Brown's[9] nephew, who was paralyzed and ultimately passed away, and Mario

---

[9] Ms. Brown was a victim in Defendant's Davidson County case.

- 10 -

Herrera's mother. Mr. Herrera indicated in text messages exchanged with Defendant that he needed the money from the sale of his home for his mother who was ill. The State argued that the information was relevant, probative, and not overly prejudicial because it was one of the reasons that Mr. Herrera needed his money, which was supposed to be held in trust by Defendant. Ms. Brown had conversations with Defendant that she needed money from the sale of a home, also supposed to be held in trust by Defendant, for her nephew and that the money was needed quickly.

Defendant argued that the evidence had no relevance because it did not prove any elements of the theft charge. He further asserted that the evidence "just invokes prejudice, sympathy, things that don't really need to be in the jury's analysis as to whether or not there was a theft." The trial court disagreed and concluded:

> You know, one of the things about a jury trial, it involves humanity. It involves, you know, what happened. It involves facts. We just can't take a count at a time, this happened, he didn't do it; this happened, he said he was an attorney and he wasn't.

> You know, we've got to deal with humanity, and this goes to intent. If somebody is telling you that they need this money to take care of a nephew, that goes - - you know, it's prejudicial. And I'm sorry that it's prejudicial, but most proof in a criminal trial is prejudicial.

> I find that the probative value outweighs the prejudicial effect on both of these, and these motions will be denied.

*Trial*

Doug Bergeron and Russell Willis, attorneys with the BPR, testified that the Rules of Professional Responsibility govern the ethical obligations of attorneys, including trust accounts. Mr. Bergeron explained that an attorney often holds another person's money as a "fiduciary," and there are a number of rules that are applicable to that practice. He testified that: "[a]s a fiduciary, you have certain obligations. You have to handle that property or money in the best interest of the person whose property or money it is," "at all times." He further explained that the money is usually held in one of two types of trust accounts: a regular trust account and an IOLTA account, which is an Interest On Lawyers' Trust Accounts.

Mr. Bergeron testified that an IOLTA is "for short-term placement of funds, whereas a trust account separately would be for very large amounts of money sitting for very long periods of time." He explained that attorney fees that have not yet been earned and prepaid discretionary costs, such as in a contingency case, are the types of funds that go into a trust account until the work is performed and the expenses are incurred. Mr.

Bergeron testified that "any other funds received from clients or third parties to be held on behalf of the client or third party," such as a settlement from a car accident case, "would be something that would have to go in a trust account until it was disbursed." Mr. Bergeron testified that a client's funds cannot be co-mingled with an attorney's funds in a trust account. He said: "[i]f you earn funds, you have to remove them from a trust account."

Mr. Bergeron also identified the types of fees that an attorney may charge, which include contingency fees, hourly fees, refundable fees, and nonrefundable fees. He explained that any refundable fee is required to go into a trust account and not the attorney's personal account or firm's account until the money is earned. Mr. Bergeron testified that it would be improper for an attorney to deposit a refundable fee directly into an operating account instead of an IOLTA account. Attorneys are required to provide thorough billing statements, evidence that work on a case was completed, before moving portions of a refundable fee into an operating account. Mr. Bergeron explained that for a retainer fee to be nonrefundable, "[i]t has to be plainly stated in writing." On cross-examination, Mr. Bergeron agreed that from the BPR's perspective, a violation of a Rule of Professional Conduct is not a crime.

Mr. Willis testified that he was the lawyer assigned to prosecute the disciplinary complaints against Defendant. He said that Defendant's license to practice law was temporarily suspended on September 9, 2016, effective immediately. Pursuant to that suspension, Defendant was not to accept any new clients, and within thirty days, he was required to have stopped practicing law and to have withdrawn from all his cases. Defendant was also required to file a motion with the trial court to withdraw from representation or to file a notice of substitute counsel in his cases. It was also mandatory for Defendant to inform his clients and opposing counsel of his suspension.

For existing clients, Defendant was required to send a certified letter, return receipt requested, informing them that he had been temporarily suspended from the practice of law and could no longer represent them. He was also required to return their case files and any unearned fees. Mr. Willis testified that Defendant was required to be "upfront" with his clients by telling them that he was suspended and that he could not provide any legal advice except to advise them to hire a new attorney. He said that Defendant was prohibited from presenting any "indicia of a lawyer," meaning that Defendant could not "look like," "sound like," or "act like a lawyer."

In the BPR proceedings regarding Wanda Kelley and Lisa Smelser, Defendant did not contest the allegation that he continued practicing law without a license. He admitted before the BPR to violating certain rules and that he owed $108,077.08 to Kevin Dycus, $24,377.52 to Rosa Ponce, and $4,500 each to Bethany Stollar, Yvonne Prather, Robert Brown, and Nancy Whitman.

Erin Roach, a loan officer with Volunteer State Bank, testified that Defendant had three firm checking accounts with the bank. She explained that the signature cards for the accounts indicated that Defendant was the owner and "the presumption is that he's the one who actually controls the funds." There were also other individuals who had "signatory access." Ms. Roach explained that "NSF" in bank records means "non-sufficient funds[,]" and "NSF/uncollected" means that the "account was charged back and the bank was unable to collect those funds." She also said that "OD" is an overdraft, and a "returned item fee" means that a "check or transaction tried to clear the account and we chose not to pay it so we returned the item and did not pay it." As for a "charge back[,]" Ms. Roach testified that "means a check was deposited into the account and the funds were not collected at the other bank and so we charged those funds back to the account to recoup them."

Ms. Roach testified that Defendant's accounts were "regularly negative" which meant that he went below his balance "once a week, if not more." Ms. Roach noted that because it was usually difficult to contact Defendant, branch manager Becky Rogers regularly attempted to contact Defendant and "Gloria" by email to collect funds to make the accounts "positive." She said that Defendant eventually brought money in to make the accounts positive, sometimes after numerous attempts to contact him. Ms. Roach testified that in 2015 and 2016, Defendant's loan payments were constantly late. She said, "After a while, it got to the point where the guarantor - - which just means an additional signer on the loan - - had to supplement some of the payments, and then [Defendant] just stopped paying altogether and the guarantor had to take over completely."

Ms. Roach testified that Volunteer State Bank ended its financial relationship with Defendant after his firm "operating" account had been negative for forty-five days. The bank eventually filed a lawsuit which resulted in a judgment that Defendant later paid. Ms. Roach testified that Defendant's firm's accounts had a total of $31,940 in NSF, NSF/uncollected charges, and returned item fees in a three-year period and that his personal accounts incurred an additional $10,000 in fees. She also noted that Defendant's employees regularly had issues with cashing their paychecks due to insufficient funds.

Jimmy Overton, Vice President of Loss Mitigation at Volunteer State Bank, testified that when Defendant's accounts were referred to him because they were overdrawn, he would attempt to reach Defendant by phone. He said, "[a] lot of times I couldn't get him, but I tried to reach him on the phone as many times as I could. I've texted him several times, called him on the phone to try to communicate with him." Mr. Overton testified that after the bank ended its financial relationship with Defendant, on behalf of the bank, Mr. Overton obtained a judgment for $8,372.79 for an account that was overdrawn, which Defendant paid.

Becky Rogers was previously employed by Volunteer State Bank as the branch manager of the Hendersonville location. When any of Defendant's accounts were overdrawn and needed a deposit, which was a common issue with the accounts, she emailed

- 13 -

Defendant about bringing in funds. On cross-examination, Ms. Rogers testified that after she contacted Defendant, he usually brought a deposit to cover the negative balance in his accounts. Sometimes it would take a few days, and one email she sent to Defendant indicated that one of his accounts had been overdrawn for twenty-six days. She agreed that due to regulatory changes in banking, Defendant's relationship with the bank changed because the bank was no longer allowed to "float" small business like it had in the past.

Mary Jane Isham, a Senior Vice President at Pinnacle Bank, testified that Defendant had a personal and firm checking account and a line of credit at Pinnacle Bank that were opened in "probably 2014 to 2016." She said that his firm's account was frequently overdrawn, "[a]lmost every day or every Friday whenever payday was[,]" and "his employees were trying to get their payroll checks paid every week and it was overdrawn." Ms. Isham further testified: "we tried to pay the checks that we could pay, but not all the employees would get paid at some periods. Some might and all might not. It just depended on what monies or funds were in the bank." She said that Defendant made the banking decisions on his accounts, and she did not interact with anyone else.

Ms. Isham testified that Defendant also opened a trust account for an estate for which he had been appointed as executor of the estate. She said that as executor, Defendant had the authority to transfer money out of the account. She noted that there were numerous transfers out of the account into two of Defendant's Pinnacle checking accounts. Ms. Isham testified that Defendant's relationship with the bank ended when they asked him to leave because there was "turmoil" every pay period. "It involved our entire office as to who we could pay and who we couldn't pay[,] and it was very time-consuming." She said that the total amount of fees charged to Defendant's accounts by Pinnacle from December 2015 through March 2016 was $11,459, which was highly unusual. Ms. Isham testified that Defendant's unsecured line of credit at the bank was $100,000, and it was ultimately "charged off" and never paid back.

On cross-examination, Ms. Isham agreed that Defendant was contacted when there was a problem with payroll checks, and it was corrected "[m]ost of the time." She reiterated that this problem occurred on a weekly basis.

Patricia Elliott was previously employed as the Financial Center Manager at Simmons Bank. She said that Defendant first opened accounts at the bank in March of 2016, which included a firm's operating account, an IOLTA account, and three personal accounts. She noted that the Tennessee Bar Foundation was also listed on the IOLTA account and thus would have received notifications of any overdrafts. Ms. Elliott testified that on December 8, 2016, the bank sent Defendant a letter notifying him that his accounts would be closed on December 16, 2016, due to the "unsatisfactory handling of his accounts." She said that checks were frequently returned on the firm's operating account because it was overdrawn, and Defendant's employees began having difficulty getting their paychecks cashed each week.

On cross-examination, Ms. Elliott agreed that the bank began placing a temporary hold on a portion of some of the larger checks Defendant deposited for them to clear the bank. On redirect examination, Ms. Elliott agreed that in November 2016, Defendant's IOLTA account was $4.09 overdrawn and a check written by Defendant for $230,064.09 on the account was returned for insufficient funds. She noted that Defendant had previously deposited a check in the account for that same amount on August 15, 2016.

### Michael Kevin Dycus – Theft of Property Greater Than $60,000

Teena Vincent testified that she had been a licensed attorney for twenty-two years and primarily practiced probate law. She testified that when she is probating an estate, she "open[s] a bank account in the estate of the decedent, and then I operate out of that, specifically for uses of that estate." The estate has a separate "estate trust account, because only monies from that estate are deposited, only checks written from that estate account applies to that estate. You can't co[-]mingle the - - the estates, they have to be separate." She said that an attorney's own money cannot be co-mingled with that of the estate.

Ms. Vincent testified that she was appointed as the "administrator ad litem" for the Estate of Brenda Ingram in 2008. Defendant filed a notice of appearance in 2013 indicating that he represented Kevin Dycus, the father and guardian of G.D., Ms. Ingram's minor son and an heir of her estate. In closing Ms. Ingram's estate, Ms. Vincent prepared the "final receipt and release" for the funds in the estate and issued a check for $108,077.08, payable to Michael Kevin Dycus for G.D. That check was released to Defendant on March 14, 2014.

Michael Kevin Dycus testified that after discovering Ms. Ingram had a $180,000 life insurance policy at the time of her death, with her estate as the beneficiary, he initially paid Defendant, a high school friend, $2,500 to represent him and G.D. with regard to the estate. Mr. Dycus and Ms. Ingram were divorced and shared joint custody of G.D. at the time of her death, and she had been married to her current husband for one and one-half years. Mr. Dycus testified that Ms. Vincent had shown him "some paper with bills, including funeral bills and various bills that the estate owed." At that point, it was estimated that G.D. would receive seventy-five percent of Ms. Ingram's estate. Mr. Dycus testified that Defendant advised him "that that figure should be closer to 90 percent."

Mr. Dycus testified that the $2,500 fee that he initially paid to Defendant was "to run an ad in the paper to notify [Ms. Ingram's] husband that we were pursuing additional funds [from the life insurance policy]. [Defendant] said that was part of the law, and he said the rest of it would - - you know, would be his fee." They never discussed Defendant receiving a portion of G.D.'s inheritance. Mr. Dycus testified that G.D. was appointed a guardian, and pursuant to the court order establishing the guardianship for the purposes of receiving the funds on behalf of G.D., no money was to be spent nor any change in

investments made from G.D.'s funds until a property management plan had been approved; any disbursements had to be approved by the court.

Mr. Dycus testified that after Ms. Ingram's estate was settled, the insurance company wrote a check in the amount of $108,077.08 payable to "Michael Kevin Dycus for [G.D.]." Mr. Dycus endorsed the check and gave it to Defendant. Mr. Dycus explained:

> So I wanted it - - a judge to put it in kind of a semi-trust, until [G.D.] was either 21 or 25, to be used for college. Or at a later date, like, 21 if you're out of college, 25 if you're not, and you can't touch the fund without my consent, just - - that's it.
>
> I wanted the funds to go [to] an investment group. I needed a judge to court order that, and so I signed the check over to [Defendant].

Mr. Dycus testified that Defendant was aware of the plans for the money, and he and Defendant never discussed Defendant charging a large fee or taking one third of the funds. He said Defendant "explained that he simply needed an investment plan from Edward Jones, and we'd take that to the judge, and the judge would sign it." Based on his conversations with Defendant, Mr. Dycus was hoping that the process would take a few months to complete.

Mr. Dycus testified that he communicated with Defendant on a regular basis over the two years following the receipt of the insurance check, but Defendant did not establish or complete an investment plan for G.D. to file with the court. When asked what Defendant told him about moving the funds into the court supervised account, Mr. Dycus testified:

> Generally that the case had been postponed. "I got called to a hearing out of town, going to have to postpone it again." I heard several times that. You know, "Well, now the money has changed a little bit since it accrues a little bit [of] money in my" - - in his attorney trust account. "I need Edward Jones to send me a new plan. It's got to be down to the penny."

Text messages exchanged between Mr. Dycus and Defendant were admitted at trial. Various court dates were discussed in the messages, but no hearing was ever held. At one point, Mr. Dycus received an approved management plan directly from his financial advisor at Edward Jones, told Defendant that he needed a court date to release the funds, and requested that he and Defendant meet to discuss the plan. However, Defendant repeatedly postponed the meeting and never set a date for a hearing. Mr. Dycus's financial advisor at Edward Jones indicated that Defendant never gave her the information she needed to submit a plan to the judge.

Defendant denied receiving a plan from Mr. Dycus's advisor at Edward Jones. He also claimed to have left messages for the advisor. In September 2015, Defendant told Mr. Dycus: "I got it all done. You don't have to come in. It's taken care of." Mr. Dycus then assumed that "we got the court order from the judge signed and that [Defendant] could now release the money to Edward Jones." However, Edward Jones never received any documentation from the court or funds from Defendant. Defendant later sent Mr. Dycus unsigned documents that were supposedly filed with the court. In January 2016, Defendant assured Mr. Dycus that G.D.'s money was still safe in Defendant's firm's trust account, and he provided a printout showing the amount of money in the account. Defendant never mentioned taking additional fees out of the funds. In August 2016, Mr. Dycus learned that Defendant had not yet filed a motion to release G.D.'s money.

Mr. Dycus eventually enrolled G.D. in a rehabilitation program and needed some of G.D.'s funds to pay for it. Defendant sent Mr. Dycus a screenshot of his firm's trust account showing a balance of $230,000 and noted that not all of the money in the account belonged to G.D. He indicated that he would get the money to Mr. Dycus the following day. When Mr. Dycus found out Defendant wrote a check directly to the rehabilitation center, Mr. Dycus informed Defendant that he had already paid the center and needed the check to be payable to him for reimbursement. However, Defendant sent the rehabilitation center the check and after it was deposited, the rehabilitation center contacted Mr. Dycus to let him know Defendant's check did not clear the bank.

In December 2016, Mr. Dycus was informed by his Edward Jones representative that Defendant's law license had been suspended and that there were lawsuits pending against Defendant. Mr. Dycus and Defendant exchanged numerous text messages in which Mr. Dycus asked Defendant to contact someone at Edward Jones about disbursing G.D.'s funds. Mr. Dycus was supposed to receive a check for $97,000, the remaining balance of G.D.'s trust fund, less the amount subtracted for the cost of the rehabilitation center. Mr. Dycus became concerned about receiving this amount after the check for the rehabilitation center did not clear; however, Defendant assured him that the check was good. Mr. Dycus stopped hearing from Defendant after January 2017, and he never received any of the funds owed to G.D.

### Estate of Jane Denney – Theft of Property Greater Than $60,000

Defendant was appointed as executor of Jane Denney's estate. Ms. Denney passed away in February 2015, and her beneficiaries included Elizabeth Brown, Sheila Andrews, A.B. (a minor), and Defendant's stepfather Paul Moore. The estate consisted of Ms. Denney's home, jewelry, coins, guns, and a van, and Defendant was responsible for the sale of the home and distribution of the personal property. In his fiduciary capacity as executor of the estate, Defendant received a check for $119,941.39 from the sale of Ms. Denney's home, which he deposited into a separate trust account on October 8, 2015. At some point, Defendant provided a final accounting and distribution document to the

beneficiaries concerning the distribution of Ms. Denney's estate, which they signed, indicating the amount of personal property each beneficiary had received and the amount of money to be distributed to each of them from the estate. Thereafter, Defendant made a series of transactions from the trust account distributing funds into his firm's operating account and other trust accounts, so that by December 18, 2015, the balance of the account was $2.82. Ms. Andrews, A.B.'s mother Darlene Batey, and Mr. Moore all testified that they did not authorize any of the transactions, and none of the funds from Ms. Denney's estate were ever distributed to them. Defendant indicated to some of the beneficiaries that he was waiting for the "trustee" to release the funds from the estate account.

Mark Smith, the Clerk and Master for the Sumner County Chancery Court, testified that Ms. Denney had a will at the time of her death, and Defendant was named as the executor. A petition for probate was filed on July 7, 2015, and a hearing took place on August 25, 2015. An order was entered and signed by the judge on August 26, 2015, which contained the following notation: "net funds derived from the sale of the real property are to be held in the estate account and not disbursed without an order from the Court[.]" Mr. Smith also noted that Defendant signed an affidavit and swore that he would "honestly and faithfully execute the duties of the executor" of Ms. Denney's estate "according to the laws of Tennessee to the best of my knowledge and ability[.]" Mr. Smith testified that neither Defendant nor anyone else requested permission or was granted authority to make any distribution of the funds from the sale of Ms. Denney's property. He noted that Ms. Denney's will excused a final accounting by the executor.

### Kenneth Floyd Sutton – Theft of Property Greater Than $10,000 but Less Than $60,000

Kenneth Floyd Sutton hired Defendant to represent him in a child support case, and paid Defendant a retainer fee of $1,500 in cash on November 26, 2013. Mr. Sutton testified that the case was not very complicated and involved child support arrearages for a child who Mr. Sutton was unaware of until the child was nearly eighteen years old. The child's mother was seeking a large sum of money for the arrearages. Mr. Sutton was initially happy with Defendant's work. Mr. Sutton later wrote Defendant a check in the amount of $941 to reimburse Defendant for a fee Defendant had paid on Mr. Sutton's behalf. On June 15, 2015, Mr. Sutton wrote a check payable for $4,000 which he understood would go into an "escrow account" and remain there until it was determined if Mr. Sutton was required to pay child support arrearages, in which event the funds would be applied to the child support awarded. The money would be returned to Mr. Sutton if he was not required to pay child support. Mr. Sutton wrote "CSA" on the memo line of the check, which meant "[c]hild support arrearages." Mr. Sutton did not give the money to Defendant for personal use.

Approximately one year later, Defendant told Mr. Sutton that an additional $12,587 was needed in his account to pay child support arrearages. Mr. Sutton believed the amount

to be accurate because he had received a letter from the judge specifying that amount. Defendant told Mr. Sutton to bring the amount in cash or a money order because a personal check would not clear the bank in time. Mr. Sutton gave Defendant $12,587 in cash and received a receipt stating that the money was for child support arrearages. Defendant never told Mr. Sutton that amount was for his fee. On that same date, Defendant deposited $12,000 into his personal bank account he shared with his wife, and that amount was then withdrawn from his personal account to make a credit card payment. Mr. Sutton testified that Defendant did not have his consent to use his money for Defendant's personal expenses.

Mr. Sutton testified that his child support case was eventually appealed and remanded to the trial court. Another attorney from Defendant's firm represented Mr. Sutton on appeal. On remand, the trial court found that Mr. Sutton owed approximately $12,000 in child support arrearages, the amount Mr. Sutton had previously given Defendant to pay the arrearages. Mr. Sutton then hired a second attorney to prove that he had already paid that amount. Mr. Sutton testified that he gave Defendant more than $16,000 which was never returned to him. To Mr. Sutton's knowledge, Defendant only made one payment of $941 on Mr. Sutton's behalf. Mr. Sutton never received a bill from Defendant for his services.

### Rosa Ponce - Theft of Property Greater Than $10,000 but Less Than $60,000

Rosa Ponce hired Defendant in 2012 to represent her in an employment dispute with the Clarksville Montogomery County Community Action Agency, Head Start Department ("Head Start") and paid him $4,500 for his services. Ms. Ponce was eventually fired from her job and filed for unemployment, which was initially denied but later approved after Defendant helped her with an appeal. She had started a complaint on her own with the Equal Employment Opportunity Commission ("EEOC"), and after Ms. Ponce gave Defendant her employment-related paperwork, Defendant made "some adjustments" to her claim to make it stronger. Ms. Ponce later received a "right to sue" letter from the EEOC. She worked with an attorney named Jedidiah in Defendant's office who "made it seem like we didn't have a strong case and that we should think about settling." She told him to "go ahead and figure out a settlement." They ultimately agreed to a settlement, and she reviewed a settlement agreement at Defendant's office.

Ms. Ponce did not know the settlement had been completed until she began publicly speaking out about her case and asking Montgomery County officials for her money. She then received a call from someone at Defendant's office instructing her that the settlement agreement prohibited her from speaking publicly about the lawsuit. Ms. Ponce spoke with Defendant about that issue, but he did not mention that he had received a settlement check. On March 3, 2015, Head Start wrote a check payable to Ms. Ponce in the amount of $14,694.14, which Defendant received and signed Ms. Ponce's name as her attorney. He then deposited the settlement check into his firm's operating account at Pinnacle Bank

without informing Ms. Ponce he had received the check. He also received a check payable to his firm in the amount of $15,622.48. In January or February of 2016, Ms. Ponce received a W-2 statement from Head Start for 2015 showing she received wages, tips or other compensation in the amount of $24,377.52. She cried upon receipt because that "confirmed that there was a settlement." Her "only assumption was to think that [Defendant] had [the money] and just didn't give it to [her]." Ms. Ponce directed all future communications about the settlement to the BPR. Ms. Ponce lived at the same address from the time she retained Defendant to represent her until Defendant's trial, and she never had any difficulty receiving other mail from the EEOC concerning her case. She testified that she did not give Defendant permission to deposit the money into his account, and she never received any of her money. Defendant admitted that he owed Ms. Ponce money.

On cross-examination, Ms. Ponce agreed the settlement that she signed with Head Start contained a "non-disparagement clause" and that she violated that clause by emailing numerous individuals, including county commissioners, about her case. Ms. Ponce asserted that she was not aware of the clause, even though she had signed the agreement, because she had never received a copy of the settlement signed by Head Start and was "under the assumption that things were still being worked out and that I was free to speak my mind and say whatever I wanted[.]" She said that she had asked Defendant when she signed the agreement in February of 2015 if she could speak out against Head Start, and he said that she could. Ms. Ponce testified: "It was my mistake to not read the agreement because I trusted [Defendant] as my lawyer." Thereafter, Head Start requested that the settlement money be returned to them because Ms. Ponce had violated the settlement agreement by speaking out.

On redirect examination, Ms. Ponce testified that she contacted Defendant after receiving the W-2. Defendant never mentioned the settlement amount and replied:

> I have reached out to their attorney about withdrawing their complaint or W-2, either of which should fix the tax issue. I have had multiple phone conversations with them about giving up their intent on suing you for breach of the settlement agreement. I anticipate having an answer from them no later than next Wednesday as to whether they are going to continue pursuing this. We will get this wrapped up before your tax deadline. As for the W-2, I had anticipated you receiving a 1099 instead of a W-2, but I'll get clarification on that when I talk to them.

**Roger Brown - Theft of Property Greater Than $2,500 but Less than $10,000**

Roger Brown worked as a dispatcher for Robert Orr Sysco. After his employment was terminated, he noticed that the company was firing employees once they turned sixty years old. He contacted Defendant on December 13, 2013, which was a Friday afternoon, about a potential age discrimination lawsuit because he had seen Defendant on television

commercials. Defendant told Mr. Brown that his claim was valid and to bring payment to Defendant's office that night so that Defendant could file the lawsuit the following morning, which was Saturday. Mr. Brown informed Defendant that it would take some time to get to Defendant's office in Hendersonville because it was late, and traffic was bad, but Defendant said that he would wait. Mr. Brown testified that he and Defendant had a brief meeting, and he provided Defendant with documentation from his termination. He and Defendant then entered into an Attorney-Client Litigation Agreement pursuant to which Mr. Brown paid Defendant $4,500 by check for his legal services. The agreement did not state that the fee was nonrefundable. Mr. Brown asked Defendant if the money was for a retainer fee, and Defendant directed him to write "admin remedy fee" on the memo line. Defendant then deposited the check into his Volunteer State Bank firm's operating account on December 16, 2013, which at that time had a negative balance. Defendant did not tell Mr. Brown that he was going to immediately spend the money, nor did he say that he needed to deposit it directly into his firm's operating account to apply to his negative balance. Mr. Brown testified that he did not give Defendant permission to take his money and spend it before it was earned.

Mr. Brown testified that he did not talk with Defendant very often after their initial meeting. At that meeting, Defendant told Mr. Brown that he "could contact a lady named Nicole" who worked at Defendant's office to discuss the case. However, when Mr. Brown contacted Nicole, she would not give him any information about his case and said that he needed to speak with Defendant. Mr. Brown testified:

> Every few months or something, I'd get a - - you know, I'd finally get through to him, and he'd tell me he was real busy, he was out of state working other cases and everything, and it just kept on and on, you know. He would tell me all the lawyers - - or all the judges retired at the same time, and so he was having to wait, you know, for them. And then he said that he did get me - - there was another judge that was going to take it, but he was waiting - - he was getting ready to retire, so he was holding onto it until he got - - you know, he retired, then he could just pass it on to somebody else.

Mr. Brown detailed his attempts to contact Defendant from August 17, 2015, until March 28, 2016. On March 28, 2016, Defendant finally responded that he would call Mr. Brown the following morning. Again, Defendant never called, and Mr. Brown texted him on March 31, April 6, and April 12, 2016, indicating that Defendant had failed to call him. Defendant finally responded on April 12, 2016, saying that he had not forgotten about Mr. Brown.

Mr. Brown texted Defendant on June 3, 9, and 20, 2016, asking about his case, and Defendant responded on June 21, 2016, asking if Mr. Brown was free the following morning and to call him at 10:00 a.m. Mr. Brown called at 10:00, and Defendant texted that he was "on the other line." Mr. Brown requested that Defendant return his call, but

Defendant never called back. Defendant then sent a text asking if Mr. Brown could meet on July 14, 2016, at 2:00 p.m. After that, Mr. Brown was unable to get in touch with Defendant, and Defendant sent a text on July 30, 2016, asking Mr. Brown if they were meeting that day. Mr. Brown agreed and said that they were supposed to meet at 9:00 a.m. Defendant responded that he might be "about ten minutes late[.]" Defendant later asked to move their appointment to the following morning or the next Saturday morning because he had been at the hospital most of the night with his daughter. Mr. Brown agreed to meet Defendant the following Saturday at 10:00 a.m.

On October 31, 2016, Mr. Brown sent Defendant a text that read in part:

I'm contacting you again because I am both tired and frustrated by the lack of information about my case. I was in your office on August 6th, and you promised me and my wife that you would send my paperwork by mail. That was almost three months ago. What is the next course of action?

On November 2, 2016, Defendant responded: "Sorry for the delay. I didn't know you hadn't received it. On the way to you now. I'll call you this afternoon." However, Mr. Brown never received any legal documents from Defendant. He called Defendant on November 4, 2016, because he had seen information about Defendant's suspension in a news article. Defendant answered the call and told Mr. Brown that it was "just a misunderstanding." Mr. Brown testified that he never received any notice from Defendant in September or October 2016, that Defendant had been suspended from practicing law.

Mr. Brown testified that he received "nothing" in exchange for the $4,500 that he paid Defendant "to represent [him] in [his] case." Defendant never filed a complaint on his behalf. Defendant told Mr. Brown that there would be a deposition, but it never took place. Mr. Brown testified that Defendant once mentioned a class action lawsuit in Houston, Texas, but he told Mr. Brown that he did not need to join the case. Mr. Brown also never received an accounting from Defendant detailing how the $4,500 was spent.

**Bethany Stollar - Theft of Property Greater Than $2,500 but Less than $10,000**

Bethany Stollar worked as a professor at Middle Tennessee State University for six years and was fired in May of 2014. She contacted Defendant to discuss her case, and he said that she "had a very good case." Ms. Stollar signed an Attorney-Client Litigation Agreement with Defendant on May 16, 2014, and wrote him a check for the $4,500 retainer fee. She noted that her check was initially returned for insufficient funds because the money she had borrowed from her father was not yet in her checking account. Ms. Stollar wrote Defendant a second check, which he deposited into his firm's operating account, which had a negative balance at the time. She thought that in exchange for the retainer fee, Defendant would "create a case" for her wrongful termination. She also noted that

Defendant told her that "he would take me on contingency and that the [$]4,500 was all I was going to pay him at that point."

> Concerning Defendant's representation, Ms. Stollar testified:
>
> I contacted [Defendant] multiple times to find out what we were doing because I had never experienced anything like this before. I was told that the judges were - - had retired - - most of the judges had retired and there was a huge backlog. That went on for about a year.
>
> The year after that, I - - I was under the understanding that we only had a year to file for the case. So after a year had passed, I was like, you know, "what are we doing," you know, "Can you give me some information," and there were just lots of excuses for why we hadn't filed anything yet.

Ms. Stollar mainly communicated with Defendant by email and text messages. On December 1, 2015, she texted Defendant indicating that she had emailed him the first week of September and was still waiting for some kind of update on her case. She also noted that her father wanted the money that he loaned her for the retainer fee repaid, and she did not have the funds to pay him. Defendant replied that he was preparing for the trial date and could try to schedule an early mediation date. He did not have an actual date at that time. At that point, Ms. Stollar thought Defendant had filed a lawsuit on her behalf, although she had not seen the actual pleading.

Ms. Stollar continued texting Defendant requesting updates on her case. Sometimes he replied but did not give her any substantive information. She also called him multiple times, and someone answered one time and promised her that she would receive a call back "after that week was over." On June 6, 2016, after calling Defendant multiple times, Ms. Stollar sent Defendant a text indicating that she had not heard from him or "Shelly" and asked if she needed to drive to his office to get some answers. Defendant then replied: "Sorry. I'm in downtown in deep depos. Promise I will call this afternoon."

On November 20, 2016, Defendant sent Ms. Stollar a link to a document that could only be accessed through "Dropbox." Defendant did not tell her at the time that his law license was suspended. Ms. Stollar testified that she then asked Defendant for a case number for her lawsuit. The following day, she tried to call "Shelly," but got no answer. Thereafter, Ms. Stollar sent the following text to Defendant: "Okay. Well, hmmm, I tried to call. No answer. I tried Shelly's extension, no answer. I've tried to find a case number. Nada. Why can't someone just tell me what's going on?" Defendant replied: "Hold on."

Ms. Stollar testified that the Dropbox document referenced the Tennessee Board of Regents ("TBR"), and she called the board and learned that nothing had been filed with them on her behalf. She then texted Defendant stating that nothing had been filed with the

TBR, and Defendant responded, "That's not correct. It's in the system." Ms. Stollar called the TBR, and texted Defendant the following message: "I called again today and spoke with Mickey Sheen. Absolutely nothing filed with them in your name or mine. Hey, I'm tired of the lies. Something needs to happen today or that's it." Ms. Stollar later sent Defendant a text message indicating that she had spoken with another attorney, Patrick Parker, and he would not take her case. She further said that she was still waiting to hear from Defendant. Ms. Stollar also sent Defendant an email when she learned of his suspension.

Other than the Dropbox document, Ms. Stollar testified that she never received a complaint filed on her behalf by Defendant nor did she attend any depositions or participate in mediation. Ms. Stollar testified that she received "nothing" for the $4,500 retainer fee that she paid Defendant. It was not her "understanding" that the money would be deposited into Defendant's firm's operating account to be used immediately to pay his expenses. Ms. Stollar testified that she would not have given Defendant any money had she known that he was not going to file a lawsuit on her behalf.

On cross-examination, Ms. Stollar agreed that there was some difficulty with Dropbox and that Defendant emailed her a signed copy of the complaint against the TBR that had been drafted on her behalf. She further agreed that she met with Defendant on July 7, 2014, to discuss her case.

**Robert Lussier - Theft of Property Greater Than $2,500 but Less than $10,000**

Robert Lussier testified that he was a union trustee in 2015 and suspected that embezzlement was occurring because the union president and secretary refused him access to the "books." He decided he needed an attorney, and a friend recommended Defendant. Mr. Lussier contacted Defendant's office and later met with him. He hired Defendant to gain access to the union records and signed a "retainage agreement" with him on May 19, 2015, agreeing to pay a $4,500 retainer fee. Mr. Lussier paid the fee in cash and noted that the agreement did not state that the fee was nonrefundable. Defendant told him that "it would take a little while," which did not "shock" Mr. Lussier because he was aware that the court system "is not the fastest beast in the world." Mr. Lussier estimated that it would "take at least a few months" to get his case started.

To Mr. Lussier's knowledge, his case against the union never progressed. Mr. Lussier testified:

> After about three months of absolutely nothing happening, I started getting suspicious, and [Defendant] had informed [him] that his preferred means of communication was text messages because phone calls just weren't working very well. And text messages was fine for me. But after about three months, I was starting to get suspicious that this case should have moved farther along

by now. I understood it was going to take some time, but something should have been done within the first three months. So I started saving all text messages.

Mr. Lussier noted that it had been difficult to reach Defendant by phone which was very frustrating.

Thereafter, Mr. Lussier repeatedly texted Defendant requesting updates and the status of his case, and he called Defendant and left some voice messages. He also asked if Defendant had completed the "paperwork" he had promised to file. Mr. Lussier explained that the paperwork he and Defendant had discussed was to "force the union to give [him] the documents" which was the "gist of the whole case." He said that Defendant frequently failed to respond to the texts; however, in October 2015, Defendant indicated that he would file something with the court within a week. Mr. Lussier testified that by December 2015, despite his repeated inquiries, nothing had been done on his case.

From January 2016 until April 2016, Mr. Lussier continued sending Defendant text messages requesting Defendant to contact him because he had not heard from anyone about the status of his case. In an April text, Mr. Lussier indicated that he may need to "call CAP" to file a complaint to get a response from Defendant. At that point, Defendant responded and claimed that he had "been on the road" and would have information for Mr. Lussier the following day and for Mr. Lussier to call Defendant's cell phone at 10:00 a.m. Mr. Lussier called the following morning at 10:00, and Defendant did not answer. They eventually had a conversation, and Defendant indicated that he would soon file the complaint against the union. On May 19, 2016, Defendant told Mr. Lussier that the paperwork was ready and asked if they could meet the following week. Defendant scheduled a meeting with Mr. Lussier, and Mr. Lussier asked Defendant to email him a copy of the complaint to review before the meeting. Mr. Lussier testified:

> The reason for this is because in the phone calls, he would have me come down to the office supposedly to review this document that's done. But every time I get there, it's not done. And for me to go from where I was living all the way to Hendersonville to review and sign a document that's not ready is getting ridiculous. It's a pain, it's a long trip out of my way, you know. Why am I wasting my time doing this? You know, better question is, why is he wasting his time making me come down there to do that? And he's supposed to e-mail it to me, but he's not.

Beginning on May 21, 2016, Mr. Lussier repeatedly asked Defendant to email him a copy of the complaint, but he never received it, nor did he meet with Defendant.

On December 6, 2016, Mr. Lussier learned that Defendant's law license had been suspended. When Mr. Lussier asked Defendant if he ever had any intention of working on

his case, Defendant replied: "Yes. It has taken a little longer than expected. I am responding to your board complaint." Mr. Lussier noted that he had filed a complaint with the BPR. He also requested that Defendant return the $4,500 retainer fee. Defendant then indicated that he thought Mr. Lussier wanted him to stop working on the case. Mr. Lussier testified that he never received any notification from Defendant stating that Defendant had been suspended from practicing law. Additionally, Mr. Lussier never received any invoices or billing from Defendant concerning work performed on Mr. Lussier's case.

On May 19, 2016, when Mr. Lussier paid Defendant $4,500 in cash, Defendant deposited $1,000 into his firm's operating account at Pinnacle; the deposit raised the balance from negative $460 to positive $541.48. Mr. Lussier testified that he did not consent to Defendant spending his retainer fee before it was earned, and Defendant did not inform him that he would immediately spend it. When asked what he received for his $4,500 retainer fee, Mr. Lussier replied: "[t]o put it bluntly, I got a year of stalling and lip service." He felt that Defendant could not "have used a whole lot of money" on his case, and he expected Defendant to return his money or at least the part Defendant had not earned. Mr. Lussier never received a refund of his retainer fee.

On cross-examination, Mr. Lussier agreed it was his understanding that the most he would pay for Defendant's representation would be $4,500 and that Defendant would not bill him any additional fees. Mr. Lussier further agreed that he gave Defendant a copy of the minutes and approximately hour-long audio recordings of each monthly union meeting Mr. Lussier attended, and that Mr. Lussier had ongoing problems with the union. Mr. Lussier acknowledged that he and Defendant had approximately five to six in-person meetings, and he provided Defendant with the name and phone number of his maintenance craft director. He was aware that Defendant contacted the director who said that they had a short conversation. Mr. Lussier found this surprising "because when [the director] starts talking, you cannot shut him up."

**Yvonne Prather - Theft of Property Greater Than $2,500 but Less than $10,000**

Yvonne Prather was previously employed as a professor at Austin Peay State University teaching in the Department of Communication, both undergraduate and graduate. She had previously contacted Defendant when she was up for a promotion in 2004 or 2005, but he was not accepting new clients. Ms. Prather contacted Defendant when she was up for a promotion again in 2006 or 2007 and had paid him a retainer; however, she received the promotion in 2007 and no longer needed Defendant's assistance. Ms. Prather called and requested Defendant return her retainer fee, which he did "after several attempts."

Ms. Prather testified that she was up for promotion to "full professorship" in December 2015. Anticipating challenges with her promotion, she again decided to retain Defendant for legal services. She met with Defendant on December 4, 2015, and wrote

him a check for the $4,500 retainer fee, which Defendant deposited into his firm's operating account later that day. She acknowledged that Defendant signed the Attorney-Client Litigation Agreement, but she did not. The agreement did not state that the retainer fee was nonrefundable. The day before Defendant deposited Ms. Prather's check, the balance in his firm's operating account was $416.75; after the deposit of her retainer fee, the balance was $3,482.26.

Three days later, on December 7, 2015, Ms. Prather was promoted to a full professorship and thus did not need Defendant's services. She testified that she communicated to Defendant that she no longer wanted him to pursue her case and that she called and sent emails and text messages to Defendant, but her efforts at communication were unsuccessful.

On November 5, 2016, Ms. Prather asked Defendant about the status of the refund of her retainer fee. She sent a second message on November 13, 2016. She did not hear from Defendant or anyone in his office between December 2015 and November 2016, and she never received a refund of her retainer fee. She said that Defendant did not file a lawsuit on her behalf, and she did not attend any court hearings or mediation. Ms. Prather testified that she received "[a]bsolutely nothing" for the money that she paid to Defendant.

On cross-examination, Ms. Prather agreed that her salary was also an issue when she hired Defendant in December 2015. She also acknowledged her understanding that she would not have to pay Defendant any more than $4,500 regardless of the amount of work done on her case. She never received a refund of her retainer fee or any portion thereof.

**Nancy Whitman - Theft of Property Greater Than $2,500 but Less than $10,000**

Nancy Whitman was employed as the Executive Director of the Homesafe Domestic Violence Shelter ("Homesafe") and sought legal services after she and a disabled coworker were notified on July 18, 2016, by email that they had been fired. Ms. Whitman testified that she left a message for Defendant, and she and her coworker went to the EEOC to file a complaint. However, Defendant returned her call and advised her not to file the complaint but to "come see him because time was of the essence." She scheduled an appointment with Defendant on July 21, 2016. Ms. Whitman noted that she had contacted a total of five attorneys, including Defendant, about her case. Defendant was the only attorney who agreed to take her case.

Ms. Whitman described the meeting she and her coworker had with Defendant on July 21:

> So we just had a discussion, kind of overview of what our case was and any
> of the issues that we wanted to bring forward. We talked about - - there were

kind of three different things that [Defendant] said that he would do. One would be to file a preservation of evidence letter with our former employer; Number 2, he was going to file with the Tennessee Human Rights Commission; and Number 3, that he ended - - we would end up going to court and that that would take about 90 days from beginning to end of that whole process. We had requested that . . . [Defendant's] office communicate with us on a weekly basis so we kind of knew what was happening and wouldn't be left in the dark, and there was an agreement for that to happen.

Ms. Whitman testified that Defendant agreed to represent both her and her coworker for $4,500, and Ms. Whitman wrote a personal check for the entire fee. Both Ms. Whitman and her coworker signed an Attorney-Client Litigation Agreement with Defendant, but he did not sign them. The agreement did not state that the $4,500 retainer fee was nonrefundable. Defendant deposited Ms. Whitman's check into his firm's operating account that same day and immediately withdrew $500 in cash.

Ms. Whitman testified concerning her attempts to contact Defendant by phone and email to obtain updates on her case. She said, "[s]ometimes e-mails were answered, sometimes they weren't. Sometimes I called the office and left messages and no one got back to us." On one occasion, Ms. Whitman called "every single extension" in Defendant's office and "left a message for every single staff person in that office to get back to me and tell me what was happening because I was so frustrated and hadn't heard anything from anyone." On October 31, 2016, she learned that Defendant's law license had been suspended, and he claimed that it "was just a small misunderstanding." Defendant also told her that on November 2, 2016, she would receive a "copy of the case filing that was going to go to mediation." She never received a copy of the filing.

Ms. Whitman testified that she sent a certified letter to Defendant on November 15, 2016, terminating her agreement with him and requesting a refund of the $4,500 retainer fee. She recited the entire history of the case, including all meetings, phone calls, text messages, and email correspondence with Defendant. Ms. Whitman also noted in the termination letter that on October 21, 2016, she had received from Defendant a copy of a letter dated August 1, 2016, Defendant claimed had been sent to Homesafe for preservation of evidence. However, there was "no corresponding proof that it was certified return receipt and anyone had ever signed it - - received it." She said that on October 14, 2016, it was determined during a conference call that "this was no longer [an] appropriate [case] to file." Defendant was out of the office that day and did not participate in the conference call, but Ms. Whitman later called Defendant and spoke with him. The return receipt showed that Defendant's office received Ms. Whitman's termination letter on November 18, 2016. Ms. Whitman testified that Defendant never notified her verbally when they spoke, or by written notification, that his law license had been suspended. She never received a refund of her $4,500 retainer fee.

On cross-examination, Ms. Whitman acknowledged it was her understanding that Defendant would not bill her any amount over $4,500 for his representation. She said: "[i]t was my understanding that we would go to court, that there would be a filing with the Tennessee Human Rights Commission." Ms. Whitman agreed that it appeared a letter was sent to Homesafe approximately eleven days after she signed the agreement with Defendant.

### Mario Hererra – Theft of Property Greater Than $10,000 but Less Than $60,000 and Falsely Holding Oneself Out as a Lawyer

Defendant initially agreed to represent Mario Herrera during his divorce and post-divorce proceedings, but they did not discuss a fee. Mr. Herrera's and his ex-wife's home later sold for $121,000, and they had agreed to equally divide the proceeds. On December 16, 2014, the Sumner County Chancery Court Clerk and Master issued a check made payable to Mr. Herrera and Defendant for $59,969.11 for Mr. Herrera's share of the proceeds from the sale of the home. Defendant told Mr. Herrera he would deposit the check for him and asked for his bank account number. However, Defendant did not deposit the check into Mr. Herrara's account and instead wrote "Mario O. Herrera by attorney" on the check, signed his own name on the back of the check as an endorsement, and deposited the check into his firm's trust account. Defendant then wrote a check out of his firm's trust account for $54,269.11 with "Herrera Fee" written on the memo line and deposited that check into his firm's operating account. Mr. Herrera did not authorize Defendant to take any money from the proceeds of the sale of the home.

Mr. Herrera made attempts to contact Defendant about the money over the next several years, but still had not received it when he saw Defendant in court in 2016. At that time, Defendant agreed to help Mr. Herrera with a child support matter. Again, there was no discussion concerning legal fees. Mr. Herrera contacted Defendant again in 2019 for help with a child support issue. He said that he had received a letter from the State of Tennessee indicating that he owed $25,000 in child support. Defendant had told Mr. Herrera he should wait until both of his daughters turned eighteen before getting his money from the home sale "because the State is saying that - - that if you get your money right now, you're going to run - - run with the money, you're not going to pay your child support."

Mr. Herrerra identified text messages that he exchanged with Defendant on August 5, 2019, concerning the child support matter. He said that he and Defendant also had some phone conversations about the matter. Defendant never told Mr. Herrera that his law license had been suspended and that he could no longer represent Mr. Herrera. Defendant indicated that he was still working on Mr. Herrera's case. Mr. Herrera testified that as of November 6, 2019, he still believed Defendant was a lawyer and was working on his case. When Mr. Herrera inquired about the status of the money from the sale of the home, Defendant claimed that he was "working on it" and blamed the court system for the delay.

He said Defendant "always mentioned a name" of a person which led Mr. Herrera to believe that the money was safe in an account.

By February 2020, Mr. Herrera learned that Defendant no longer had any of his money. He testified that he and Defendant never discussed Defendant's taking any of the money from the sale of Mr. Herrera's home as a legal fee and Mr. Herrera never agreed to that arrangement. Mr. Herrera did agree that he was expecting to pay and would have paid Defendant a reasonable fee out of the proceeds from the sale of the home for his work if Mr. Herrera had been asked to do so. During one phone conversation, Defendant mentioned conducting an accounting of the money, but Mr. Herrera never received an accounting or any money from Defendant. Mr. Herrera resolved the child support matter on his own.

Christopher Jay Ingrum testified that he represented Mr. Herrera's ex-wife, Brenda Primeau, during their post-divorce proceedings. He asserted that when hired by a client, he placed the client's money into a trust account before it was earned and then it went into an attorney or operating account after it was earned. Mr. Ingrum testified that the Herrera/Primeau case was not overly complicated; he charged Ms. Primeau a total of $4,468.27 in legal fees for his work. On behalf of Ms. Primeau, Mr. Ingrum received a check in the amount of $59,969.11 from the sale of the home. The check was payable to himself and Ms. Primeau; they both endorsed it, and Mr. Ingrum deposited the check into a trust account. The balance of his fee was taken from those proceeds, and he issued Ms. Primeau a check for the balance of $57,500.84 along with an itemized bill "show[ing] all of the professional services rendered by the attorneys and by the paralegals" and for "additional charges for things like copies, postage, things of that nature."

### Lisa Smelser - Theft of Property Greater Than $2,500 but Less than $10,000 and Falsely Holding Oneself Out as a Lawyer

Lisa Smelser testified that she contacted Defendant in November 2016 about a workplace issue, and Defendant agreed to proofread a document she planned to send to her employer. She and Defendant communicated about the issue, and Defendant answered her questions on how to proceed. Ms. Smelser then decided to hire Defendant to represent her, and she signed an Attorney-Client Litigation Agreement with him that did not state that the retainer fee was nonrefundable. Thereafter, on November 22, 2016, at Defendant's request, Ms. Smelser brought him a cashier's check for $4,500 for the retainer fee. On that same date, Defendant deposited $3,500 from the cashier's check into his firm's operating account and $500 into his personal account at Simmons Bank. Defendant's firm's operating account had a negative balance at the time of the deposit.

Ms. Smelser later learned that Defendant had been suspended from practicing law. When she contacted him about the suspension, he claimed that it was "only temporary[,]" and that "Patrick" was helping with his cases until the suspension was lifted. Defendant

also told Ms. Smelser at that time that he would send a letter to her employer. Ms. Smelser contacted Defendant several days later and asked him to send her a copy of the document he sent to her employer. Ms. Smelser communicated exclusively with Defendant, and she contacted him on December 2, 2016, to inform him that she had not heard anything from her employer. Ms. Smelser testified that ultimately Defendant did not file the lawsuit that they had discussed, and he did not send her copies of any documents he claimed to have sent to her employer. She said that she received "[n]othing" in exchange for the $4,500 retainer fee that she paid Defendant, and she never received a refund of her money.

**Wanda Kelley - Theft of Property Greater Than $2,500 but Less than $10,000 and Falsely Holding Oneself Out as a Lawyer**

Wanda Kelley testified that she contacted Defendant about representing her in a potential discrimination case against her employer, and they met at his office on November 7, 2016. Defendant agreed to represent her and told her his fee was $4,500 in cash. Ms. Kelley told Defendant that she did not have that much cash but offered to go and withdraw the funds from her bank account. Defendant instructed her to withdraw the funds that day. Ms. Kelley testified that she had to withdraw the money from two different banks, and she got delayed in traffic on her way back to Defendant's office. While she was driving, Defendant called and asked her whereabouts because she "was taking so long" to return. She said that the Attorney-Client Litigation Agreement with Defendant did not state that the retainer fee was nonrefundable. She paid him the $4,500 fee on November 7, 2016, and on November 10, 2016, Defendant deposited $4,400 into his firm's operating account at Simmons Bank. The account had a negative balance at the time.

Ms. Kelley testified that she met with Defendant one additional time after paying the retainer fee. After that, he either missed appointments with her or asked to reschedule. Ms. Kelley testified that Defendant told her that he would file a lawsuit for discrimination, backpay, and violation of the Family Medical Leave Act. However, he never filed any legal documents on her behalf, and she said that all she received in exchange for paying the retainer fee was "[d]epression" and "heartache."

**Sharon Sullivan – Falsely Holding Oneself Out as a Lawyer**

Sharon Sullivan testified that in December 2013 she hired Defendant to represent her in an employment matter. Concerning the progress of his representation, Ms. Sullivan testified: "[w]ell, over the years until about January 2017, it was just me reaching out to him, trying to get information. Basically[,] nothing was done toward the lawsuit." Ms. Sullivan noted that after October 9, 2016, the bulk of her communication with Defendant was by text message, which continued until January 26, 2017. Based on their communications, Ms. Sullivan thought Defendant was acting as her attorney and was in the process of "working a deal with [her] former employe[r]'s attorney for settlement[.]" She noted that Defendant agreed to meet with her on January 18, 2017, to discuss a

settlement, but the meeting never occurred. Ms. Sullivan continued communicating with Defendant by text message until she learned that Defendant's law license had been suspended. She testified: "I had family members that had seen it on the news and questioned me about it, and I questioned [Defendant] and he said that it was not true." Ms. Sullivan never received a certified letter or any other communication from Defendant advising her that his law license had been suspended and that he could no longer act as her attorney. She requested her case file, and Defendant eventually returned it to her.

### Danielle Means - Falsely Holding Oneself Out as a Lawyer

Danielle Means testified that she hired Defendant to represent her in January 2013. The representation was still ongoing in 2016. Defendant never informed her that he could no longer represent her after his law license was suspended. Beginning November 3, 2016, Ms. Means said that she exchanged text messages with Defendant regarding a settlement of her case, and Defendant advised her that she could do an "e-signature" if she was in California at the time. Ms. Means testified that Defendant conveyed a settlement offer, but she did not know that he had been suspended from practicing law. When she asked Defendant if he was sending an agreement for her to sign, he asked if she sent her "W-9." He then confirmed that he had received her tax document. Ms. Means expected her settlement to be complete once she sent the tax document.

Ms. Means texted Defendant in January 2017 and asked if he had lied to her or if she had gotten a settlement that he failed to distribute to her. Defendant responded that there was a "settlement and that we 'needed to finalize[.]'" He also offered advice on how to prevent defense counsel from learning that she had gone to a rehabilitation facility. Ms. Means testified that Defendant told her that "Patrick" was an attorney assisting with her case and that "Patrick" had discussions with opposing counsel about a settlement and that "Patrick" would return shortly.

Ms. Means sent Defendant a Facebook message in April 2017 asking why she had received a bill from the court if her case had settled. Defendant responded that he did not know. At the time, she was still unaware that Defendant had been suspended from practicing law, and she considered him to be her attorney. Ms. Means testified that Defendant asked her to email him a copy of the bill and said that it could be the result of the "original nonsuit." Defendant sent Ms. Means a message stating that he would ask "Patrick" about the issue and that "[w]e nonsuited the case and refiled it." Defendant also said that the nonsuit occurred a "while back" and was a "procedural step" that did not change the case "at all." Defendant messaged Ms. Means that "Patrick" was finalizing her settlement. When Ms. Means asked when the settlement would occur, Defendant replied that he was unsure but would make inquiries.

Ms. Means testified that in July 2017 she learned that Defendant's law license had been suspended, and she confronted him about it. She said that Patrick Parker successfully

resolved her case, but that Defendant had repeatedly communicated with her as her attorney after his suspension.

### Rachell Scott – Falsely Holding Oneself Out as a Lawyer

Rachell Scott testified that in 2016, she hired Defendant to represent her in a lawsuit against her former employer. The agreement that she signed with Defendant indicated that she paid him a $4,500 retainer fee. She said that Defendant claimed to have filed the lawsuit, and she believed that her case was active based on Defendant's representations to her. Ms. Scott testified that she exchanged phone calls and text messages with Defendant about her case in 2017, and he attempted to set up meetings with her. In January 2017, she learned that his law license had been suspended. Defendant claimed that it was "just a minor thing" that he would resolve by sending in "some paperwork." When Ms. Scott further pressed Defendant about the suspension, he said that someone was helping him "knock some of these cases out" until his law license was reinstated.

According to text messages, Ms. Scott and Defendant were to meet in January 2017. She texted Defendant that she was "looking through [her] records" and did not have "anything with [her] case number on it." Ms. Scott asked Defendant if their meeting was still scheduled for 3:00 p.m. on January 10, 2017, and Defendant said he would "never make it" by that time. She texted Defendant that he needed to call her and that she needed answers. Ms. Scott testified that she never received a response from Defendant or any further communication about her case.

### Jinny Broughton - Falsely Holding Oneself Out as a Lawyer

Jinny Broughton testified that she hired Defendant in August 2015 to represent her in an employment dispute. She testified that Defendant never filed a lawsuit on her behalf, did not give her any completed paperwork, and was "very hard" to contact. Ms. Broughton texted Defendant about her case on September 14, 2016, and he claimed that he was "incorporating" information into discovery.

Ms. Broughton testified that in December 2016, she texted Defendant a screenshot of his order of suspension. He responded, "[t]hat's old." Ms. Broughton later texted Defendant and asked him to send her a copy of interrogatories and "paperwork" he had received on her case, and Defendant said he would send the documents. Ms. Broughton testified that she did not receive any documents from Defendant, but Defendant assured her he would send them. He later sent an email explaining changes that had been made to the documents and his reason for the changes. Ms. Broughton said that she continued asking Defendant to provide her with "legal paperwork." She also asked for filed copies of documents rather than drafts. Defendant responded that a family member died and asked her to "give [him] a bit."

Ms. Broughton testified that she sent Defendant multiple text messages in January 2017 asking that they talk "ASAP." Defendant eventually responded claiming that he thought Ms. Broughton had "terminated" his services.

**Other Trial Testimony**

Kristie Wixson, a criminal intelligence analyst for the Regional Organized Crime Information Center, testified that she performed an analysis of Defendant's bank accounts from three different banks and organized them into Excel spreadsheets as well as prepared charts for trial. She also entered information concerning some of Defendant's credit cards and organized the bank records to reflect the transactions involving each victim and charges related to Defendant's case. Ms. Wixson testified concerning several transactions made between Defendant's various accounts showing declining balances. She also compiled a list from Defendant's accounts of "all the fees charged, non-sufficient funds fees, overdraft charges, paid item fees, uncollected charges, returned item fees, [and] charge-back fees[,]" which totaled $58,393. Her spreadsheets were exhibited to her testimony.

Jennifer Stalvey, who was working as a forensic accountant with the Tennessee Department of Commerce and Insurance, reviewed Defendant's financial records, settlement statements, and the victims' interview summaries and prepared a report as to each victim, excluding Mr. Herrera, from a period of December 3, 2012, to November 22, 2016. Concerning the theft of trust cases, Ms. Stalvey determined that after deducting his expenses, Defendant owed $14,694.14 to Ms. Ponce, $16,433.00 to Mr. Sutton, $108,122.65 to Mr. Dycus, and $105,299.13 to the beneficiaries of Ms. Denney's estate. Ms. Stalvey further testified about the theft of retainer cases and verified that Defendant owed $4,500 to Mr. Brown, $4,490 to Ms. Stollar, $4,500 to Mr. Lussier, $4,500 to Ms. Prather, $4,500 to Ms. Whitman, $4,500 to Ms. Kelley, and $4,500 to Ms. Smelser.

On cross-examination, Ms. Stalvey testified that she did not conduct an independent search of records from the Sumner County court, EEOC, or Tennessee Department of Labor related to the victims but relied on information the TBI had been provided by the District Attorney General's Office. She also spoke with Ms. Wixson who did not provide substantive information about Defendant's clients. Ms. Stalvey agreed that her conclusions were only as reliable as the information she had been given. She testified: "That's why I'm very selective about what I utilized within the scope that I was provided. I did not rely on many of the records. I only chose the records that were - - for the most part, that were independently prepared."

Ms. Stalvey testified that from the records she reviewed, a pattern of behavior emerged where Defendant transferred and kept clients' retainer fees when no legal work had been performed and no expenses had been paid on behalf of the clients. She understood from the investigators that no "meaningful work" was performed by Defendant, which meant that the victim "paid a retainer" and "did not benefit from any work." Ms. Stalvey

testified that her task "was to identify were there any fees returned to the victims." She was unaware of how many meetings, phone calls, and email exchanges Defendant had with the victims or how much documentation had been provided by victims to Defendant at the beginning of his representation for him to sort through, review, and research. Ms. Stalvey did not know how much legal research Defendant had performed or how many legal documents or pleadings Defendant had drafted and filed on behalf of the victims. However, she said that was "not what my task was for this assignment." She was looking for "financial impropriety." Ms. Stalvey testified that she was not provided with client files from Defendant's office, and she did not speak with any of the victims in this case. She agreed that she was "working off an assumption."

On redirect examination, Ms. Stalvey testified that the TBI files contained information related to the victims and their statements. She agreed that each count Defendant had been charged for each victim could stand alone and did not require a pattern with the other counts to be shown.

Michael Tolbird attended law school with Defendant and began working remotely for Defendant from Florida in 2013. They had an agreement in which Defendant would pay Mr. Tolbird a monthly stipend plus a percentage of any settlement monies or judgment monies for cases on which Mr. Tolbird worked. He received the monthly stipends but did not receive the "percentage payment until much later" after he filed a lawsuit against Defendant in general sessions court in August 2015, which he and Defendant agreed to settle. Mr. Tolbird estimated that the settlement was for $13,000 which was originally paid in December 2015 by a check that did not clear and was later replaced by a cashier's check.

Sarah Morgenstern was employed by Defendant as a paralegal for approximately one year from 2015 until 2016. She said that Defendant oversaw the office, was in control of the finances, made banking decisions, and cashed and deposited the checks. Ms. Morgenstern did not have access to online banking for Defendant's firm's accounts. She testified that Defendant sometimes refused to "put money on the stamp machine" for letters to be sent out, and Defendant would not set up payroll so that employees could be paid by automatic deposit. Ms. Morgenstern said that she would was paid with a paper check which she sometimes was unable to cash due to insufficient funds. She noted that at one point, she had three paychecks from Defendant that she could not cash and had to borrow money from her parents to pay her bills.

Charity Demay-Samuels began working for Defendant as a paralegal and office manager in January or February of 2012 and left in August of 2014. She said that Defendant was in control of the finances in his office, and he made the banking decisions, including the cashing of clients' checks. Ms. Demay-Samuels did not have access to online banking while working for Defendant, despite her requests to do so. She said that at times her paycheck would not clear due to insufficient funds in Defendant's account, which also

caused insufficient funds in her account. She noted that at one point, her bank would no longer accept Defendant's checks for deposit.

Ms. Demay-Samuels testified that sometimes when clients called upset or inquiring as to the status of their cases, Defendant directed her and other employees to tell clients that work had been performed when such work had not actually been done. She said that Defendant took cases on contingency fees rather than billable hours. Ms. Demay-Samuels testified that "if the case was won and the [c]ourt was going to award attorney's fees, [Defendant] would have us go back through the file and start creating the time to be paid for our time." She noted that "[t]here were too many clients for the paralegals to handle." Ms. Demay-Samuels eventually left employment at Defendant's office due to her health and was offered a three-month severance package. She was eventually paid for all of the time that she worked for Defendant, but she had to "have an attorney" get her last month's pay.

Nicole Canter testified that she began working for Defendant as a paralegal in the spring of 2012 and remained there until the summer of 2015. She said that Defendant was in control of the office and finances, and he made all the banking decisions. She did not have any access to online banking or any of Defendant's firm's accounts. Ms. Canter testified that her paychecks "were not always accepted by [her] bank and frequently [she] had to wait for them to go through." She was unable to cash her final paycheck.

Ms. Canter testified that during her employment with Defendant, there were many unhappy clients calling Defendant's office about the status of their cases, and there were a lot of overdue invoices. She spoke to some of the clients and gave them what information she had, and she referred them to Defendant. Ms. Canter testified that some clients did not get their settlement checks. She said that before leaving employment at Defendant's office, "there was a client at the door asking to see [Defendant] because he had settled her case and I didn't have the money and I didn't know where it was and I didn't have anything to tell her and [Defendant] wasn't there." Ms. Canter testified that she left Defendant's office because "the rent check bounced and paychecks were always questionable and I realized I needed more stable employment." She asserted that Defendant's financial issues "trickled down to the clients."

Shelly Biemel testified that she worked for Defendant from June 2015 until December 2016. She began as a paralegal and later became the office manager. Ms. Biemel testified that Defendant was in control of the office and finances, and he made banking decisions, such as determining in which account to deposit checks. Ms. Biemel did not have access to online banking. She said that she had trouble multiple times cashing her paycheck. Ms. Biemel testified: "I did know that when he would get a retainer from a client, that he would go deposit the check and then our checks would be available. So I knew that the retainer was paying our payroll." She also said that there were clients who

were upset about the way their cases were being handled and noted that deadlines were missed in some of the cases. A large number of Defendant's cases were EEOC cases.

Katlin Dinkens, formerly Wilburn, worked for Defendant from October 2015 until November 2016 as an assistant and later a paralegal. She said that Defendant oversaw the office and made banking decisions, including cashing checks and depositing them. She did not have access to online banking while working for Defendant. Ms. Dinkens testified that her paycheck was returned several times for insufficient funds while working for Defendant.

Christine Gaetano worked for Defendant from 2013 until 2016. She was initially hired by Defendant to work from home as a staff writer and "specifically write fact sections of responses to summary judgment motions." Ms. Gaetano testified that Defendant was in control of the office, and she assumed he was in control of the finances. She said that her first paycheck from Defendant was rejected by her bank, Volunteer State Bank, and that they would not cash it or take it for deposit. Ms. Gaetano called Defendant, and he gave her what she thought at the time was a rational explanation. She said that Defendant made the check good, but the problems persisted with her paychecks. Ms. Gaetano thought Defendant had too many cases to be adequately handled by the paralegals, noting that the case list for each paralegal was "extremely long."

Allison Porter was an associate attorney with Defendant for one year from 2015 until 2016. She explained that she handled some cases after Defendant did the "initial interviews to take on the clients, and then from that, if we needed to file anything with the court, do their court complaints, any EEOC complaints, anything that needed to be filed, talking to the client, going to court for them, I handled all that from the time after he took them on as a client." Ms. Porter testified that Defendant oversaw the office and finances and made banking decisions. She had no access to online banking.

Ms. Porter testified that a few months into her employment with Defendant, her paycheck "bounced." She spoke with Defendant and got a new one. Because she was paid only once per month, she arranged with Defendant to be paid by cashier's check. Ms. Porter testified that she did not get paid for the last "couple of months" she worked for Defendant.

Ms. Porter testified that there were issues in Defendant's office with paying the fees to file complaints for new clients, causing deadlines to be missed. She said, "[c]lients were calling, and - - yeah, we were just fielding a lot of phone calls with people trying to get in touch with [Defendant] and get their cases going." She "definitely" felt that Defendant's clients were not being properly served. Ms. Porter testified that she was named, along with Defendant, in a complaint to the BPR concerning the mismanagement of a client's case. She was named in the complaint because she had conducted one of the depositions. Ms. Porter was aware of some clients who requested that their retainer fees be refunded by

Defendant. She noted that at one point, Defendant's practice lost access to legal research platforms, making it difficult to respond to various motions in cases. Ms. Porter testified that the deadline in certain cases is very strict and that there is no recourse if a complaint is not timely filed.

Jedidiah Cochran entered into an "of counsel" agreement with Defendant in June or July of 2014 and was paid a $3,000 monthly retainer to work on cases Defendant assigned to him. Mr. Cochran testified: "[s]o there was an arrangement where any attorney's fees from the cases which I actively worked, I would - - I would get a percentage of that, and I think the percentage was 50 percent." He said that Defendant was in control of the office at Allman & Associates, and he assumed that Defendant was also in control of the finances and banking decisions. Mr. Cochran testified that his last $3,000 retainer check from Defendant did not clear the bank. He called Defendant, and the issue was handled "fairly quickly." Mr. Cochran never received the agreed upon percentage for any of the cases he worked on.

Mr. Cochran testified that he worked on Rosa Ponce's case and negotiated a settlement for $40,000. He took and "defended" depositions and handled mediation in Atlanta. Mr. Cochran testified:

> Ms. Ponce would get her portion. [Defendant] would get his portion, then cut a check to me for my portion. But that - - that settled roughly the same time as I was leaving Nashville. So I was dissolving the arrangement between [Defendant] and I, so I - - I never followed up on that.

Mr. Cochran identified two checks from Head Start. One was written to Defendant for his legal fees and contingency fee, and the second was written to Ms. Ponce for the settlement amount. Pursuant to Mr. Cochran's agreement with Defendant, he should have received half of the legal fees; however, never received his half.

Margaret Brooke Smith worked for Defendant as an associate attorney from July 2016 until November 7, 2016. At the end of September 2016, she learned that Defendant had been suspended from practicing law effective October 9, 2016. She noted that the order suspending Defendant had been entered on September 9, 2016, but Defendant did not notify her of his suspension. She learned of it from some of the paralegals who worked in Defendant's office. Ms. Smith testified that Defendant and Shelly Biemel oversaw the office, and Defendant had control of the finances and made banking decisions. Ms. Smith did not have access to online banking.

Ms. Smith testified that she and Aaron Ryan, another attorney employed by Defendant, asked Defendant about the suspension order, and he said that he had hired an attorney who was taking care of everything and that the order of suspension would be lifted by October 9, 2016. Ms. Smith later spoke with someone else and realized "the situation

was like much more dire than [she] was initially led to believe" and that there were a significant number of complaints against Defendant. She noted that on November 3, 2016, Channel 4 News showed up at Defendant's office, and on November 4, 2016, an eviction notice was sent to the office stating that rent had not been paid in months. On November 5, 2016, Ms. Smith received a call from a paralegal at the office who said that several of the paralegals' checks had "bounced." After that, on November 7, 2016, she and Mr. Ryan tendered their resignations. Ms. Smith testified:

> I think there were like 400 clients on the Listserv, something like that, if my memory serves me correctly. And we were doing everything we could to - - and "we" being the two paralegals, Katie and Shelly, Aaron and I were burning CDs with the clients' files and getting the clients their files as quick as we could, and letting them know that we were no longer - - we were no longer associates at the firm. And that, you know, we would be gone by December 9th, so to come and get their files by then.

Ms. Smith said that she exclusively worked on labor and employment cases. She did not keep track of her billable hours but noted that it was customary in private practice to keep track of those hours. She further testified that "it's imperative to let the client know, 'I worked, you know, four hours on this initial pleading,' and keep them apprised of the expenditure[s]." Ms. Smith explained:

> If they've deposited anything in the trust, it's kind of like a representation agreement, you would have a retainer. So if your retainer - - it's typically $5,000 initially. And so that's held in a trust for the client, and it's earned upon attorneys working to receive it.

> So if you work on a complaint for three hours, you would let Client A know, "Hey, I drafted your complaint for three hours." They would review and approve it, and then it allows you the ability to remove that, those funds from the retainer and earn them.

> So it's just imperative that the client is kept aware and apprised of the work being done and the amount that they're being charged - - charged throughout the process of their complaint, I guess.

Ms. Smith testified that she worked on Mr. Sutton's child support case and later represented him pro bono after she was employed by another law firm. She agreed that the $12,000 in cash Mr. Sutton had given to Defendant to hold for the child support arrearages should have been deposited into a trust account and disbursed to the child pursuant to the court order. The money should not have been deposited into Defendant's personal account.

Aaron Ryan's testimony was similar to Ms. Smith's concerning retainer fees, and he also asserted that "[w]hen a settlement comes in from a case, then the attorney would put that money into a trust account until it can be transferred over to the client." He noted that one client's money cannot be removed from the trust account to pay another client. Mr. Ryan testified that he began working for Defendant as an associate in late July 2016 and resigned on November 7, 2016. He remained at the office until December 2016 to "help wind things down." Mr. Ryan testified that Defendant oversaw the office, and he assumed Defendant was in control of the finances and made banking decisions. Mr. Ryan did not have access to online banking for any of Defendant's accounts.

Mr. Ryan testified that he arrived to work one day in early September 2016, and the office door was locked. He later learned that Defendant had been suspended from practicing law, and the BPR had issued an order instructing Defendant not to take any new cases at that time. Defendant had thirty days from entry of that order to stop practicing law. Mr. Ryan testified that Defendant gave him the impression that the matter would be resolved soon. He said: "[Defendant] told us that he had received three complaints from clients who were filed to the B[PR] and that he needed to respond to those, that he had failed to respond, and that after he did that, then the suspension would be lifted."

Mr. Ryan testified that Defendant's course of conduct did not change after his license was suspended and things at Defendant's office got worse after clients learned of the suspension. He said:

> So at that point, clients were starting to find out that his license was suspended and were starting to come into the office and ask questions and have concerns. And, you know, like I said, he was out of the office for about two weeks.[10] And so we really didn't have any guidance, and it felt like we were falling further and further behind with all of these cases.

Mr. Ryan testified that he and others then spoke with someone at the BPR because Defendant was still saying that it was a misunderstanding, that he had failed to respond to some clients, and that everything would be straightened out. After speaking to someone at the BPR, Mr. Ryan and Ms. Smith informed Defendant they would be resigning and "getting clients their files and telling them to seek other counsel." Mr. Ryan testified:

> From that point on, we were basically just trying to triage these cases, and get clients their files, and ensure that these cases were taken care of while they found new counsel. There was a steady stream of clients coming into the office who were angry and who wanted to know what was going on with their case and what was going on with their attorney.

---

[10] Mr. Ryan had previously testified that Defendant was out of the office due to his brother's death.

And so we had to meet with these clients on a pretty regular basis every day to fill them in on the situation to get them their files.

Mr. Ryan concluded his interactions with Defendant on December 9, 2016. He was never required to keep track of billable hours while working for Defendant. He had one paycheck that was returned for insufficient funds while working for Defendant and later had two paychecks and one insurance reimbursement check that he was unable to cash while working for Defendant. He said that Defendant gave him cash for the check that was returned.

On cross-examination, Mr. Ryan testified that Defendant drafted a letter to send to his clients concerning his suspension and notifying them that associate attorneys, including him and Ms. Smith, would be taking care of their cases. However, he did not remember when the letter was sent out. He agreed that this caused some panic with clients. Mr. Ryan testified that he and Ms. Smith sent out a second letter to clients. He agreed that during Defendant's suspension, Mr. Ryan and Ms. Smith drafted pleadings, continued to seek Defendant's guidance, and used Defendant's electronic signature on pleadings.

Theresa Scott Swanson testified that after passing the bar examination, she worked for five and a half years with attorney Patrick Parker. She said that their office was "of counsel" with Defendant's office, "which means that we could help [Defendant] with cases that he had." Ms. Swanson noted that she and Mr. Parker took some of the "overflow cases" that Defendant's office could not handle. She said that it became clear after some time, that some of Defendant's cases were ones that should not have been taken because "there were some quality issues with the type of case that was being accepted[.]" Ms. Swanson testified: "[e]mployment law cases are - - are really hard to win anyway. And there were just a lot of clients who maybe had hurt feelings about losing their job, but it was not - - it didn't rise to the level of a - - of a federal lawsuit." She noted that some of Defendant's clients thought that they had excellent cases. Ms. Swanson testified that deadlines for employment law cases are firm and that clients do not have any recourse or remedy if a deadline is missed.

On cross-examination, Ms. Swanson estimated that she and Mr. Parker handled approximately eighty of Defendant's clients after his suspension. She agreed that Defendant's office had already provided quite a bit of work on some cases that she and Mr. Parker took over. She did not have any knowledge of the fee arrangement between Defendant and Mr. Parker. Ms. Swanson was aware that a letter had been sent to clients regarding the suspension of Defendant's law license. She thought that the letter "quoted the Supreme Court rule about the suspension, and it gave a time frame by which they could seek other counsel." She could not remember what other information was included in the letter. Ms. Swanson did not recall a second letter that went out to clients informing them that they no longer had legal representation.

Merry Lewellyn, owner of Tennessee Business Services, provided accounting, payroll, and cashflow management services for Defendant's law office from early 2013 until September 2016. She used QuickBooks software to keep track of Defendant's income and expenses. The payroll services involved "paying his weekly salary payments to employees." Ms. Lewellyn's husband used separate software for Defendant's cash flow management. However, that service stopped because it was hard for Defendant to "have time to sit down and go over the cash flow and things like that, and that just eventually stopped working." Ms. Lewellyn's relationship with Defendant ended after his business closed. She said that he still owed them $2,400 at the time for multiple months of service.

Ms. Lewellyn explained that she had "view-only" access to Defendant's firm bank accounts and would receive "information of deposits and outgoing funds and record those in Quickbooks." She was unable to transfer money from one account to another and did not have any interactions with the banks. Ms. Lewellyn had the authority to print the payroll checks without Defendant's permission and issue checks in small amounts for case-related expenses. However, she was not authorized to write checks for anything else. She was aware that some of the payroll checks were returned for insufficient funds. Ms. Lewellyn identified one handwritten check for $37,000.40 that Defendant had written out to himself. The memo line stated "Dycus settlement fee." Ms. Lewellyn noted that when she first began working for Defendant, he had some old debts, or "accounts payable," that she was eventually able to clear by paying them over a period of time.

Ms. Lewellyn testified that Defendant made the banking decisions for his firm, including on which account a check would be drawn. She did not make deposits or withdrawals on his behalf. In late 2016, Defendant directed her to write two checks for $230,000, one from his firm's trust account and one from his firm's operating account because he was not sure on which account the check would be drawn. However, her quick-view access showed that at the time the checks were written, neither account had sufficient funds for that amount. Ms. Lewellyn testified that when she would notify Defendant that he did not have the funds to cover a check she had written, he would tell her that "he had money coming in" and to write the checks and drop them off at his office. Ms. Lewellyn was never involved in the settlement of a case or the calculation of how much money the attorney or client should receive.

Ms. Lewellyn was recalled as a witness during Defendant's proof and testified that she did "[n]ot really" handle accounts receivable for Defendant's office. She explained that the deposits were made through the office, which she would record to the best of her ability. The profit and loss statements she created for Defendant used information from Defendant's bank accounts. She had to "make some assumptions because [she] didn't see who the money actually came from or anything." Ms. Lewellyn knew that Defendant charged a certain amount for a retainer fee, and she assumed a deposit for that amount was for a client fee. She also assumed that larger deposit amounts were "settlements of some

sort for clients . . . from cases." She broke down expenses from the bank transactions as either debits or checks.

Cathy Brown testified that on December 15, 2015, she met with Defendant, who she knew from high school and church, for assistance with probating her father's estate. She wrote Defendant a check for $1,500 that day. Her father lived in Nashville at the time of his death. Ms. Brown explained that there was a need to expedite the probate proceedings because her nephew had sustained a "total brain injury" in a high school football game approximately eight weeks earlier in October 2015, and "was in the hospital fighting for his life." Ms. Brown testified:

> My brother-in-law is a pastor, my sister was a teacher. She had to quit her job and, you know, their lives were just in shambles, so I just wanted to get somebody to take this over and do it and get it closed as soon as possible so we could use some of the funds for him.

Ms. Brown testified that her father's house was paid for, and he did not owe money for anything else, so "it was like this is going to be easy, it's not going to be a problem."

On February 23, 2016, Ms. Brown checked with Defendant on the progress of the probate proceedings and Defendant indicated that everything was "rolling right along." She did not hear anything else from him and contacted him again in May 2016. Defendant told Ms. Brown that the probate hearing was scheduled for June 9, 2016. However, on that day, thirty minutes before she was to leave the house, Defendant's secretary called and said that Defendant had unexpectedly been called out of town and could not attend the hearing. Ms. Brown testified: "[a]t that time, we were still friends on Facebook[,] and I have a picture of him and his family in Alaska on a vacation. So it certain[ly] wasn't a family emergency, which it just made me totally livid."

On July 15, 2016, Ms. Brown asked Defendant if they could go ahead and sell her father's house because her sister's family needed the money. Defendant indicated that it would not be a problem due to the way her father's will was written. He also said that he would ask permission from the court for the sale. Ms. Brown testified that there was a hearing on June 21, 2016, but Defendant was missing paperwork, so they could not get the approval. She said, "but we did go up to a desk and fill out papers, which now I know at that point was when the four months actually started" to notify potential creditors; that process was actually just the start of the probate proceedings.

Ms. Brown testified that on August 1, 2016, she again asked Defendant about selling the house. She found out six or seven months later that the letters testamentary were sent to Defendant's office on August 4, 2016. She said, "but once the letter of testamentary came out, then I could have had that money in an estate account that I could have then given my sister."

Ms. Brown testified that her father's house was sold "in days" for $230,000, and the closing was held on August 8, 2016. After the closing, Ms. Brown found out that Defendant had instructed the closing attorney to "send the check to his office so he could put it in his estate account, which all sounded legit to me." At that time, Ms. Brown thought that they were still waiting on the letters testamentary. A check dated August 15, 2016, was sent to Defendant's office from Belle Meade Title for $230,064.09, payable to Ms. Brown's father's estate. Ms. Brown acknowledged that she endorsed the check at Defendant's office. The check was deposited into Defendant's firm's trust account on August 15. The balance of the account before the deposit was $407.50, and after the deposit it was $230,471.59. By the end of August 2016, the balance of the account was $96,344.84, and on September 26, 2016, there was $149 left in the account.

On August 25, 2016, Ms. Brown emailed Defendant and asked if she could have some of the money from the estate for her sister because her nephew was transferring to another facility not covered by insurance. Her brother-in-law also asked Defendant for a portion of the funds for the transfer but Defendant "[j]ust kept putting [them] off."

On November 3, 2016, after Ms. Brown and her husband saw a story on the news about Defendant's suspension, she became concerned and drove to Defendant's office the following morning; the office door was locked. She texted Defendant, and he told her not to worry about anything, that he was working "on it," and it was "going to all get taken care of." Defendant also said that he was in Fort Lauderdale and would have "Merry Ann" write her a check. Ms. Brown testified that she could not get a check from either Defendant or "Merry Ann," so she eventually hired another attorney to help get the money from Defendant. Defendant initially claimed that he had wired the money to her; however, her bank never received a wire transfer. She said that on November 18, 2016, Defendant finally wrote a check payable to her attorney, but the check was returned for insufficient funds. Ms. Brown testified that neither she nor her sister ever received any money from her father's estate. Ms. Brown testified that she did not give Defendant permission to use money from her father's estate to pay his own bills, other clients, or his employees.

Defendant testified that he primarily practiced employment law and handled civil rights claims and opened his own law firm in 2012. Defendant testified that he designed a timeline and templates specific to employment law and civil rights cases to use for his practice, which was important "because there are deadlines in each of the phases[.]" He further testified that he instructed the paralegals who worked in his office to "stagger out when you ask for that right-to-sue letter[,]" which started the clock for deadlines, to ensure that their caseload was manageable. Defendant also outlined his process for working on a case after the initial phone consultation, including researching the employer, meeting with clients, obtaining employment and medical records, and identifying potential claims. He testified that the next step was to file "paperwork with the appropriate governmental agency" or court, and he explained the process for each type of case.

As to the trust cases: Dycus, Denney, Brown, and Ponce, Defendant did not dispute that the victims were entitled "to a disbursement or a payment of money." He asserted:

> As the owner of that firm, I was entrusted to keep that money separate, safe, secure, and I didn't do it. I failed at doing that. I did not have any proper controls in place, any separation of the money. It was mixed in with other money that went through the trust. I transferred money. I allowed checks to be written against that money, and it's my fault. The business, I owned it. The business is my responsibility, and I just wholly failed to keep that money safe for those trust cases, and that's on me.

> I will say to you that at no time did I have intent - - criminal intent to deprive them of this money permanently, and I don't. In fact, I've worked hard to ensure that hopefully they get paid, but at the end of the day I am responsible for that money not being held safe. But like I said, at no time did I have any criminal intent to deprive them of this money permanently.

Defendant testified that his office was not "designed" for those types of cases.

Regarding the theft of retainer fee charges, Defendant testified concerning the circumstances and the amount of legal work he claimed he performed for Mr. Brown, Mr. Lussier, Ms. Stollar, Ms. Prather, and Ms. Whitman. He agreed that there was a breakdown in the communications and handling of their cases. Defendant further testified:

> They should have been communicated with more on a regular basis. They should have been given - - they should have - - it should have been ensured that they were assigned a specific paralegal, a designated paralegal, when the one they had left, and that didn't happen. They, in some instances, should have handled - - had their claims handled a little more quickly. You know, when I look at some of these, yes, they should have had their claims handled more quickly.

> But at the end of the day it was the intent of [Defendant] and his staff to perform the work they were hired to perform, and it's the same work that [Defendant] has been doing for 20 years.

As to the charges of falsely holding himself out as a lawyer, Defendant testified that on October 6, 2016, Mr. Willis of the BPR instructed him to communicate with his clients and to give them what they needed. He asserted:

> There turned out to be, in my mind, some gray area about communicating with the clients. Now, I continued to do what Mr. Willis told me to do. I did that. My clients needed answers. They needed to know about their cases.

- 45 -

They needed a status: where is it; what's going on; what's happening. Now, remember there's 270 of them all wanting the same information.

Defendant testified there was a directive for letters to go out to all clients during his suspension notifying them that his office would remain open, and there would be two associate attorneys to "pick up and handle the cases." He said that he communicated with clients as directed.

Concerning the charge for falsely holding himself out as a lawyer in Ms. Smelser's case, Defendant asserted that Ms. Smelser was aware of his suspension because she was a witness in a federal trial he had been given permission to try during his suspension. Defendant admitted that he should have told Ms. Smelser that he could not help her when she contacted him after his suspension; he should have made certain that she knew of the suspension and should not have accepted her payment. He claimed that he did not intend to permanently deprive Ms. Smelser of her money. Defendant further admitted that Ms. Smelser's retainer fee was deposited into his firm's operating account and that "ultimately she didn't get the help that she was looking for."

Defendant testified that Mario Hererra did not have the ability to pay an upfront retainer fee, and Defendant agreed to perform the work on his case and "get paid on the back end." He claimed that he and Mr. Hererra had conversations about how Defendant would be paid, and they agreed that Defendant would be paid from the sale of Mr. Herrera's house. Defendant testified that Mr. Hererra was out of the country when Defendant received the check for the proceeds from the sale of the home. Defendant then signed Mr. Hererra's name to the check and deposited it into his firm's trust account. As to falsely holding himself out as a lawyer to Mr. Hererra, Defendant testified that in the fall of 2016, he and Mr. Hererra had a conversation in Defendant's dining room about the suspension. Defendant said that Mr. Herrera later called about something that was happening in his child support case. He said that he did not accept a payment or create any legal documents for Mr. Hererra and told him that he needed to send a "letter" to appeal. Defendant testified that he intended for Mr. Parker to handle anything else that arose in Mr. Hererra's case, and he advised Mr. Hererra that he needed to contact Mr. Parker.

Defendant testified that he initially advised Mr. Sutton that child support cases "can get expensive." He claimed that Mr. Sutton said that he did not have a lot of money to pay upfront and that he could afford to pay Defendant $1,500. Defendant testified that Mr. Sutton's case "grew into something much larger" than he anticipated, and they went through two trials, "lots" of in-court motions, and an appeal. Defendant claimed that he had no intention of depriving Mr. Sutton of his money.

Defendant agreed that Ms. Ponce's case settled for $40,000. He said that pursuant to his agreement with her, he "would receive a third, plus the expenses that I had advanced, and she would receive the two-thirds less her withholding in income tax because it was

wages." Defendant testified that he received the settlement checks and deposited his check into his account and mailed Ms. Ponce's check to her that same day on March 4, 2015. He said that the check was returned to him on March 23, 2015, "with an insufficient-address-unable-to-forward sticker on it." Defendant testified that he then deposited Ms. Ponce's check into his firm's trust account and instructed a paralegal to locate Ms. Ponce. He said that he later received a letter from opposing counsel demanding the return of the settlement money due to Ms. Ponce's breach of the settlement agreement and he began defending Ms. Ponce on that claim. Defendant agreed that Ms. Ponce never received her money but that he did not intend to deprive her of it.

Defendant agreed that he incurred a large number of insufficient fund fees in his firm's operating account, and "there were issues with the cash flow management." He said that he did not help Ms. Lewellyn as he should have or adequately communicate with her.

Based on this proof, the jury convicted Defendant of twelve counts of theft and six counts of falsely holding oneself out to be an attorney.

*Sentencing*

A corrected presentence report was admitted as an exhibit, and the trial court noted that it had read all of the letters sent to the court on Defendant's behalf written by family members, friends, and a client. Additionally, some of those individuals, along with others, testified on Defendant's behalf at the sentencing hearing.

Susan Morrow, an employee of the Tennessee Department of Correction, Probation and Parole, prepared the presentence report. She said that Defendant did not initially cooperate with her, but after hiring and speaking with an attorney, Defendant spoke with her and was forthcoming about his personal information. Ms. Morrow testified that Defendant did not provide his financial information or assets but provided his wife's instead. He said that his wife lived in their residence in Hendersonville, but he did not give any information on the value of the home or any information on bank accounts, vehicles, or other assets. Ms. Morrow testified that in Defendant's STRONG-R assessment, Defendant denied any criminal behavior and said that everything was a "mistake."

Cynthia Taylor testified that she contacted Defendant after being terminated from her employment and she paid him a full retainer. She met with Defendant numerous times to discuss her case, and he gave her hope, made promises, and she felt like he was in her "corner" and understood her situation. Ms. Taylor thought that she would regain her job with compensation. However, because of Defendant's "lies and deception," she lost that opportunity because "the time lapsed with [the] EEOC." This caused Ms. Taylor to experience a "hardship" because she was unemployed and unsure how she would "make ends meet." She testified that she lost her money and a chance of regaining employment.

Linda Cela paid Defendant $4,500 to represent her in recouping money from her employment with the United States Army. Defendant failed to file any legal documents on her behalf and repeatedly lied to her about the status and progress of her case. After Ms. Cela filed a complaint against Defendant with the Better Business Bureau, Defendant threatened to sue her for defamation. She then filed a civil complaint against him to recoup the $4,500 fee she paid him. However, she never recovered the fee payment. Ms. Cela testified that she lost both her retainer fee and the ability to pursue her case against the Army.

Tonya Blades testified that she also paid Defendant $4,500 to represent her and that he never filed a complaint with the EEOC or a lawsuit on her behalf. She borrowed the money from her father for the fee. Ms. Blades said that on top of the stress from a hostile work environment, she experienced theft by Defendant. Her workplace issues continued after paying Defendant, and she ultimately lost the ability to file a complaint with the EEOC for a right to sue.

Pamela McInish testified that she hired Defendant to represent her in an employment discrimination matter. She borrowed money from her mother to pay Defendant, and she did not believe that he ever intended to pursue her case. Ms. McInish testified that Defendant claimed she had a court date and that he was litigating the matter, but she later learned that he never filed a lawsuit on her behalf. She said that because of Defendant's actions, she lost the opportunity to regain her pension and that her lifetime pension losses totaled nearly "half a million dollars." Ms. McInish testified that Defendant had been ordered to repay her, but he had not yet done so.

TBI Special Agent Reilly Gray testified that her investigation included numerous bank records from Defendant's accounts involving the victims' cases. She gave detailed testimony as to Defendant's banking activity as it related to the victims' funds and how Defendant used money from some of the victims' cases to pay other clients. Defendant also took out loans to pay clients. Special Agent Gray testified that Defendant lied about certain assets in his possession, and he fabricated certain documents, including those related to work he claimed he had performed for Kenneth Sutton and Mario Herrera. Special Agent Gray also found documents in Defendant's home that appeared to have been fabricated, including bills, credit reports, and bank statements.

The trial court made extensive findings concerning Defendant's sentence as to the enhancement and mitigating factors and consecutive sentencing. The court ultimately imposed a sentence of twelve years for the two convictions of theft of property greater than $60,000, Class B felonies; six years for the three convictions of theft of property greater than $10,000 but less than $60,000, Class C felonies; four years for the seven counts of theft of property greater than $2,500 but less than $10,000, Class D felonies; two years for five of the convictions for falsely holding oneself out as a lawyer, and a one-year sentence for the sixth count of holding oneself out as a lawyer, Class E felonies. The trial court

imposed partial consecutive sentencing for an effective thirty-five-year sentence to be served in confinement.

## Analysis

### I.  Sufficiency of the Evidence

When evaluating the sufficiency of the evidence on appeal, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e).  The standard of review is the same whether a conviction is based on direct or circumstantial evidence.  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).  "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (quotations omitted) (quoting *Hanson*, 279 S.W.3d at 275).  Further, the State is afforded "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (quotations omitted) (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

The jury evaluates the credibility of the witnesses, determines the weight to be given to witnesses' testimony, and reconciles all conflicts in the evidence.  *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)).  Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence.  *Dorantes*, 331 S.W.3d at 379.  A guilty verdict "accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997) (citing *State v. Grace*, 493 S.W.3d 474, 476 (Tenn. 1973)).  This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *Bland*, 958 S.W.2d at 659).

### Theft Cases

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a).  "Three elements must be proven to establish theft under our statute: '(1) the defendant knowingly obtained or exercised control over property; (2) the defendant did not have the owner's effective consent; and (3) the defendant intended to deprive the owner of the property.'" *State v. Gentry*, 538 S.W.3d

413, 422 (Tenn. 2017) (quoting *State v. Amanns*, 2 S.W.3d 241, 244-45 (Tenn. Crim. App. 1999)). "'Effective consent' means assent in fact, whether express or apparent, including assent by one legally authorized to act for another." T.C.A. § 39-11-106(a)(11).

## A. Theft of Retainer Fees

Defendant argues that the evidence was insufficient to support his convictions of theft in the retainer fee cases because he lacked the intent to deprive the victims of their money, "as he always planned to work on their cases to reach a satisfactory resolution." He further contends that he provided "extensive testimony" of the work he completed on the victim's cases, although he conceded that there was "certainly more work" to be done to get them resolved. Therefore, he asserts that the evidence in this case demonstrates that there was a fee dispute rather than intent to commit theft. The State disagrees.

Viewed in a light most favorable to the State, both Mr. Willis and Mr. Bergeron explained at trial that for a "flat fee" retainer to be nonrefundable, it had to be explicitly stated in the agreement between the lawyer and client. Mr. Willis further testified that any fee not explicitly stated to be nonrefundable was subject to being returned to the client. *See* Tenn. R. S. Ct. R. 8, RPC 1.5(f)

Victims Mr. Brown, Ms. Stollar, Mr. Lussier, Ms. Prather, Ms. Whitman, Ms. Kelley, and Ms. Smelser each testified that Defendant requested a $4,500 retainer fee to represent them and that the Attorney-Client Litigation Agreement they signed did not state that the retainer fee was nonrefundable. In each case, Defendant immediately deposited the entire retainer fee or a portion thereof into one of his firm's accounts, other than a trust account, and the account into which the retainer fee was deposited had either a negative balance or a low balance. In particular, we note Mr. Brown's testimony that Defendant pressed Mr. Brown to meet at Defendant's office to pay a retainer fee after hours on a Friday evening and Defendant's claim that he would file a lawsuit on Mr. Brown's behalf the following day on Saturday. When Mr. Brown said that traffic might delay his arrival, Defendant insisted that he would wait. Additionally, regarding Ms. Kelley and Ms. Smelser, Defendant was suspended from practicing law and taking new clients at the time he accepted their retainer fees, although he claimed that he planned to transition them to Patrick Parker. Defendant did not tell any of the victims that he intended to spend their retainer fees right away, and none of the victims gave Defendant permission to spend the retainer fees before he earned them.

The victims testified that they had difficulty communicating with Defendant after paying the $4,500 retainer fee, and he either misled them into believing that he had completed paperwork to file legal documents on their behalf, that he had actually filed pleadings, or he gave excuses as to why he had not taken action. For example, he told Ms. Stollar that some of the judges had retired and that "there was a huge backlog." He also told her that he was preparing for a trial date which clearly had not been set. In all the

proof other than Defendant's own self-serving testimony, there were only two clients for whom Defendant may have actually prepared legal documents: Defendant sent drafts of legal documents to Ms. Stollar through Dropbox, and he sent Ms. Whitman a copy of a letter to her employer, but she confirmed Defendant never actually sent the letter as he claimed. Each of the victims testified that Defendant did not file any legal documents to initiate the work for which they hired him, nor did they receive any legal work in exchange for their $4,500 retainer fee. Additionally, Ms. Kelley and Ms. Smelser were never transitioned to Mr. Parker for representation as Defendant assured them they would be.

Defendant relies on *State v. Kendrick*, 178 S.W.3d 734 (Tenn. Crim. App. 2005), in support of his claim that he did not commit theft in the retainer fee cases. However, *Kendrick* is distinguishable from the present case. In *Kendrick*, the defendant was contracted to build a garage to be paid in four installments but failed to complete the portion of the work for the second installment. *Id.* at 735-36. He had poured a concrete pad, built two walls of the foundation block, and placed some lumber in the yard. *Id.* at 736. He did not complete the foundation, driveway apron, and floor of the garage as required by the contract to receive the second payment. *Id.* This court concluded that the defendant had completed at least a portion of the work that he was hired to perform although he did not complete the job. *Id.* at 739. Unlike *Kendrick*, in this case, the proof shows that Defendant did not complete any portion of the work in the retainer fee cases, other than Defendant's own testimony that he performed some of the work, or that he intended to complete work on the cases and therefore, lacked intent to deprive the victims of their property. However, the jury rejected his testimony as was its prerogative.

Based on the evidence presented at trial that Defendant's Attorney-Client Litigation Agreement with each victim failed to specify that the retainer fees were nonrefundable, that Defendant deposited money into his firm's operating accounts, other than trust accounts, that such accounts had negative or low balances, and that Defendant failed to perform any legal work or return the victims' money, a rational juror could reasonably find that Defendant intended to deprive each of the victims of their $4,500 retainer fee without their effective consent.[11]

As part of his challenge to the sufficiency of the evidence for the retainer fee cases, Defendant argues that the trial court erred by admitting expert testimony by Jennifer Stalvey as to what kinds of transactions constitute theft. At trial, Ms. Stalvey was qualified as an expert in forensic accounting.[12]

---

[11] We note that Defendant admitted to owing $4,500 to Mr. Brown, Ms. Stollar, Ms. Prather, and Ms. Whitman.

[12] The State argues that Defendant waived this issue by failing to contemporaneously object to Ms. Stalvey's testimony at trial. However, Defendant raised the issue in his motion for new trial. Therefore, it is not waived. "[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, . . ., unless the same was specifically stated in a motion for new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(e).

Expert testimony, like other evidence, must be relevant in order to be admissible. *See* Tenn. R. Evid. 402 ("Evidence which is not relevant is not admissible."). Relevant evidence is defined as any evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. This court reviews a trial court's decisions concerning the admissibility of expert evidence under an abuse of discretion standard and will reverse a decision only "'when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party.'" *State v. Parker*, 350 S.W.3d 883, 897 (Tenn. 2011) (quoting *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008)).

The admission of expert testimony is governed by Tennessee Rule of Evidence 702, which provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. "The witness may acquire the necessary expertise through formal education or life experiences." *State v. Reid*, 91 S.W.3d 247, 302 (Tenn. 2002) (Birch, J., concurring in part) (citing Neil P. Cohen et al., *Tennessee Law of Evidence* § 7.02[4] (4th ed.2000)). "However, the witness must have such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise is beyond the scope of common knowledge and experience of the average person." *Id.* The determining factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002) (emphasis omitted).

In this case, consistent with her expertise in forensic accounting, Ms. Stalvey examined Defendant's bank records and prepared a report which tracked the indictments, the fees paid by each of the victims or funds Defendant received on behalf of the victims, and the trail of those fees through Defendant's various bank accounts. She included three categories of theft in her report including theft of client funds, estate-related thefts, and theft of retainers. Ms. Stalvey explained that on the retainer fees cases, she had been informed by the TBI that "no meaningful work was performed" on the victims' behalves. While she acknowledged that she relied on the information she had been provided by the TBI and had not personally verified whether Defendant had performed any of work on behalf of the clients, Ms. Stalvey clearly stated that she was not testifying that Defendant was guilty of theft, only that she had calculated the amount of loss for each victim if the State proved theft. As pointed out by the State, the prosecutor specifically phrased each question to ensure that Ms. Stalvey's testimony did not imply that Defendant committed theft, only the amount of loss if the jury determined that Defendant had committed the offense. Therefore, we agree with the State that Ms. Stalvey did not provide her expert opinion that Defendant committed theft.

Defendant further complains that the trial court improperly limited his cross-examination of Ms. Stalvey about her knowledge of the different types of retainer fees she included in her report, therefore violating his right to due process. Specifically, Defendant asserts in his brief that the trial court erred in prohibiting him from questioning Ms. Stalvey "about whether flat fees were earned upon receipt, so long as the attorney was available to perform services and, therefore should not have been included in the amounts subject to the theft charges." Thus, Defendant argues that he was "prevented from establishing that the theft of retainer charges more properly constituted fee disputes or malpractice claims." The State objected to Defendant's request to cross-examine Ms. Stalvey regarding different types of retainer fees on the grounds that such questioning was outside the scope of her expertise as a forensic accountant. We conclude that the trial court did not err in finding that because Ms. Stalvey's expertise was that of a forensic accountant and not an attorney, testimony concerning the various types of retainer fees was outside the area of her expertise. Furthermore, any error in not allowing the cross-examination of Ms. Stalvey on retainer fees was harmless because Defendant was permitted to pursue this line of questioning through Mr. Willis, Mr. Bergeron, and Mr. Ingrum. Defendant is not entitled to relief on this issue.

## B. Theft of Client Trust Funds

Defendant argues that the evidence was insufficient to sustain his convictions for theft of funds from Mr. Herrera and Mr. Sutton. He claims that he performed extensive work on their behalf and was entitled to be paid for his services. The State disagrees, arguing that Defendant deprived Mr. Hererra of approximately $54,000 and Mr. Sutton of $16,587 without their effective consent and that the amounts did not constitute legal fees earned by Defendant.

The proof shows that Defendant represented Mr. Hererra during his divorce and post-divorce proceedings, and they did not discuss a fee. Mr. Herrera and his ex-wife's home was sold for $121,000, and Mr. Herrera was to receive half of the proceeds from the sale. Mr. Herrera, neither verbally nor in writing, agreed for Defendant to take a portion of the sale proceeds as his fee for representing Mr. Herrera. On December 16, 2014, a check in the amount of $59,969.11 was issued by the Sumner County Clerk and Master payable to Defendant and Mr. Hererra. Defendant requested Mr. Herrera's bank account number and claimed that he would deposit the check into Mr. Herrera's account. Instead, Defendant endorsed the back of the check with "Mario O. Herrera by attorney," signed his own name, and deposited the check into his firm's trust account without telling Mr. Hererra about the deposit. On that same date, Defendant wrote a check from his firm's trust account to himself for $54,269.11 with "Hererra Fee" written in the memo line. He then deposited that check into his firm's operating account. Mr. Herrera did not authorize Defendant to take the funds from the sale of the home.

Defendant later represented Mr. Herrera in a child support matter, and again there was no discussion about a fee. Defendant advised Mr. Herrera to wait until his daughters turned eighteen before withdrawing the funds from the home sale and never told Mr. Herrera he had spent the entirety of the funds.

Over the next several years, when Mr. Hererra asked Defendant about the status of his money, Defendant claimed that he was "working on it" and blamed the court system for the delay. He said that Defendant "always mentioned a name," leading Mr. Hererra to believe that his money was safe in an account. By February 2020, Mr. Hererra learned that Defendant no longer had any of his money. Mr. Hererra agreed that he always expected to pay Defendant a fee and would have paid Defendant a reasonable fee had he been asked to do so. Defendant never asked Mr. Hererra to pay a fee, nor did he provide Mr. Hererra with an accounting of his money. Regarding what would have been a reasonable fee, attorney Christopher Ingrum testified that he represented Mr. Herrera's ex-wife and charged a fee of $4,468.27 to represent her in the proceedings.

Based on this evidence, a rational trier of fact could find that Defendant intended to deprive Mr. Hererra of $54,269.11 from the proceeds of the sale of his home, without his effective consent. The two did not agree to any fee, and Defendant did not inform Mr. Herrera that he was taking that amount as his fee for representing Mr. Hererra in the divorce proceedings. Although Defendant contends that Mr. Herrera understood that Defendant's fee would be paid from the sale of the home, the jury rejected this claim.

The proof also shows that Mr. Sutton hired Defendant to represent him in a child custody matter, and he agreed to pay Defendant a $1,500 retainer fee. They did not discuss any other fees, and Mr. Sutton noted that the matter was not very complicated. Mr. Sutton later wrote a check for $4,000 to be held in escrow until it could be determined whether Mr. Sutton owed the amount in child support. Subsequently, Defendant told Mr. Sutton that he needed an additional $12,587 for the escrow account to be paid by cash or money order. Mr. Sutton did not question Defendant's request because Mr. Sutton had received a letter from the court informing him that he needed that amount in the escrow account.

Mr. Sutton paid the $12,587 to Defendant in cash for child support arrearages, and on that same date, Defendant deposited $12,000 into a personal checking account he shared with his wife. Defendant did not ask Mr. Sutton's permission to take the $12,000 and Mr. Sutton said he would not have consented to the deposit. Mr. Sutton later learned that the trial court had found that he owed $12,000 in child support arrearages, and he thought that the full amount was in the escrow account. He later unsuccessfully attempted to contact Defendant to get his money returned.

Based on this evidence, a rational jury could find that Defendant intended to deprive Mr. Sutton of $16,587 that he gave to Defendant to be held in an escrow account for child support arrearages. Mr. Sutton testified that the two never agreed on Defendant's fee, and

Mr. Sutton never consented to the money being taken by Defendant for his personal use. Mr. Sutton never received a bill for Defendant's services. Although Defendant claims that Mr. Sutton's case was a highly contentious child support matter in which he would not have accepted a retainer fee of $1,500 and that the $12,000 deposited into his account was for his services, the jury rejected this claim.

## Falsely Holding Oneself Out as a Lawyer

"It is unlawful for any person, either directly or indirectly, falsely to advertise the person as, or hold the person out as, a lawyer." T.C.A. § 23-3-108(a). Defendant argues that the evidence is insufficient to sustain his convictions for falsely holding oneself out as a lawyer because Tennessee Code Annotated section 23-3-108(a) applies only to non-attorneys; that the statute is void for vagueness; and that the evidence does not show that he held himself out as a lawyer to victims Lisa Smelser (count nineteen), Mario Hererra (count five), Sharon Sullivan (count sixteen), Danielle Means (count seventeen), Rachell Scott (count twenty-one), and Jinny Broughton (count twenty-two). The State responds that application of Tennessee Code Annotated section 23-3-108(a) is not limited to non-attorneys, that the statute is not void for vagueness because it is a strict liability offense and does not require a mens rea, and that the record belies Defendant's contentions that he did not provide legal advice or hold himself as a lawyer to the victims while his license to practice law was suspended.

Defendant argues that rather than charging him under Tennessee Code Annotated section 23-2-108(a), the State should have charged him with violating section 23-2-103, which provides that "[n]o person shall engage in the practice of law or do law business, or both, as defined in § 23-3-101, unless the person has been duly licensed and while the person's license is in full force and effect[.]" *Id.* § 23-3-103(a).

In support of his argument, Defendant relies on *Board of Professional Responsibility v. Barry*, 545 S.W.3d 408, 426-27 (Tenn. 2018), in which our supreme court, in deciding whether disbarment was the appropriate discipline for an attorney, discussed the differences between disbarment and suspension. The court stated:

> In *Hornbeck* [*v. Board of Professional Responsibility*, 545 S.W.3d 386 (Tenn. 2018)], we explained that disbarment and suspension of an attorney's law license are two wholly distinct remedies. *Id.* at [397]. With suspension, the lawyer remains a member of the bar but is temporarily prevented from exercising the privileges associated with his or her law license. "Suspension specifically contemplates that, once the conditions imposed under the suspension are met, the attorney will be permitted to return to law practice." *Id.*

Disbarment, however, is not a temporary state. It "terminates the individual's status as an attorney." *Id.* (quoting Tenn. Sup. Ct. R. 9, § 12.1 (2014)). "The purpose of disbarring an attorney is to remove from the profession a person who has proven to be unfit or unworthy of being entrusted with the duties and responsibilities accorded to those who have gained the privilege of a law license." *Id.* In contrast to suspension, disbarment "does not contemplate that the disbarred attorney will return to the practice of law" in Tennessee. *Id.*

*Id.* (footnote omitted). In *Hornbeck*, concerning suspension, the supreme court stated:

An attorney whose license to practice law is suspended is in a temporary state; to suspend means "[t]o temporarily keep (a person) from performing a function, occupying an office, holding a job, or exercising a right or privilege < the attorney's law license was suspended for violating the Model Rules of Professional [Responsibility] >." *Black's Law Dictionary 1675* (10th ed. 2014). Thus, an attorney under suspension remains a member of the bar. Suspension specifically contemplates that, once the conditions imposed under the suspension are met, the attorney will be permitted to return to law practice.

*Hornbeck*, 545 S.W.3d at 397.

Neither in *Barry* nor *Hornbeck* did the court analyze Tennessee Code Annotated section 23-8-108(a) or hold that the statute applies only to non-attorneys. Nor does the plain language of the statute limit its application only to non-attorneys as argued by Defendant. Mr. Willis testified that while suspended from practicing law, Defendant could not provide any legal advice except to advise his clients to hire a new attorney. Defendant was prohibited from presenting any "indicia of a lawyer," meaning that Defendant could not "look like," "sound like," or "act like a lawyer." Furthermore, section 28 of Rule 9 of the Tennessee Supreme Court Rules requires an attorney on suspended or disability status to refrain from maintaining a presence or occupying an office where the practice of law is conducted and requires him or her to remove "any indicia of attorney, lawyer, counselor at law, legal assistant, law clerk, or similar title." Tenn. Sup. Ct. R. 9 § 28.8.

As stated above, Tennessee Code Annotated section 23-3-108(a) provides that it is unlawful for any person to falsely advertise or hold themselves out as a lawyer. "Person' means a natural person, individual, governmental agency, partnership, corporation, trust, estate, incorporated or unincorporated association, and any other legal or commercial entity however organized[.]" T.C.A. § 23-3-101(2). As pointed out by the State, nothing in the plain language of section 23-3-108 or in the definitions in the statutory scheme provides that section 23-3-108(a) applies only to non-attorneys. The fact that Defendant could have been charged with violating Tennessee Code Annotated section 23-3-103 does not preclude

the State from charging him with violating section 23-3-108(a). While we recognize that there is a difference between disbarment and suspension, the fact remains that a lawyer who is suspended from the practice of law is not a lawyer during the suspension even though he or she may still be a member of the bar. Defendant was not charged under an inapplicable statute.

As for Defendant's argument that section 23-3-108(a) is void for vagueness because it does not contain a mens rea, we agree with the State that because this is a strict liability offense, no mens rea is required. As pointed out by both Defendant and the State, the mens rea contained in Tennessee Code section 39-11-301(b) of intentionally, knowingly, or recklessly is inapplicable in this case because that section is limited to offenses enumerated in Title 39 of Tennessee Code Annotated. *See State v. Terry*, E2021-00406-CCA-R3-CD, 2022 WL 1288587, at *11 (Tenn. Crim. App. Apr. 29, 2022), *no perm. app. filed.*

The United States Supreme Court "has identified 'public welfare' or '"regulatory" offenses' which allow for 'a form of strict criminal liability through statutes that do not require the defendant to know the facts that make his conduct illegal.'" *Id.* (quoting *Staples v. United States*, 511 U.S. 600, 606 (1994)). "Criminal strict liability is defined as '[a] crime that does not require a mens rea element, such as traffic offenses and illegal sales of intoxicating liquor." *Id.*; *see also Strict Liability Crime*, Black's Law Dictionary (12th ed. 2024). This court has held that violating the Motor Vehicle Habitual Offender ("MVHO") Act; driving under the influence of an intoxicant ("DUI"), and driving on a cancelled, suspended, or revoked license ("DORL") are all strict liability offenses and do not require a mens rea. *State v. Turner*, 953 S.W.2d 213, 215 (Tenn. Crim. App. 1996); *Terry*, 2022 WL 1288587, at *11-13; *State v. McDonald*, No. 02C01-9206-CR-00126, 1993 WL 312698, at *3 (Tenn. Crim. App. Aug. 18, 1993).

In concluding that DUI is a strict liability offense, this court in *Turner* observed that the DUI statute "plainly dispenses with a mental element" and that "an intoxicated person seated behind the steering wheel of a motor vehicle is a threat to the safety and welfare of the public." *Turner*, 953 S.W.2d at 215. In *Terry*, this court opined that the terms of violating the MVHO Act "clearly dispense with a mens rea element" and that the public policy of the MVHO Act "indicates that the legislature intended for this offense to likewise be a public welfare or regulatory offense with no mens rea." *Terry*, 2022 WL 1288587, at *12.

Likewise, the offense of falsely holding oneself out as a lawyer in Tennessee Code Annotated section 23-3-108(a) plainly dispenses with a mens rea and contains no requirement that a defendant act with any culpable mental state to commit the offense. The offense is committed when a person who is not a lawyer falsely advertises or holds himself or herself out as a lawyer. Like the offenses of violating the MVHO Act, DUI, and DORL, the intent of section 23-3-108(a) is to ensure the safety and welfare of the public. This court has observed that "'[t]he purpose of the statutory prohibition against the unauthorized

practice of law protects the public by ensuring that the public receives high quality legal services.'" *State ex rel. Slatery v. Witherspoon Law Group PLLC*, No. E2021-01343-COA-R3-CV, 2022 WL 17828855, at *9 (Tenn. Ct. App. Dec. 21, 2022) (quoting *Fifteenth Jud. Dist. Unified Bar Ass'n v. Glasgow*, No. M1996-00020-COA-R3-CV, 1999 WL 1128847, at *6 (Tenn. Ct. App. Dec. 10, 1999)). Because a violation of section 23-3-108(a) is a strict liability offense, which is permissible and does not require a mens rea, Defendant has not shown that the statute is void for vagueness.

Finally, the proof is sufficient to show that Defendant falsely held himself out as a lawyer to the victims. Mr. Willis testified that the Tennessee Supreme Court temporarily suspended Defendant's law license effective September 9, 2016. Pursuant to the suspension order, Defendant was not authorized to accept any new clients. As noted above, Mr. Willis testified that Defendant was prohibited from displaying "the indicia of a lawyer," which meant that Defendant could not "look like, act like" or "sound like a lawyer."

As to Ms. Smelser, Defendant accepted a $4,500 retainer fee from her on November 22, 2016, and agreed to represent her while his license was suspended. After learning that Defendant's license was suspended, Ms. Smelser confronted Defendant, and he claimed that the suspension was temporary and would soon be lifted because he had filed "paperwork" to lift the suspension. Defendant then continued to engage in conversations with Ms. Smelser about her case, and on November 29, 2016, agreed to email her a copy of the contract she had signed with him the previous week. Defendant never told Ms. Smelser that he could not represent her because his license had been suspended. Additionally, Mr. Willis agreed that during the BPR proceedings, Defendant did not contest the allegation that he represented Ms. Smelser without a law license.

Defendant argues that Ms. Smelser knew about his suspension because it was openly discussed at a trial in which Ms. Smelser was a witness, that he thought his office had mailed her a letter advising her of his suspension, and that he intended to transition her to Mr. Parker's representation. The record does not support Defendant's claims. Moreover, even if Defendant had notified Ms. Smelser about his suspension, any such notification does not negate the fact that his law license was suspended at the time that Ms. Smelser hired him, and he did not disclose the suspension to her. Based on this proof, a rational jury could find that Defendant falsely held himself out as a lawyer to Ms. Smelser.

Mr. Herrera testified that Defendant never informed him that his law license was suspended when he spoke with Defendant in 2019 concerning his child support case. Defendant had previously represented Mr. Hererra, and Mr. Herrera believed that he was still an attorney. During Defendant's suspension, he exchanged text messages with Mr. Hererra about the status of Mr. Hererra's case and the work Defendant claimed he had performed. In some of the text messages, Defendant acknowledged that he had received documents and discussed drafting an appeal in Mr. Herrera's case. Although Defendant

claimed he told Mr. Herrera about his suspension and referred him to Mr. Parker for representation, the jury rejected this claim as was their prerogative. Based on this proof, a rational jury could find that Defendant falsely held himself out as a lawyer to Mr. Hererra.

Ms. Sullivan hired Defendant to represent her in an employment matter in December 2013 which was still ongoing in October 2016. She was not aware that his law license had been suspended when she communicated with him after October 9, 2016, believing that he was still an attorney and working on a settlement in her case. She also continued to ask Defendant legal questions and for updates on her case, and Defendant responded in a manner indicating that he was still acting as her attorney. From this evidence, a rational jury could find that Defendant falsely held himself out as a lawyer to Ms. Sullivan.

Ms. Means hired Defendant to represent her in January 2013 in a personal injury suit. Beginning on November 3, 2016, Defendant and Ms. Means exchanged text messages about her case, and Defendant indicated that he was working on a settlement. He did not inform her that his law license was suspended and that he could no longer represent her. In January 2017, Ms. Means texted Defendant and asked if he had lied about the settlement or failed to distribute it. Defendant claimed that he was attempting to finalize the settlement and that another attorney was helping him. In April 2017, Ms. Means and Defendant again exchanged text messages about the status of her case. During those conversations, Defendant never disclosed that his law license was suspended, and Ms. Means considered him to be her attorney. During those conversations, Defendant answered legal questions and discussed strategy with Ms. Means about her case. Based on this proof, a rational jury could find that Defendant falsely held himself out as a lawyer to Ms. Means.

Ms. Scott hired Defendant on February 4, 2014, to represent her in a lawsuit against her former employer. Defendant told her he had filed the lawsuit, and Ms. Scott believed that her case was active. Ms. Scott communicated with Defendant about her case into January 2017, when she learned that his law license had been suspended. However, Defendant claimed that it was "just a minor thing" that would be resolved by sending in "some paperwork." When Ms. Scott pressed Defendant further about the suspension, he said that he had someone helping him "knock some of these cases out" until his license was restored. Defendant never advised Ms. Scott to seek other counsel because he could no longer represent her, and he led her to believe that he was still working on her case. From this proof, a rational jury could find that Defendant falsely held himself out as a lawyer to Ms. Scott.

Ms. Broughton hired Defendant to represent her in 2015. In text messages Defendant exchanged with Ms. Broughton while Defendant's law license was suspended, he indicated that he was "incorporating" certain information "into discovery" which gave her the impression that he was acting as her attorney and actively working on her case. Ms. Broughton continued texting Defendant from October to December 2017, believing that he was still her attorney and representing her. She eventually confronted Defendant about his

suspension, and he claimed that it was "old." Defendant did not tell Ms. Broughton he could no longer represent her or provide legal advice and he continued indicating that he was working on her case. Based on this proof, a rational jury could find that Defendant falsely held himself out as a lawyer to Ms. Broughton.

Although Defendant claims that he directed his staff to mail letters to all his clients concerning his suspension, none of the victims testified that they received such a letter. Defendant further claims that he provided the victims only the information that they needed, such as the status of their cases, and he believed he was complying with the BPR's instructions to continue communicating with his clients to give them what they needed during his suspension. However, the jury rejected Defendant's claims. The evidence was sufficient to support Defendant's convictions for falsely holding himself out as a lawyer.

## II.    Jury Instructions

Defendant argues that the trial court erroneously instructed the jury regarding the mens rea of falsely holding oneself out as a lawyer; that the trial court should have instructed the jury as to when consent is effective; that the trial court erroneously granted the State's request for special instructions regarding the Rules of Professional Responsibility; and that the trial court should have provided a special instruction concerning the definition of a "flat fee" retainer. The State asserts that this court should deny Defendant's claims because the trial court properly instructed the jury.

A defendant in a criminal case "has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). A jury charge should contain no statement which is inaccurate, inapplicable, or which might tend to confuse the jury. *State v. Hatcher*, 310 S.W.3d 788, 812 (Tenn. 2010). Whether a jury instruction is required by the facts of a particular case is a mixed question of law and fact. *State v. Hawkins*, 406 S.W.3d 121, 128 (Tenn. 2013). The question of whether a jury instruction should have been given is therefore reviewed de novo with no presumption of correctness. *Id.* A special jury instruction may be given "to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury." *State v. Cozart*, 54 S.W.3d 242, 245 (Tenn. 2001), *overruled on other grounds by State v. White*, 362 S.W.3d 559, 570-78 (Tenn. 2012). A jury instruction must be considered in its entirety and read as a whole rather than in isolation. *State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004). A jury instruction is only considered "prejudicially erroneous" if the jury charge, when read as a whole, "fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005).

### A. Mens Rea for Falsely Holding Oneself Out as a Lawyer

Defendant argues that the trial court erroneously charged the jury that it could convict him of falsely holding himself out as a lawyer if it found that he acted intentionally, knowingly, or recklessly because Tennessee Code Annotated section 23-3-108(a) does not contain a mens rea. He contends that the trial court erroneously substituted the mens rea of intentionally, knowingly, and recklessly under Tennessee Code Annotated section 39-11-301(b) because the charged offenses do not fall under Title 39. Therefore, Defendant argues that the "rule of lenity weighs in favor of interpreting the statute narrowly" in his favor and that the trial court should have charged the jury that it could convict him only if it found that he acted intentionally. The State contends that because Tennessee Code Annotated section 23-3-108 does not contain a mens rea and is a strict liability offense, the trial court should not have instructed the jury with the mens rea of intentionally, knowingly, or recklessly. However, the State argues that any error was harmless because it was favorable to Defendant.

As we have previously discussed, Tennessee Code Annotated section 23-3-108 is a strict liability offense which plainly dispenses with a mens rea and contains no requirement that a defendant act with any culpable mental state to commit the offense. *See McDonald*, 1993 WL 312698, at *3. Therefore, Defendant was not entitled to a mens rea instruction that he acted intentionally concerning this offense. *Terry*, 2022 WL 1288587, at *13 ("Because the trial court correctly determined that this MVHO Act violation was a strict liability offense, there was no error in its decision not to include a mens rea instruction in the jury charge."). Moreover, the rule of lenity, which requires that an ambiguous criminal statute be resolved in favor of the defendant, is a "tie-breaker" to be used only when an ambiguity remains after considering the plain language of the statute, the legislative history, and other canons of statutory construction. *State v. Marshall*, 319 S.W.3d 558, 563 (Tenn. 2010). The rule of lenity is "rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his [or her] conduct is prohibited. *Id.* (alteration in original). The rule of lenity is not implicated "unless there is 'a "grievous ambiguity or uncertainty" in the statute.'" *State v. Deberry*, 651 S.W.3d 918, 932 (Tenn. 2022) (quoting *State v. Welch*, 595 S.W.3d 615, 623 n.4 (Tenn. 2020)). There is no grievous ambiguity or uncertainty in the language of Tennessee Code Annotated section 23-3-108. Defendant is not entitled to relief on this ground.

Although the trial court erred by charging the jury that it could convict Defendant of falsely holding himself out as a lawyer if it found that he acted intentionally, knowingly, or recklessly, the error was harmless. We agree with the State that the jury instruction increased, rather than decreased, the State's burden of proof. *See State v. Clark*, No. M2017-02525-CCA-R3-CD, 2019 WL 410705, at *6 (Tenn. Crim. App. Jan. 31, 2019) ("Initially, the Defendant is not entitled to relief based on error in the oral instructions because the error in the oral instructions served only to increase the State's burden of

proof."). Moreover, the error was harmless beyond a reasonable doubt. "When an appellate court undertakes a harmless error analysis its purpose is to ascertain the actual basis for the jury's verdict. . . . [T]he crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision-making." *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008). The evidence here overwhelmingly supported the conclusion that Defendant falsely held himself out as a lawyer to Lisa Smelser, Mario Hererra, Sharon Sullivan, Danielle Means, Rachell Scott and Jinny Broughton. Defendant is not entitled to relief on this issue.

## B. Definition of Deception When Defining Effective Consent

Defendant contends that the trial court should have charged the jury in accordance with Tennessee Pattern Jury Instruction (T.P.I.) 11.01 that consent is not effective when induced by deception or coercion and that the trial court should have granted his request for a special instruction defining "deception." He asserts that deception was fairly raised by the proof, and therefore, the trial court violated his right to complete and accurate jury instructions. Defendant further contends that the definition of "deception" was critical because it clarified that "mere failure to perform is insufficient to establish that the person did not intend to perform or knew the promise would not be performed." The State argues that Defendant is not entitled to relief because this instruction was not fairly raised by the proof, and alternatively, any error in omitting the instruction was harmless.

T.P.I. 11.01 sets out the elements of theft of property, and defines effective consent as follows:

> "Effective consent" means assent in fact, whether express or apparent, including assent by one legally authorized to act for another. Consent is not effective when:
>
> [(A) induced by deception or coercion].

*See* T.C.A. § 39-11-106(a)(11)(A). Tennessee Code Annotated section 39-11-106(a)(7)(A) provides that "deception" means that a person knowingly:

(i)     Creates or reinforces a false impression by words or conduct, including false impressions of fact, law, value or intention or other state of mind that the person does not believe to be true;

(ii)    Prevents another from acquiring information which would likely affect the other's judgment in the transaction;

(iii)   Fails to correct a false impression of law or fact the person knows to be false and:

(*a*) The person created; or

(*b*) Knows is likely to influence another;

(iv)    Fails to disclose a lien, security interest, adverse claim or other legal impediment to the enjoyment of the property, whether the impediment is or is not valid, or is or is not a matter of public record;

(v)    Employs any other scheme to defraud; or

(vi)(*a*) Promises performance that at the time the person knew the person did not have the ability to perform or that the person does not intend to perform or knows will not be performed, except mere failure to perform is insufficient to establish that the person did not intend to perform or knew the promise would not be performed[.]

The trial court in this case instructed the jury in accordance with T.P.I. 11.01 that "[e]ffective consent means assent in fact, whether express or apparent, including assent by one legally authorized to act for another." However, the court declined Defendant's request to instruct the jury that consent is not effective when induced by deception or coercion and his request for a special instruction defining deception because deception was "not a part of theft" and "not an element of theft." The trial court further stated:

Now, [Defendant], you - - and I think this probably goes with your testimony, but you've got your defenses here, and I'm looking at number three, that you obtained or exercised control over the property while honestly believing that the owner, if present, would have consented.

I don't know if you understand that when you take property in a theft case, you don't necessarily have to have the intent to deprive the owner of that property the minute that you exercise control over the property. In situations where people give property to somebody else to keep and they - - yeah, they've got authority to keep it, and then for some reason or another they do what they want to do with it and they exercise control and deprive the owner of the property. That's clear in the definition of theft. So I just wanted to caution you on that. That's what you testified to.

And the State is alleging, yes, you got this; you got this fee; you've taken it as a retainer; you're exercising control over it as a fiduciary, but it's not necessary that the intent to deprive exists when you got it. Do you understand that, [Defendant]?

- 63 -

We agree with Defendant that deception was fairly raised by the proof in this case, given the State's theory that Defendant intended to defraud clients and committed theft by accepting retainers for cases on which he never intended to work. Defendant also testified that he always intended to complete the work for which he was retained but was overwhelmed by the high volume of his practice. While we agree with the State that the proof established that Defendant took money he was not authorized to take and failed to return it to the victims, "thereby taking the money without the victims' 'assent in fact, whether express or apparent,'" there was testimony presented that implied deception on Defendant's part at the time he accepted the victims' money. *See* T.C.A. § 39-11-106 (a)(11). Therefore, the trial court should have instructed the jury that consent is not effective when induced by deception or coercion and provided a definition of deception.

However, any error in omitting Defendant's requested instruction was harmless because it did not impact the jury's verdict. Errors in jury instructions are subject to a "harmless error" analysis. *Hawkins*, 406 S.W.3d at 128 (citing *State v. Williams*, 977 S.W.2d 101, 104-05 (Tenn. 1998)). The test in determining whether an error is harmless is "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *State v. Cecil*, 409 S.W.3d 599, 610 (Tenn. 2013) (quoting *Rodriguez*, 254 S.W.3d at 371).

The proof in this case was overwhelming and does not reflect that Defendant intended to complete work on the victims' cases but failed to do so due to the high volume of his law practice. As pointed out by the State, Defendant did not deposit any of the retainer fees into his firm's trust account as required; instead, he deposited them into his firm's operating account and personal account, both of which had negative or low balances. The victims testified extensively about the difficulty in contacting Defendant about their cases, and when they did reach him, he falsely claimed that their cases were proceeding and that he was continuing to work on them. However, Defendant failed to file promised lawsuits or take other legal action on behalf of the victims. In Ms. Kelley's and Ms. Smelser's cases, Defendant agreed to undertake legal representation for them and accepted their $4,500 retainer fees after his law license had been suspended. Ms. Kelley and Ms. Smelser both testified that Defendant never informed them that his license was suspended and that he would not perform the legal work they paid him to do. The proof does not support Defendant's contention that the mere failure to perform was insufficient to establish that he did not intend to perform or knew the promise would not be performed. Therefore, even if the trial court had provided the jury with Defendant's requested instruction, it would not have affected the verdict in this case.

## C.  Instructions on the Rules of Professional Responsibility

Defendant argues that the trial court erred by granting the State's request to instruct the jury about the Rules of Professional Responsibility because it improperly allowed the jury to use ethical rules to find intent to commit crimes. He further asserts that the special

instructions were not necessary because two witnesses from the BPR had already testified concerning the rules. Therefore, Defendant argues that the "court issued instructions that failed to fairly submit the relevant legal issues, constituting prejudicial error" and that the instructions were "inherently confusing and misled the jury regarding the applicable legal standards." The State responds that the trial court correctly provided the instructions for "contextual purposes."

Multiple witnesses at trial testified about the Rules of Professional Responsibility (the "Rules") and Defendant's violations of the Rules. Both Mr. Bergeron and Mr. Willis of the BPR testified that the Rules govern the ethical obligations and conduct of attorneys and regulate how attorneys are required to hold money belonging to others. Mr. Bergeron testified that before an attorney can become licensed in Tennessee and continue to practice law, the attorney must certify that he or she understood and was familiar with the Rules. He further discussed the application of Rule 1.15. Attorneys Mr. Tolbird, Ms. Porter, and Mr. Ryan testified about how they practiced law in accordance with the Rules. Based on the proof at trial, the trial court instructed the jury on the Rules as follows:

> Rules of Professional Responsibility. You must understand that a violation of these rules or any discipline which might have been imposed for an alleged violation of these rules is not a criminal proceeding, but an administrative proceeding. These rules and any evidence of action by the Tennessee Supreme Court or the Tennessee Board of Professional Responsibility are being provided to you solely for context.

The instruction went on to include from Tennessee Supreme Court Rule 8 in their entirety, Rule 1.1 on Competence; Rule 1.3 on Diligence; Rule 1.4 on Communication; Rule 1.5 on Fees; Rule 1.15 on Safekeeping Property and Funds; Rule 1.16 on Declining or Terminating Representation; and Rule 4.1 on Truthfulness in Statements to Others.

The trial court determined that the jury instruction provided guidance to the jury on how to consider the Rules. The court further instructed the jury that "a violation of these rules or any discipline which might have been imposed for an alleged violation of these rules is not a criminal proceeding, but an administrative proceeding," and that the Rules and "any evidence of action by the Tennessee Supreme Court or the Tennessee Board of Professional Responsibility are being provided to you solely for context." The trial court again cautioned the jury at end of the instruction that "those [R]ules were given to you in context, as this case has developed." The trial court's instruction made it clear that violating the Rules of Professional Responsibility was not a criminal offense and that the instruction was solely to provide context to the proof presented at trial. Jurors are presumed to follow the instructions given to them by the trial court. *Henley v. State*, 960 S.W.2d 572, 581 (Tenn. 1997). We cannot conclude that the trial court erred in providing the jury with the instruction on the Rules of Professional Responsibility.

## D. Instruction on the Definition of a Flat Fee

Defendant asserts that the trial court erred in denying his request for a special jury instruction to inform the jury of the "earned upon receipt" nature of "flat fee" retainers arguing that his request was pertinent to the jury's analysis of his guilt or innocence. Additionally, he argues that the special instruction was necessary to rebut the State's assertions that the failure to deposit flat fees into a trust account was an indication of theft and to bolster his theory that depositing flat fees into a trust account would violate the prohibition against commingling funds. Defendant further asserts that the trial court's failure to issue the instruction left "the jury to assess [his] guilt without the proper framework for understanding the type of fees that he charged and that flat fees are not to be deposited in the trust account." The State argues that Defendant's requested instruction was not a correct statement of the law.

Relying on the supreme court's decision in *Board of Professional Responsibility v. Reguli*, 489 S.W.3d 408, 421-22 (Tenn. 2015), Defendant requested that the trial court instruct the jury as follows:

> The term "retainer" is often used to describe three variations of fee arrangements. One type of retainer, of which you have heard evidence about, is the "advance fee retainer," which "is a present payment to a lawyer as compensation for the provision of specified legal services in the future.["] This fee is intended to compensate the lawyer for all work to be done on a matter, and is more commonly known as a "fixed" or "flat" fee. This fee is earned upon receipt, assuming the lawyer is available to perform the services. Accordingly, an earned "fixed" or "flat" fee should not be placed in a client trust account.

(citations omitted).

We agree with the State that Defendant's proposed instruction was misleading and an inaccurate statement of the law, and therefore, the trial court properly declined to instruct the jury as Defendant requested. In *Reguli*, the supreme court identified three types of fees typically described by the term "retainer." *Id.* at 421-22. One type of fee included an "advance fee retainer," which was "a present payment to a lawyer as compensation for the provision of specified legal services in the future." *Id.* at 422. The court explained that this type of fee was "intended to compensate the lawyer for all work to be done on a matter," that it was "more commonly known as a 'fixed' or 'flat' fee," that it was "earned upon receipt, assuming the lawyer is available to perform the services," and "should not be placed in a client trust account." *Id.* However, *Reguli* further clarified that Rule of Professional Conduct 1.5(f) "requires '[a] fee that is nonrefundable in whole or in part [to] be agreed to in a writing, signed by the client, that explains the intent of the parties as to the nature and amount of the nonrefundable fee." *Id.* (alteration in original) (quoting Tenn.

- 66 -

R. S. Ct. R. 8, RPC 1.5(f)). The supreme court concluded that the fee in *Reguli* was not nonrefundable nor earned upon receipt because it was not specified in the contract that the fee was nonrefundable. *Id.*

At trial, Mr. Bergeron explained that any refundable fee from a client must be deposited into a trust account and must not be transferred to an operating account until earned. Consistent with *Reguli*, Mr. Bergeron testified that for a retainer fee to be nonrefundable, it must be plainly stated in writing. Mr. Willis also testified that "a fee is always refundable unless the lawyer in writing tells the client that it's going to be nonrefundable." Mr. Willis further testified that "[e]ven the flat fee would be refundable" unless "in writing, signed by the client, and clearly stating" that such fee was nonrefundable.

In this case, it is undisputed that Defendant's Attorney-Client Litigation Agreements with the victims did not clearly state that the retainer fees were nonrefundable; therefore, the money was not earned upon receipt and was required to be placed in Defendant's firm's trust account because they were refundable. As such, Defendant's proposed instruction was an inaccurate statement of the law as applied to his case. The trial court did not err in failing to provide Defendant's requested instruction to the jury.

### III. Prosecutorial Misconduct During Closing Argument

Defendant contends that during closing argument, the State made a highly improper and inflammatory "safer streets" statement to the jury "calculated to appeal to the jury's generalized fear of crime" and thus constituting prosecutorial misconduct. Defendant concedes that he did not contemporaneously object to the statement but asks that we review the issue for plain error. The State argues that Defendant has not "shown that plain error review is warranted."

Under plain error review, relief will only be granted when five prerequisites are met: (1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice. *State v. Rimmer*, 623 S.W.3d 235, 255-56 (Tenn. 2021) (citing *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016)). If any one of these factors is not satisfied, we do not need to consider the remaining factors. *State v. Smith*, 492 S.W.3d 224, 232 (Tenn. 2016).

Closing arguments are valuable tools for both the prosecution and the defense, and the Tennessee Supreme Court has historically allowed wide latitude to counsel in arguing their cases during closing arguments. *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). "Trial judges in turn are accorded wide discretion in their control of those arguments." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. 2003) (quoting *State v. Zirkle*, 910

S.W.2d 874, 888 (Tenn. Crim. App. 1995)). In order to properly bring an issue regarding closing argument forward on appeal, the complaining party must have objected to the argument contemporaneously. *State v. Robinson*, 146 S.W.3d 469, 518 (Tenn. 2004); *see State v. Green*, 947 S.W.2d 186, 188 (Tenn. Crim. App. 1997).

Further, a trial judge's discretion will not be interfered with in terms of closing arguments without evidence of an abuse of discretion. *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). There is reversible error only when, "conduct was so improper or the argument so inflammatory that it affected the verdict to the Appellant's detriment." *Goltz*, 111 S.W.3d at 5 (quoting *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965)). In *Judge v. State*, this court determined five factors to consider to determine whether there has been prosecutorial misconduct in closing arguments: (1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

In *State v. Goltz*, the Tennessee Supreme Court outlined "five general areas of prosecutorial misconduct" that can occur during closing arguments: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or the defendant's guilt; (3) using arguments calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge. *Goltz*, 111 S.W.3d at 5.

During closing arguments in this case, the State made the following statement:

I'm interested in this new definition of theft that [Defendant] is presenting us. Apparently[,] you can take money from people, lie to them, spend it on whatever you want, lie to them and delay some more, and then, you know, three, four, five years later, when you're caught, well, I didn't - - I didn't mean to permanently deprive them. I just, you know, took their money. Spent it. Lied and delayed. But, no intent to permanently deprive.

This is really going to cut down on our thefts. I mean, how many prosecutions of theft are going to be left? You can do that and that's not theft? What is?

First, Defendant cannot show that the State's argument breached a clear and unequivocal rule of law. A full reading of the closing arguments demonstrates that the prosecutor's statement was not a "safer streets" argument, but instead a rebuttal to Defendant's claim in closing argument that he did not intend to permanently deprive the victims of their money

- 68 -

and that he did not commit theft. The prosecutor's statement did not stray "too far 'from the evidence and the reasonable inferences to be drawn from the evidence.'" *Whitehead v. State*, No. M2019-00790-CCA-R3-PC, 2020 WL 2026010, at 5 (Tenn. Crim. App. Apr. 27, 2020) (citations omitted).

Additionally, Defendant has failed to show that a substantial right was adversely affected or that consideration of the issue is necessary to do substantial justice. "For a 'substantial right' to have been affected, the error must have prejudiced the appellant. In other words, it must have affected the outcome of the trial court proceedings." *Rimmer*, 623 S.W.3d at 278 (quoting *State v. Maddin*, 192 S.W.3d 558, 562 (Tenn. Crim. App. 2005)). In the theft of retainer fee cases, the proof was overwhelming that the victims paid Defendant to represent them, that Defendant deposited the victims' unearned retainer fees into an account, other than his firm's trust account, and that the accounts into which Defendant deposited the unearned retainer fees almost always had a negative balance. Thereafter, the victims had difficulty contacting Defendant about the status of their cases, and Defendant did not perform the agreed-upon legal work. As for the theft of trust cases, the proof shows that Defendant received money on behalf of Mr. Hererra, Mr. Sutton, Ms. Ponce, Mr. Dycus, and the heirs of the Denney estate, that he was required to hold the received funds in a trust account, and that he instead distributed those funds to himself and depleted them. The proof also shows that Defendant falsely held himself out as a lawyer to Ms. Sullivan, Ms. Means, Ms. Smelser, Ms. Scott, Ms. Broughton, and Mr. Herrera by failing to advise them of his suspension from the practice of law, providing legal advice, and asserting that he was actively working on their cases. Therefore, a substantial right was not adversely affected, and plain error review is not necessary to do substantial justice.

Finally, Defendant has not established that his failure to contemporaneously object to the State's closing argument was not strategic, and there was nothing in the record to suggest that the failure to object was not strategic. *State v. Brodie*, No. M2023-00135-CCA-R3-CD, 2024 WL 3272795, at *14 (Tenn. Crim. App. July 2, 2024), *no perm. app. filed*. "[I]t is well-established that the plain error rule is not applicable when the record reflects that a defendant made a deliberate, tactical choice to waive an objection." *Id.* (quoting *State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000)); *see also State v. Cox*, M2017-02178-CCA-R3-CD, 2019 WL 1057381, at *10 (Tenn. Crim. App. Mar. 6, 2019) ("This Court can contemplate multiple tactical reasons that would explain why defense counsel may have consciously chosen not to object to the prosecutor's closing argument, and none of those reasons were dispelled in defendant's brief. Therefore, Defendant has not carried his burden of persuasion.").

Because Defendant has not established the criteria for plain error review, he is not entitled to relief on this issue.

## IV. Exclusion of Evidence

Defendant argues that the trial court erred by prohibiting him from "presenting critical evidence in his defense" in the form of profit and loss statements "that would have provided the jury with a clearer understanding of the firm's finances and would have rebutted the State's theory that [he] stole from clients out of financial desperation." Defendant asserts that the trial court also erred by excluding "time records" and client files to show work that he performed on the victims' cases, thereby proving his innocence of theft. He argues that the exclusion of the evidence violated his constitutional right to present a defense. The State responds that trial court did not abuse its discretion in excluding the evidence because it was irrelevant.

"[I]t is well established that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of discretion." *State v. Stinnett*, 958 S.W.2d 329, 331 (Tenn. 1997). "Principles of due process require that a defendant in a criminal trial have [sic] the right to present a defense and to offer testimony" favorable to his cause. *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000)). However, that right is not without limits. *See id.* (citing *Chambers*, 410 U.S. at 302). The United States Supreme Court has observed that "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence." *Chambers*, 410 U.S. at 302. "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Flood*, 219 S.W.3d at 316 (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Holmes v. South Carolina*, 547 U.S. 319 (2006); *Chambers*, 410 U.S. at 302). In determining whether a particular evidentiary ruling has violated a defendant's constitutional right to present a defense, a reviewing court must consider:

(1) Whether the excluded evidence is critical to the defense;

(2) Whether the evidence bears sufficient indicia of reliability; and

(3) Whether the interest supporting exclusion of the evidence is substantially important.

*Flood*, 219 S.W.3d at 316 (citing *Brown*, 29 S.W.3d at 434-35; *State v. Rice*, 184 S.W.3d 646, 673 (Tenn. 2006) *abrogation recognized by State v. Shackleford*, 673 S.W.3d 243 (Tenn. 2023); *State v. Rogers*, 188 S.W.3d 593, 614 (Tenn. 2006)).

## A. Profit and Loss Statements

During Defendant's offer of proof, the trial court voiced concern with the relevance, materiality, and accuracy of the profit and loss statements prepared by Ms. Lewellyn. The court was specifically concerned that the statements included deposits from the victims that should have been placed in a trust account and did not reflect loan balances. Defendant agreed that in the reports, Ms. Lewellyn "flagged everything as legal fee income," which the court felt, and Defendant agreed, was a "problem." The court pointed out: "So you've got - - we've got an issue with quote/unquote stolen money, and you've got an issue with loans not being reflected." When Defendant asserted that the statements reflected "roughly a million dollars a year going through the account," the trial court replied:

Well, I understand, [Defendant]. I understand that you had a very profitable business, but we have to consider certain things, and I do not want to mislead the jury. Just because you have a favorable report somewhere doesn't completely tell the whole story, and that's what I have reminded you about a few times. If you were an attorney, how is this admissible? How is this not frivolous and skirting an issue?

Defendant asserted that the statements were just "one piece of the puzzle." The trial court ultimately found that the statements were inadmissible:

[Defendant], I've looked over this and looked over some of the testimony. I don't believe they are complete statements representing the profit and loss by Allman & Associates. I don't think Ms. Lewellyn has been given all the information and I think this would not be an accurate picture of what was happening.

Defendant has not shown that admission of the profit and loss statements was relevant and that any probative value was not substantially outweighed by the danger of misleading and confusing the jury. Although Ms. Lewellyn created the statements, she acknowledged that she had no control of Defendant's firm's accounts, and she did not know how many outstanding loans Defendant had or whether he had paid the loans. She agreed that because she did not know the source of incoming money, had it been determined any of the income was stolen, she would have identified it as profit if she did not "know any better." Ms. Lewellyn testified that Defendant had sole access to the firm's accounts and sole authority to move and transfer funds and that she sometimes had to make assumptions based on information from the accounts. Therefore, Ms. Lewellyn could not be certain of the accuracy of the "profits" shown in the statements. Because the statements did not bear a sufficient indicia of reliability and would have been misleading to the jury, the trial court did not abuse its discretion by excluding the profit and loss statements, and the exclusion of the statements did not violate Defendant's due process right to present a defense. Defendant is not entitled to relief on this issue.

## B. Client Files, Time Records, and Emails

In considering Defendant's request to admit client files, time records, and emails concerning the retainer fee cases, the trial court concluded:

> [Defendant], first of all, there's a long-standing rule of law that a defendant who makes a self-serving statement, it's inadmissible. It's like a defendant in a murder case proving that he made a statement somewhere down the line, that he did it in self-defense. That can't be done. And the records - - records - - you know, I've already - - we've already seen how - - records were not kept here. There's a poor system of recordkeeping in this business. And you can't get up here and produce documents that are self-serving. You can state that, "Yes, I did this," or "did that." But there are clear rules, [Defendant], and this is - - I've told you it's a dangerous path, representing yourself, but, secondly, taking the witness stand. I want you to remember more than anything else, sir, you're under oath - -

>        *    *    *

> - and will follow the rules of evidence. And when the generals make an objection, I will rule on it, but the rules of evidence will be followed. You can't make any self-serving statements. You can't introduce any records that are not authenticated.

More specifically, Defendant wanted to admit handwritten time logs from Mr. Hererra's case and Mr. Sutton's case, a draft in progress and legal research on Ms. Whitman's case, and a rough draft of a complaint in Mr. Brown's case. The State noted that the materials were not provided to the State prior to trial despite a reciprocal request for discovery. The State was also concerned that some of the documents were fabricated. The trial court again expressed concern that the documents contained self-serving statements. The court stated:

> Now, if you've got emails that you've sent to somebody else that show that you've done some work, that's self-serving. I can't allow the defendant to get on the witness stand in a first-degree murder case and say, well, here's a letter that I wrote to somebody saying I did it in self-defense. That's self-serving, and it's also hearsay because it's not an admission of a party-opponent; it's not a confession; it's also hearsay.

> So, we're in a difficult spot here. Your testimony can cover some of this, but we're not going to receive any documents because they're inadmissible.

We agree with the State that the trial court properly determined that any of the emails between Defendant and the victims were self-serving statements that constituted

inadmissible hearsay. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "[N]o general rule of evidence excludes statements merely because they are self[-]serving. Instead, most self-serving statements are excluded not solely because they are self-serving but instead because they constitute inadmissible hearsay." *Phipps v. State*, No. E2008-01784-CCA-R3-PC, 2010 WL 3947496, at *8 (Tenn. Crim. App. Oct. 11, 2010) (citations omitted). The "self-serving hearsay" rule "simply acknowledges that such statements constitute hearsay if offered to prove the truth of the matter asserted therein and, like other hearsay evidence, are unreliable." *State v. Faulkner*, No. M1998-00066-CCA-R3-CD, 2000 WL 711144, at *10 (Tenn. Crim. App. June 2, 2000) (citing Neil P. Cohen, et al., *Tennessee Law of Evidence* § 803(1.2).2, at 514 (3d ed.1995)). "Thus, if a defendant's self-serving statement is offered for a purpose other than proving the truth of the matter asserted therein, the statement does not constitute hearsay and will be admissible unless excluded pursuant to some other rule of evidence." *Id.* (citing *State v. Roe*, No. 02C01-9702-CR-00054, 1998 WL 7107, at *11 (Tenn. Crim. App. Jan. 12, 1998)).

Defendant argues that the emails were not offered for the truth of the matter asserted but were offered to show communication between himself and the victims in support of his testimony that he performed work on their cases. However, to the extent that the emails established that Defendant performed the work, they would have been offered for the truth of the matter asserted and were properly excluded.

Furthermore, Defendant failed to establish that the files, emails, and time records bore a sufficient indicia of reliability and would not have been misleading to the jury. At trial, multiple attorneys and paralegals who worked with Defendant testified that they did not track their billable hours and that there was no system in place in Defendant's office for keeping track of billable hours and time spent on a case. Ms. Demay-Samuels testified that sometimes when clients called upset or inquiring as to the status of their cases, Defendant directed her and other employees to tell clients that work had been performed that had not actually been done. She said that Defendant's work was done through contingency fees rather than billable hours. Ms. Demay-Samuels testified that "if the case was won and the [c]ourt was going to award attorney's fees, [Defendant] would have us go back through the file and start creating the time to be paid for our time." Furthermore, the victims testified that Defendant failed to provide them with any accounting or billing statements to explain how his fees were earned. As pointed out by the State, Defendant has not established that the files, emails, and time records were accurate records kept during the normal course of business and not created after the fact in response to Defendant's criminal charges. Therefore, the trial court did not abuse its discretion by excluding the documents. Additionally, the exclusion of the documents did not violate Defendant's due process right to present a defense. Defendant was able to present evidence, through his own testimony, about the work that he allegedly performed on the victim's cases.

Defendant also asserts that the trial court erred by limiting his cross-examination of Ms. Swanson. After she testified that some of Defendant's cases were of low quality, Defendant wanted to ask her if the cases she had taken over after Defendant's suspension had received financial settlements. The trial court found that the disposition of cases that occurred after Defendant's suspension was irrelevant, and that Ms. Swanson could discuss "the cases that [Ms. Swanson] knew of, the results prior to the suspension, but nothing after the suspension." "The propriety, scope, manner and control of the cross-examination of witnesses . . . rests within the discretion of the trial court." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). The trial court did not abuse its discretion in limiting the scope of cross-examination of Ms. Swanson.

## V. Admission of BPR Findings

Defendant argues that the trial court erred by admitting the BPR's findings from his order of suspension that he had misappropriated client funds as proof of motive or intent under Tennessee Rule of Evidence 404(b). More specifically, he contends that the trial court failed to comply with the requirements of the rule because it did not find that proof of the acts referenced in the order of suspension were clear and convincing. He further contends that the evidence was "highly prejudicial" noting that the BPR proceedings lacked due process protections. The State argues that the trial court did not abuse its discretion in admitting the findings from the order of suspension.

Tennessee Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403.

It is well-established "that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996). Tennessee Rule of Evidence 404(b) permits the admission of evidence of prior conduct if the evidence of other acts is relevant to a litigated issue such as identity, intent, or rebuttal of accident or mistake, and the probative value outweighs the danger of unfair prejudice. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts.; *see State v. Parton*, 694 S.W.2d 299, 303 (Tenn. 1985); *State v. Hooten*, 735 S.W.2d 823, 824 (Tenn. Crim. App. 1987). However, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Before admitting evidence under Rule 404(b), the rule provides that (1) upon request, the court must hold a hearing outside the jury's presence; (2) the court must determine that the evidence is probative on a material issue and must, if requested, state on the record the material issue and the reasons for admitting or excluding the evidence; (3) the court must find proof of

the other crimes, wrongs, or acts to be clear and convincing; and (4) the court must exclude the evidence if the danger of unfair prejudice outweighs its probative value. *Id.*

The clear and convincing standard cannot be met solely from hearsay evidence unless it is admissible under an exception to the hearsay rule, such as Rule 804(b)(6). *State v. Sexton*, 368 S.W.3d 371, 405 (Tenn. 2012), *as corrected* (Oct. 10, 2012). Evidence is unfairly prejudicial if it has "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. DuBose*, 953 S.W.2d 649, 654 (Tenn. 1997).

The BPR order temporarily suspending Defendant from practicing law stated that "[b]ased upon the Petition and the supporting Affidavits, the Court finds [Defendant] failed to respond to the Board of Professional Responsibility concerning complaints of misconduct, misappropriated funds and poses a threat of substantial harm to the public as detailed by the Affidavits of Disciplinary Counsel and Ms. Ponce." During the jury-out hearing on this matter, Mr. Willis testified that it was unusual for the BPR to issue a suspension order such as the one in Defendant's case. He further testified: "[b]ut of the cases we handle that involve misappropriation of funds, those cases - - in all those cases in which the lawyer does not respond to us, we seek 12.3[13] in those particular cases on a regular basis." Mr. Willis agreed that Defendant was suspended due to a threat of substantial harm to the public, along with the fact that he had not responded to a number of bar complaints. He said that under those circumstances, an attorney would remain suspended until he or she responded to complaints against him or her.

The trial court pointed out that Defendant failed to comply with an ethical obligation, "but then this is conduct that possibly supports a material issue for the [S]tate." The trial court further concluded:

> I find that this is conduct that goes directly to the order of temporary suspension. This is unusual. I mean, this jury has heard some amazing testimony, and it's not going to come as a shock or it's not going to prejudice the defendant anymore than the prejudice that has come in from the direct testimony.
>
> I also find that this is conduct that is material to [the] issue of motive and intent and not taking care of business. I find that it would be admissible under 404(b) for those purposes, and like I have [said] throughout the course of this trial, I'll give an instruction to the jury on this or possibly other matters about how this testimony is to be taken.

---

[13] This is in reference to section 12.3 of Rule 9 of the Supreme Court Rules concerning temporary suspension.

With respect to Tennessee Rule of Evidence 404(b)(3), the trial court did not explicitly state that proof of the acts referenced in the BPR suspension order was clear and convincing. However, it is clear from the reading of the record that this finding was implicit in the ruling of the trial court in admitting the evidence, especially in light of Defendant's admissions. *See State v. Clark*, 452 S.W.3d 268, 291 (Tenn. 2014) (concluding that although the trial court failed to "expressly state" that the evidence was "clear and convincing," the defendant's repeated admission to conduct supported a "clear and convincing" finding); *State v. Nelson*, No. 03C01-9706-CR-00197, 1998 WL 694971, at *8-9 (Tenn. Crim. App. Sept. 9, 1998) (holding that the trial court substantially complied with Rule 404(b) even though it did not specially make a finding that the proof was "clear and convincing").

Additionally, at this point in the trial, the trial court had already heard Ms. Ponce's testimony that she paid Defendant a $4,500 retainer fee to represent her, that she signed an agreement with her former employer in which she would receive a $40,000 settlement, that Defendant received a check made payable to Ms. Ponce, and that he endorsed it with her name, indicating that he did so as her attorney. Ms. Ponce testified that Defendant never informed her that he received the check, and she did not receive any money from the settlement. Ms. Ponce's trial testimony was clear and convincing evidence that Defendant misappropriated funds belonging to Ms. Ponce as referenced in the BPR order of suspension, and the trial court considered the "direct testimony" presented at trial in admitting the BPR findings.

We conclude that the trial court in this case substantially complied with the requirements of Rule 404(b):

When the proffered evidence is subject to the procedural requirements of Tennessee Rule of Evidence 404(b) and when the trial court has substantially complied with those requirements, any decision as to whether to admit evidence under Rule 404(b) will be reversed only for an abuse of discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). Because the term "discretion" essentially "denotes the absence of a hard and fast rule," *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999), we will reverse a decision to admit evidence "only when the 'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *Id.* (citing *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)).

*State v. Harris*, No. M2019-01609-CCA-R3-CD, 2021 WL 673015, at *17 (Tenn. Crim. App. Feb. 22, 2021), *perm. app. denied* (Tenn. June 9, 2021). Accordingly, the trial court in this case did not abuse its discretion in admitting the BPR's findings from Defendant's order of suspension that he had misappropriated client funds as proof of motive or intent

under Tennessee Rule of Evidence 404(b). Furthermore, the "tendency" of the evidence to show Defendant's motive and intent outweighs any possibility of unfair prejudice. *Id.*

Finally, we reject Defendant's assertion that the BPR findings should have been excluded because disciplinary proceedings do not include the same due process protections as those in a criminal trial. Again, as pointed out by the State, the basis for the BPR's finding that Defendant misappropriated funds in Ms. Ponce's case comes from her affidavit, and she testified at trial concerning the content of the affidavit, that Defendant took her settlement money without her knowledge or consent. Furthermore, the trial court instructed the jury that it was not to consider proof of other crimes to "prove his disposition to commit such a crime as that on trial" and that it could only be considered for the "limited purpose of determining whether" it provided motive and intent. The trial court further instructed the jury, as set forth above, that a violation of the Rules of Professional Responsibility is not a criminal but an administrative proceeding and were being provided "solely for context." Again, jurors are presumed to follow the instructions given to them by the trial court. *Henley*, 960 S.W.2d at 581. Defendant is not entitled to relief on this issue.

## V. Pretrial Motions

Defendant argues that the trial court erred in denying several of his pretrial motions. He asserts that the trial court should have: excluded testimony about the health conditions of Ms. Brown's nephew and Mr. Hererra's mother; excluded testimony of the difficulty his employees had in cashing and depositing their paychecks; excluded testimony from bank employees because the parties had already stipulated to the evidence; dismissed the "flat fee" retainer cases or severed the cases from the remaining ones; and dismissed one charge of falsely holding himself out as a lawyer because it violated double jeopardy. The State contends that the trial court did not abuse its discretion in denying the motions.

As previously noted, "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Generally, relevant evidence is admissible, and irrelevant evidence is inadmissible. Tenn. R. Evid. 402. The trial court may, however, exclude relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Questions concerning the admissibility of evidence fall within the trial court's sound discretion. *State v. Dotson*, 254 S.W.3d 378, 392 (Tenn. 2008).

## A. Health of the Victims' Family Members

At trial, Defendant argued that the testimony of the health conditions of Ms. Brown's nephew and Mr. Hererra's mother should have been excluded because it was irrelevant and would play upon the sympathy of the jurors. Ms. Brown's nephew was paralyzed from an accident and ultimately passed away but needed access to the money during the relevant time period. Mr. Herrera indicated in text messages exchanged with Defendant that he needed the money from the sale of his home for his mother who was ill. The State argued that the information was relevant, probative, and not overly prejudicial because it was one of the reasons both Mr. Herrera and Ms. Brown needed the funds Defendant was supposed to be holding in trust for these clients.

Defendant also argued that the evidence had no relevance because it did not prove any elements of the theft charge. The trial court disagreed and concluded that the evidence was relevant to show Defendant's intent. The court further said: "[i]f somebody is telling you that they need this money to take care of a nephew, that goes - - you know, it's prejudicial. And I'm sorry that it's prejudicial, but most proof in a criminal trial is prejudicial." The trial court ultimately found that the probative value of the evidence was outweighed by the prejudicial effect.

As observed by the trial court and pointed out by the State, "the mere fact that evidence is particularly damaging does not make it unfairly prejudicial." *State v. Gentry*, 881 S.W.2d 1, 7 (Tenn. Crim. App. 1993); *see also State v. March*, 395 S.W.3d 738, 774 (Tenn. Crim. App. 2011) ("[A]ny evidence which tends to establish the guilt of an accused is highly prejudicial to the accused, but this does not mean that the evidence is inadmissible as a matter of law.").

Ms. Brown and other family members repeatedly asked, and desperately needed, the money from her father's estate to help with expenses for her nephew's injury. This evidence was probative to show Defendant's intent because despite being aware of Ms. Brown's family circumstances, he still took the money and permanently deprived them of the funds. Likewise, with Mr. Hererra, despite being aware that Mr. Herrera's mother was sick and that Mr. Hererra was requesting his money for his mother's care, Defendant still took the proceeds from the sale of Mr. Herrera's home and permanently deprived him of those funds. The trial court considered this evidence and found that its probative value was not substantially outweighed by the danger of unfair prejudice. We conclude that the trial court did not abuse its discretion in admitting this evidence. Defendant is not entitled to relief on this claim.

## B. Employee Paychecks

Initially, we note that although it appears that on September 8, 2021, the trial court heard argument on the State's motion to allow evidence of Defendant's employees'

delayed paychecks, and took the matter under advisement, neither the motion nor the transcript of the hearing on this motion are included in the record on appeal. It is the appellant's duty to prepare a record necessary to convey the issues on appeal. Tenn. R. App. P. 24(b). In any event, during a jury-out hearing at trial on the admissibility of the evidence, the trial court found that the evidence was relevant as to Defendant's motive and intent, "and that would go to show not a propensity for violating the law, but as an element of proof for the underlying offenses."

Several of Defendant's former paralegals and associate attorneys testified that they had difficulty both cashing and depositing their paychecks due to insufficient funds in Defendant's firm's operating account on which the checks were drawn. Ms. Biemel further testified at trial that when Defendant received a retainer fee, he deposited the fee in the firm's operating account. This was highly probative of Defendant's intent and motive to take money from the victims to cover his financial difficulties without intending to provide any legal work to the victims. Because this evidence related to the element of intent in Defendant's theft charges, its probative value was not substantially outweighed by the danger of unfair prejudice. We conclude that the trial court did not abuse its discretion in admitting evidence concerning Defendant's employees' paychecks. Defendant is not entitled to relief on this claim.

## C. Bank Employee Testimony

Defendant also argues that the trial court erred by admitting testimony by bank employees Jimmy Overton of Volunteer State Bank, Alisha Matthews, and the custodian of records for Pinnacle Bank because Defendant stipulated to the admissibility of his bank records. He further argues that the testimony was irrelevant, confusing, a waste of time, and cumulative.

Initially, as pointed out by the State, it does not appear that Ms. Matthews testified at trial; therefore, Defendant cannot show any error concerning her testimony. Also, the only Pinnacle Bank employee who testified at trial was Mary Jane Isham; however, she did not testify as the custodian of records.

In any event, in a jury-out hearing before trial, concerned with the attempt to reduce the number of witnesses, Defendant asserted that he had stipulated to the admission of his bank records and that testimony by bank employees was irrelevant. The State pointed out that even with the stipulation, the State was allowed to present its proof "in the way that we feel is necessary." The State also noted that it would not be "redundant," planned to be efficient, and that the witnesses would testify as to their personal interactions with Defendant which was "critical for the jury to hear this in deciding what happened and who actually stole this money from each and every victim that we have in this case." The trial court ultimately denied Defendant's motion to exclude the testimony.

Ms. Isham's testimony established that Defendant's bank accounts were frequently overdrawn. She said that she only interacted with Defendant as he was solely in charge of banking decisions regarding his accounts. Ms. Isham also testified that Defendant, as the executor of an estate, transferred money out of the estate trust account into his personal and firm's accounts with Pinnacle Bank. She also detailed Defendant's behavior which caused the bank to end its relationship with him and noted that Defendant had an unsecured line of credit for $100,000 which was ultimately charged off and never paid back. Mr. Overton's testimony also established that Defendant's accounts were frequently overdrawn and that he was difficult to contact concerning the matter. He said that after the bank ended its relationship with Defendant, the bank obtained a judgment against Defendant for $8,372.79 for an account that was overdrawn, which Defendant did not pay.

As argued by the State, Ms. Isham's and Mr. Overton's testimony was brief and described Defendant's behavior in a manner not reflected in the bank statements. Again, because this evidence related to the element of intent in Defendant's theft charges, its probative value was not substantially outweighed by the danger of unfair prejudice. We conclude that the trial court did not abuse its discretion by admitting this evidence. Defendant is not entitled to relief on this claim.

**D. Motion to Dismiss Retainer Fees Cases**

Defendant argues that the retainer fees paid to him by clients were "flat fee" retainers that were earned upon receipt and could not "provide the basis for theft of property." He further contends that "[g]iven the legal impossibility of theft of retainer fees that were earned upon receipt, the trial court abused its discretion in denying [Defendant's] motion to dismiss these charges."

Defendant again relies on *Reguli* for the proposition that the retainer fees in this case were paid "up front" and could not have been stolen because they became his property upon payment, "so long as he remained available to perform the services." He asserts that he provided extensive testimony of the work he performed on the cases and that the circumstances amounted to a contract dispute rather than theft. *See Kendrick*, 178 S.W.3d at 739.

However, as previously discussed, Defendant's reliance on *Reguli* here is misplaced. In *Reguli*, the supreme court provided that "'[a] fee that is nonrefundable in whole or in part [shall] be agreed to in a writing, signed by the client, that explains the intent of the parties as to the nature and amount of the nonrefundable fee.'" *Reguli*, 489 S.W.3d at 422 (quoting Tenn. R. S. Ct. R. 8, RPC 1.5(f)). Furthermore, Mr. Willis explained that "[e]ven the flat would be refundable" unless "in writing, signed by the client," and "clearly laid out to the client" that the fee is nonrefundable. Mr. Willis agreed that any retainer fee which did not include a signed agreement was subject to be refunded. In this case, none of Defendant's Attorney-Client Litigation Agreements with the victims

that Defendant claims were "flat fee" cases stated that the retainer fee was nonrefundable; Defendant conceded this fact. The proof at trial showed that Defendant accepted the retainer fee in each case and then either failed take action or complete the legal work to earn the fee paid to him. The trial court did not abuse its discretion in denying Defendant's motion to dismiss the retainer fee cases and allowing the jury to determine if Defendant's actions amounted to theft.

### E.  Severance of Retainer Fee Cases

Defendant argues that if the trial court did not dismiss the retainer fee cases, the trial court should have severed the retainer fee cases from Defendant's other charges because they were not part of a common scheme or plan and did not have a similar character as the remaining charges. Again, he asserts that the charges were simply contract disputes because he performed extensive work on the victims' cases.

A trial court's decision to consolidate or sever offenses is discretionary and will only be reversed if discretion has been abused. *State v. Shirley*, 6 S.W.3d 243, 245-47 (Tenn. 1999); *State v. Moore*, 6 S.W.3d 235, 238 (Tenn. 1999). "[A] trial court's decision to consolidate or sever offenses will not be reversed unless the 'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *Spicer v. State*, 12 S.W.3d 438, 442-43 (Tenn. 2000) (quoting *Shirley*, 6 S.W.3d at 247); *see also State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997). Discretion is also abused when the trial court "failed to consider the relevant factors provided by higher courts as guidance for determining an issue." *State v. Garrett*, 331 S.W.3d 392, 401 (Tenn. 2011) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

The consolidation of multiple offenses against a single defendant in a single trial is governed by the interplay of Rules 8, 13, and 14 of the Tennessee Rules of Criminal Procedure. Rule 8 identifies the circumstances for mandatory joinder and permissive joinder. Under the rule for mandatory joinder:

(a)(1) Two or more offenses *shall* be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or the offenses consolidated pursuant to Rule 13, if the offenses are:

(A) based on the same conduct or arise from the same criminal episode;

(B) within the jurisdiction of a single court; and

(C) known to the appropriate prosecuting official at the time of the return of the indictment(s), presentment(s), or information(s).

Tenn. R. Crim. P. 8(a) (emphasis added). Under the rule for permissive joinder:

(b)(1) Two or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13, if:

(1) the offenses constitute parts of a common scheme or plan; or

(2) they are of the same or similar character.

Tenn. R. Crim. P. 8(b) ("Rule 8(b)"). Thus, if the State moves to consolidate separate indictments, it needs to establish only one thing: the offenses are either parts of a common scheme or plan, or, that they are of the "same or similar character." *Id.*; *see also Spicer*, 12 S.W.3d at 443. Next, Rule 13 permits the trial court to sever offenses pre-trial "if a severance could be obtained on motion of a defendant or of the state pursuant to Rule 14." Tenn. R. Crim. P. 13(b). Finally, Rule 14(b)(1) permits the severance of offenses which have been joined permissively under Rule 8(b).

Under Rule 14(b)(1), a defendant has "an absolute right" to a severance of the offenses unless the State can establish that (1) the offenses are part of a common scheme or plan; (2) evidence of each offense would be admissible in the trial of the other offenses if severed; and (3) the probative value of the evidence of the other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant. *State v. Eady*, 685 S.W.3d 689, 709 (Tenn. 2024); *State v. Toliver*, 117 S.W.3d 216, 228 (Tenn. 2003); *Spicer*, 12 S.W.3d at 443-45 (citing Tenn. R. Crim. P. 14(b)(1), Tenn. R. Evid. 404(b)(2), and (4)).

Under the first prong, crimes which are part of a larger, continuing plan or conspiracy constitute evidence of a common scheme or plan under Rule 14(b). *State v. Hoyt*, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995), *overruled on other grounds by Spicer*, 12 S.W.3d at 447, n.12; *see also State v. Hallock*, 875 S.W.2d 285, 289-90 (Tenn. Crim. App. 1993).

Under the second or "primary" prong, multiple offenses tried together is an issue of evidentiary relevance and thus invokes Rule 404(b). Rule 404(b) excludes evidence of other crimes which amount to nothing more than propensity evidence unless the evidence serves some "other purpose" such as identity, motive, intent, absence of mistake or accident, if that is a defense, and a common scheme or plan for commission of two or more crimes so related to each other that proof of one tends to establish the other. *Moore*, 6 S.W.3d at 239; Tenn. R. Evid. 404(b), Advisory Comm'n Cmts; *Toliver*, 117 S.W.3d at 230.

For the third prong, the trial court must balance the probative value of the evidence against the danger of its unfair prejudice in showing the defendant's propensity or character

as required by Rule 404(b). Factors to consider include "the prosecution's need for the evidence, the likelihood the defendant committed the other crimes, and the degree of its relevance." *State v. Edwards*, 868 S.W.2d 682, 691 (Tenn. Crim. App. 1993). "The similarity of the acts makes the probative value particularly significant." *Id.*

In determining whether discretion has been abused, our review of a severance ruling is confined to the evidence presented at the severance hearing, along with the trial court's findings of fact and conclusions of law. *Spicer*, 12 S.W.3d at 445 (concluding that "because the trial court's decision of whether to consolidate offenses is determined from the evidence presented at the hearing, appellate courts should usually only look to that evidence"); *see also Shirley*, 6 SW.3d at 247 (reviewing severance issue by examining only the proof at the severance hearing where the trial court held a severance hearing but failed to make findings of fact and conclusions of law); *cf. Toliver*, 331 S.W.3d at 404 (stating that because trial court failed to hold a hearing, our supreme court analyzed the consolidation issue based on the evidence at trial).

In this case, after initially agreeing to consolidate the offenses, Defendant filed a motion to sever the "flat fee" retainer counts arguing "joinder of these [c]ounts at trial are not necessary to the proof of the remaining issues and are unduly prejudicial to . . . Defendant's defense, denying . . . Defendant a fair determination." More specifically, Defendant averred that the retainer fee counts were "contract disputes" because of their nonrefundable nature. Therefore, these counts were civil disputes and not criminal offenses. The State countered that the retainer fee counts were based on the same conduct or arose from the same criminal episode, requiring mandatory joinder, and the retainer fee counts showed a common scheme or plan, thus allowing permissive joinder. Jennifer Stalvey's report was entered as an exhibit at the hearing and Special Agent Gray testified extensively concerning the circumstances of Defendant's charges.

The trial court denied the severance motion finding that Defendant's case involved mandatory joinder. The court further concluded:

> If you look at permissive joinder, you look at whether they are part of a common scheme or plan and whether they are of the same or similar character. Same or similar character is a no-brainer. Yes. Offenses constitute parts of a common scheme or plan, we look and see what common scheme or plan evidence, and the one that would apply here is part of a larger continuing plan or conspiracy.
>
> What I've heard today, just briefly - - I mean, we've got similar situations: Dennys, hundred thousand dollars; Dycus, hundred thousand dollars; Sutton, $12,000; Ponce, $14,000. These are non-retainers and these - - don't know where the money is.

- 83 -

You take the retainers - - and I do not believe that the *Reguli* case is authoritative here. What I think we need to look at is whether the defendant was given money and whether he took that money or used it to do what he was supposed to do, and that's what we'll look in each of those other cases and we'll have to go through each one of them. In order to do that - - we'll have to do that - - and it'll take a week to go through that just pretrial.

So as of this stage, I will not grant a severance. All these motions [sic] will be tried together, and that's really what the parties agreed to do a long time ago.

The proof in this case supports the trial court's findings and demonstrates that Defendant committed all of the offenses as part of a larger scheme or plan to take money from the victims and use it to either pay his personal debts, his employees, or other clients. As previously discussed, Defendant's personal and firm's operating accounts frequently had negative balances, and he deposited retainer fees into those accounts on multiple occasions. Ms. Stalvey and Ms. Wixson each testified that Defendant used money from Ms. Ingram's estate in the Dycus case to pay money owed to other clients. Ms. Biemel testified that Defendant took retainer fee checks and deposited them into his firm's operating account to have money to pay his employees. The proof also showed that Defendant failed to perform work on any of the retainer fee cases or any of the other theft cases, indicating a larger scheme or plan to steal money from the victims to pay off other debts. *See State v. Wiseman*, 643 S.W.2d 354, 362-63 (Tenn. Crim. App. 1982) (concluding that joinder of offenses was proper when the offenses were all part of a larger conspiracy to defraud Washington County, and much of the evidence of the methods used to defraud the county was admissible as to each count).

The charges in the retainer fee cases were also similar in nature to the theft of client and estate trust funds, and Defendant's charges of falsely holding himself out as a lawyer. In all of the theft cases, Defendant had sole access to the accounts and authority to transfer money. He displayed a similar pattern of behavior in the cases by falsely indicating that he was going to perform legal work and then using the fees paid by the victims to pay other clients, employees, personal debts, or to bring one of his accounts with a negative balance to a positive balance. The charges against Defendant of holding himself out as a lawyer to Ms. Smelser and Ms. Kelley were also similar in nature in that Defendant accepted fees from Ms. Smelser and Ms. Kelley after he had been suspended. Defendant also falsely held himself out as a lawyer just as he falsely indicated to the victims in the retainer fee cases that he would perform legal work in exchange for the fee.

Additionally, evidence of each offense was relevant to the material issue of motive and intent, and the probative value outweighed any danger of unfair prejudice. As pointed out by the State, although the trial court did not make these specific findings, the record is adequate for this Court's review of the issue. *See Garrett*, 331 S.W.3d at 404 (analyzing

severance based on proof presented at trial when the trial court failed to hold a hearing and make requisite findings of fact and conclusions of law). The trial court did not abuse its discretion in denying Defendant's motion to sever the retainer charges from the remaining counts. Moreover, any error in denying Defendant's motion to sever the retainer fee cases was harmless given the strength of the State's case. Defendant is not entitled to relief on this issue.

### F. Double Jeopardy

Defendant argues that the trial court should have dismissed the charge of falsely holding himself out as a lawyer as to Ms. Smelser because it violated Double Jeopardy protections. He contends that he "had previously pled [guilty] to this crime in the context of the criminal contempt proceedings before the Tennessee Supreme Court."[14]

"The Double Jeopardy Clause protects a person from being prosecuted twice 'for the same offense.'" *Denezpi v. United States*, 596 U.S. 591, 594 (2022); *see* U.S. CONST. amend. V; TENN. CONST. art. I, § 10. Under both the federal and our state constitutions, a defendant is protected against (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012). A claim that multiple convictions violate the protection against double jeopardy is a mixed question of law and fact, which this Court will review de novo without any presumption of correctness. *State v. Smith*, 436 S.W.3d 751, 766 (Tenn. 2014) (citing *State v. Thompson*, 285 S.W.3d 840, 846 (Tenn. 2009)).

Defendant's case implicates the third type of double jeopardy protection: protection against multiple punishments for the same offense. This type of claim has been divided into two categories: (1) unit-of-prosecution claims, "when a defendant who has been convicted of multiple violations of the same statute asserts that the multiple convictions are for the same offense"; and (2) multiple description claims, "when a defendant who has been convicted of multiple criminal offenses under different statutes alleges that the statutes punish the same offense." *Id.* (citing *Watkins*, 362 S.W.3d at 543-44). Defendant's argument is one concerning a multiple description claim. To address a multiple description claim, we must apply the two-pronged test laid out in *Blockburger v. United States*, 284 U.S. 299, 304 (1932). *See Smith*, 436 S.W.3d at 767; *Watkins*, 362 S.W.3d at 556.

> In a *Blockburger* analysis, our primary focus is whether the General Assembly expressed an intent to permit or preclude multiple punishments. If either intent has been expressed, no further analysis is required. When the

---

[14] The trial court dismissed the corresponding charge involving Wanda Kelley, finding that it involved the same conduct and criminal elements as Defendant's plea in the criminal contempt proceedings before the supreme court.

legislative intent is unclear, however, we must apply the "same elements test" from *Blockburger*. Under this test, the first step is to determine whether the convictions arise from the same act or transaction. The second step is to determine whether the elements of the offenses are the same. If each offense contains an element that the other offense does not, the statutes do not violate double jeopardy.

*Smith*, 436 S.W.3d at 767 (internal citations omitted).

In this case, Defendant's convictions do not satisfy the first step of the *Blockburger* test because they involve conduct on two different dates, and therefore, do not arise from the same transaction. The criminal contempt petition to which Defendant pled guilty charged him with misleading Ms. Smelser into believing that he was an active attorney on November 9, 2016, for failing to disclose to her on November 22, 2016, that he was suspended, and for contacting Ms. Smelser on January 4, 2017, while continuing to represent her. The indictment in case No. 2017-CR-548 charged Defendant with falsely holding himself out to her as a lawyer on November 9, 2016, and November 29, 2016. As such, the indictment charging Defendant with the offense on November 29, 2016, did not charge the same conduct as that conduct which formed the basis for his guilty plea for criminal contempt.

Defendant's convictions likewise do not satisfy the second step of the *Blockburger* test because each offense contains an element that the other does not. Contempt requires a mens rea not found in Tennessee Code Annotated section 23-3-108, the statute for falsely holding oneself out as a lawyer. Criminal contempt, as charged in this case, is defined as "[t]he willful disobedience or resistance of any officer of the such courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of such courts." T.C.A. § 29-9-102(3).

> Thus, the "four essential elements" of contempt in section 29-9-102(3) are (1) "the order alleged to have been violated must be 'lawful'"; (2) "the order alleged to have been violated must be clear, specific, and unambiguous"; (3) "the person alleged to have violated the order must have actually disobeyed or otherwise resisted the order"; and (4) "the person's violation of the order must be 'willful.'"

*State v. Matthews*, No. M2010-02601-CCA-R3-CD, 2011 WL 3798873, at *3 (Tenn. Crim. App. Aug. 26, 2011) (citation omitted). However, as previously discussed, section 23-3-108 is a strict liability offense and does not require a mens rea. Therefore, the two statutes have differing mens rea requirements and "pass *Blockburger's* same-elements test, and, as a result, prosecution of [Defendant] . . . does not violate the Double Jeopardy Clause of the United States Constitution." *Id.* at *4. Defendant is not entitled to relief on this claim.

## VII. Sentencing

Defendant argues that the sentence imposed by the trial court in this case was excessive because the trial court erroneously applied two enhancement factors and ordered him to serve partial consecutive sentences. The State responds that the trial court acted within its discretion in sentencing Defendant.

The trial court has broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* at 707. In *State v. Caudle*, our Supreme Court clarified that the "abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." 388 S.W.3d 273, 278-79 (Tenn. 2012). Under the Sentencing Act, trial courts are to consider the following factors when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;

(7) Any statement the defendant wishes to make on the defendant's own behalf about sentencing; and

(8) The result of the validated risk and needs assessment conducted by the department [of correction] and contained in the presentence report.

T.C.A. § 40-35-210(b).

Trial courts are "required ... to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. *See* T.C.A. §§ 40-35-114, -113; *see also Bise*, 380 S.W.3d at 701. Moreover, a trial court is "guided by – but not bound by – any applicable enhancement or mitigating factors when adjusting the length of a sentence[,]" and its "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706.

In this case, the record reflects that in sentencing Defendant, the trial court considered all appropriate principles set forth in Tennessee Code Annotated section 40-35-210(b). The trial court applied three enhancement factors to all counts, including Defendant's history of criminal convictions or behavior in addition to those necessary to establish the range; that Defendant abused a position of public or private trust or used a professional license in a manner that significantly facilitated the commission or the fulfillment of the offense, citing to the trust with the lawyer/client relationship; and the offense involved the theft of property and, as a result of the manner in which the offense was committed, the victim suffered significant damage to other property belonging to the victim or for which the victim was responsible. *See* T.C.A. § 40-35-114(1), (14), and (24). The trial court also applied enhancement factor three to Defendant's theft conviction in count three of case No. 2017-CR-548 because the offense involved more than one victim: Micheal Dycus and G.D., and factor seven to count one in case No. 2020-CR-133 because Defendant was on bond when he falsely held himself out as a lawyer to Mario Hererra. *Id.*, (3) and (7). Defendant argues that the trial court erred in applying factors one and twenty-four, but he does not contest the application of factors three, seven, and fourteen, and the record reflects that they were appropriately applied. The trial court reviewed mitigating factors proposed by Defendant and found that none applied in Defendant's case.

The record supports the trial court's findings with respect to enhancement factors one and twenty-four. The trial court based application of factor one on testimony from Ms. Taylor, Ms. Cela, Ms. Blades, and Ms. McInish at the sentencing hearing that Defendant took their $4,500 retainer fee but failed to perform any legal work on their cases. The court also considered Special Agent Gray's testimony that Defendant altered and fabricated documents related to his charges. The trial court observed that Defendant was found in criminal contempt by the supreme court, and he violated the law while on bond. Additionally, as pointed out by the State, Defendant had a pending theft charge in Davidson

County at the time of the sentencing hearing, and Ms. Brown testified at trial concerning that charge as further evidence of Defendant's history of criminal behavior. *See State v. Dixon*, No. M2021-01326-CCA-R3-CD, 2022 WL 5239289, at *23 (Tenn. Crim. App. Oct. 6, 2022) (observing that a trial court may consider pending charges as evidence of criminal behavior). We do not find any error in the trial court's application of this factor based on Defendant's history of criminal behavior.

As to factor twenty-four, the trial court found that this factor applied because the victims lost the potential for a favorable settlement or verdict in their cases and even lost their cause of action in some cases because of Defendant's conduct. The court noted that several victims had EEOC claims based on wrongful termination, and they were deprived of both employment and the opportunity to pursue a legal remedy for their cases because the time for filing such actions had expired due to Defendant's failure to pursue their cases as he had promised. Defendant argues in his brief that this factor does not apply because the General Assembly enacted this factor in response to the growing problem of scrap metal theft; however, nothing in the plain language of the statute concerning this factor limits its application to those specific types of theft of property cases. The trial court in this case correctly found that Defendant's thefts deprived the victims of both potential employment and the potential for a financial settlement or verdict, and the thefts also affected other compensation and benefits. We conclude that the trial court correctly applied factor twenty-four to Defendant's case. However, even if either this enhancement factor or factor one was not appropriately applied, mitigating and enhancement factors are advisory only, and erroneous application of enhancement and mitigating factors is no longer a basis to reverse a sentence. *See* T.C.A. § 40-35-114; *see also Bise*, 380 S.W.3d at 698, 704, 706; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008).

The trial court clearly stated on the record its reasons for the sentence imposed, and Defendant's sentences are within the appropriate range and "justly deserved in relation to the seriousness of the offense[s]" in this case. T.C.A. § 40-35-102(1). The record reflects that the trial court considered the purposes and principles of the Sentencing Act, the evidence adduced at the sentencing hearing which included the presentence report, the parties' arguments, and the nature and characteristics of the crimes. We cannot conclude that the trial court abused its discretion by sentencing Defendant to twelve years for the two convictions of theft of property greater than $60,000; six years for the three convictions of theft of property greater than $10,000 but less than $60,000; four years for the seven counts of theft of property greater than $2,500 but less than $10,000; two years for five of the convictions for falsely holding oneself out as a lawyer, and a one-year sentence for the sixth count of holding oneself out as a lawyer.

With respect to consecutive sentencing, our supreme court has held that the standard of review adopted in *Bise* "applies similarly" to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of

the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013). Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the following criteria by a preponderance of the evidence:

>  (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;
>
>  (2) The defendant is an offender whose record of criminal activity is extensive;
>
>  \*      \*      \*
>
>  (6) The defendant is sentenced for an offense committed while on probation[.]

T.C.A. § 40-35-115(b). In *Pollard*, the court reiterated that "[a]ny one of these grounds is a sufficient basis for the imposition of consecutive sentences." 432 S.W.3d at 862. "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.*; *Bise*, 380 S.W.3d at 705.

Here the record reflects that the trial court in sentencing Defendant found that Defendant is an offender whose record of criminal activity is extensive. T.C.A. § 40-35-115(b)(2). The court also pointed out that consecutive sentencing was mandatory for count one in case No. 2020-CR-133, because Defendant was on bond when he falsely held himself out as a lawyer to Mr. Hererra. *Id.* § 40-20-111(b). The trial court based its finding that Defendant's record of criminal activity is extensive on the eighteen felony convictions in this case committed over a six-year period, that Defendant was "disbarred three times," was "held in contempt by the supreme court," and "a receivership had to be established and a special master appointed to address these issues in the Sumner County Chancery Court." The court also pointed out that the "TBI was involved in the criminal investigations resulting in indictments in Sumner County and Davidson County[.]" Defendant continued practicing law while suspended and while on bond in one case. Defendant also owed approximately $323,931 in restitution to the victims in the theft cases. The trial court cited to the impact of the thefts on the victims and that Defendant repeatedly lied to conceal his thefts. The trial court concluded that confinement in this case was necessary to protect society, to avoid depreciating the seriousness of the offenses, and to provide an effective deterrent. *See* T.C.A. § 40-35-103. Defendant complains that the trial court failed to state that his sentence was no greater than that deserved for the offenses or that it was the least severe measure to achieve the purposes of sentences. However, the court was not required

to explicitly make this statement in its findings. *State v. Beasley*, No. M2022-00842-CCA-R3-CD, 2023 WL 5033142, at *5 (Tenn. Crim. App. Aug. 8, 2023), *no perm. app. filed*.

The trial court relied on *State v. Hatmaker*, No. 2017-01370-CCA-R3-CD, 2018 WL 2938395 (Tenn. Crim. App. June 8, 2018) to support its finding that Defendant's record of criminal activity was extensive. In *Hatmaker,* this court held that "[e]ven if a defendant has no prior convictions, current offenses may be used in determining criminal history for the purposes of consecutive sentencing." *Id.* at *11 (internal quotations omitted); *see also State v. Nobles*, No. M2006-00695-CCA-R3-CD, 2007 WL 677861, at *12 (Tenn. Crim. App. Mar. 7, 2007) (citing *State v. Cummings*, 868 S.W.2d 661 (Tenn. Crim. App. 1992)); *State v. Jones*, No. W2010-01080-CCA-R3-CD, 2011 WL 2162986 (Tenn. Crim. App. May 26, 2011). Additionally, as pointed out by the State, the trial court also properly relied on the BPR's restitution schedule as evidence of Defendant's criminal history. Although Defendant argues that the restitution schedule contained errors, he admitted to owing money to Mr. Dycus, Ms. Ponce, Mr. Brown, Ms. Taylor, Ms. Stollar, Ms. Prather, Ms. Brown, and Ms. Whitman. We cannot conclude that the trial court abused its discretion by ordering partial consecutive sentences in this case.

Accordingly, the trial court properly sentenced Defendant, and he is not entitled to relief on his claim that his sentence is excessive.

## VIII. Cumulative Error

Defendant contends that he is entitled to relief under the cumulative error doctrine. The cumulative error doctrine recognizes that there may be many errors that are harmless in isolation, but "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To warrant relief under the cumulative error doctrine, there must have been more than one actual error committed during the trial proceedings. *Id.* at 77. Because we have only found one error in this case, the cumulative error doctrine is inapplicable. Additionally, the error is harmless. Defendant is not entitled to relief.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed. However, we note that there are no judgment forms in the record for the counts in which the State entered a nolle prosequi before trial or that were dismissed during trial. These include counts one, four, six, seven, eight, ten, fifteen, seventeen, twenty, twenty-four, twenty-six, twenty-seven, and twenty-eight in case No. 2017-CR-548; and counts one, two, three, four, five, six, seven, eight, nine, and ten in case No. 2017-CR-875. A trial court must enter judgment "[i]f the defendant is found not guilty or for any other reason is entitled to be discharged." Tenn. R. Crim. P. 32(e)(3); *State v. Campbell*, No. W2022-01039-CCA-R3-

CD, 2023 WL 2968225, at *3 (Tenn. Crim. App. Apr. 17, 2023), *no perm. app. filed.* Therefore, we remand for entry of judgment forms reflecting the dismissal of those counts.

_____
JILL BARTEE AYERS, JUDGE